UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

William G. Stevens,
                    Plaintiff,

                                        Civil Action Docket
v.                                      No. 04-CV-11938 JLT

Robert Howland,
Joseph Murphy,
Robert Murphy,
Kathleen Dennehy,
Natalya Pushkina,
The Massachusetts Department of Corrections

AMENDED COMPLAINT

82.   The plaintiff re-alleges and incorporates all of the allegations contained in the 81 paragraphs of the origional complaint filed in this action.

ADDITIONAL PARTIES

83.   The defendant Natalya Pushkina (hereafter Pushkina) is a natural person, who is the librarian for the inmate library at the M.T.C., 30 Administration Road, Bridgewater, Plymouth County, Massachusetts.

84.   At all times relevant to this action the defendant Pushkina was acting under the color of law.

STATEMENT OF ADDITIONAL FACTS

COUNT VII THE DESTRUCTION OF THE MEDICINE BAG

85.   In 2001 Stevens was presented with a medicine bag by the elders of the Wiccan faith and an outside volunteer of the Native American Circle as a token of fellowship and thanks for work Stevens had done for both groups in N.C.C.I. Gardner.

86.   Stevens had the medicine bag in his possession when he was processed into the M.T.C.

87   The medicine bag was listed on Stevens' property list.

2

88. On August 18, 2004 Stevens' cell was shaken down by C.O. Moreton.

89. Stevens was not allowed to observe the shakedown.

90. During the shakedown C.O. Moreton opened the medicine bag by breaking or cutting the strings closing it, thereby desecrating the bag.

91. C.O. Moreton later told Stevens that he had dumped the contents of the medicine bag on the floor of the cell because, he claimed, he did not know what the bag or its contents were, thereby desecrating the contents of the bag.

92. Specific policies have been put into place by the D.O.C. governing medicine bags including size shape, material and contents just so religious rights wouldn't be violated in this manner.

93. Stevens wrote to the Superintendent on August 26, 2004 requesting that the administration post regulations governing medicine bags in roll call and on the I.M.S. computer. (Attached as exhibit 14).

94. Stevens filed grievance #5562 on August 7, 2004 requesting that the D.O.C. replace the medicine bag and its contents. (Attached as exhibit 15)

95. On October 7, 2004 Stevens received an answer from the Superintendent to the August 26, 2004 letter stating that no action would be taken. (Attached as exhibit 16)

96. On October 15, 2004 Stevens received an answer to grievance # 5562 with conflicting decisions (see exhibit 15).

97. Stevens asked the Institutional Grievance Coordinator to clarify his decision to grievance # 5562 but has, as yet, not received a response.

3

## COUNT VIII VIOLATIONS OF LIBRARY REGULATIONS

98.  On February 17, 2004 Stevens submitted material for
copying to defendant Pushkina, which Stevens intended to send
to his attorney who had never done a M.G.L. c. 123A case defense
before.

99.  These materials included motions and pleadings filed
by various lawyers of established competence in the M.G.L. c. 123A
field.

100.  Defendant Pushkina refused to copy these pleadings.

101.  On March 16, 2004 Stevens submitted a copy of the
United States Supreme Courts decision on Crawford v. Washington
to Pushkina requesting a copy be made for Stevens' attorney.

102.  Pushkina refused to make a copy of the decision and
cited the policy 103 MTC VII, f which provides that "Legal book
materials will not be copied."

103.  Stevens informed Pushkina that Crawford v. Washington
was still not available in published form, but had been sent
to another inmate from the internet.

104. Pushkina continued to refuse to make the requested
copies.

105.  Stevens filed grievance #3150 on March 20, 2004 and
cited the Code of Massachusetts Regulations 103 CMR 478.11 (4)(a)
which provides:

> "Photocopying services shall be for the purpose of
> duplicating origi·nal legal documents and for the purpose
> of increasing access to the legal collection."

106.  Stevens went on to point out that CMRs have the force
of law.  (Grievance attached as exhibit 17)

107.  On March 20, 2004 grievance #3150 was denied.

108.  On April 15, 2004 Stevens appealed the denial of

4

grievance #3150 to the Superintendent and was again denied.

109.  Defendant Pushkina also refuses to make copies of
regulations  or policies which apply to persons held at the
M.T.C.

110.  The policy which Pushkina aND THE Superintendent cite
in support of their refusal to make legal copies, purports to
have been approved by defendant Dennehy.


COUNT IX LEAST RESTRICTIVE ALTERNATIVE

111.  The defendants are holding Stevens in conditions of
confinement which far exceed the least restrictive alternative,
and which are substantially more restrictive and punitive than
the conditions under which Stevens was held while in prison.

112.  Stevens is being held in an 80 square foot cell which
was designed for one prisoner when the M.T.C. was built in 1985.
Another prisoner is being housed with Stevens in this cell,
which was designed for one.

113.  At Gardner Stevens had adequate storage space.  At
the M.T.C. Stevens has approximately 5 cubic feet of storage
space.  As origi nally designed, for single occupancy, the cells
at the M.T.C. provided over 20 cubic feet of storage space for
each prisoner.

114.At N.C.C.I. Gardner Stevens had access to the law library
6 days per week mornings, afternoons and evenings for a total
of 39 hours per week.  At the M.T.C. the law library is open
only 10.5 hours per week.  Because movement is often substantially
delayed and the libraries limited capacity of 23 prisoners is
often filled before Stevens can get there, the actual number
of hours the law library is available to Stevens is substantially

5

less.

115.    At the M.T.C. all law books must be checked out individually for use within the library, only one prisoner is allowed in each aisle of books at a time, prisoners are not allowed to scan through books such as the Federal Digest or Shepards Citations at the book shelves, but must sign out the book and return with it to the work table.  This was not the case at N.C.C.I. Gardner which facilitated legal research.

116.    At the M.T.C. the law library is combined in one single room with the general library.  This limits the total number of prisoners who can access the library, both law and general, to 23 at any given time.  This was not the case at N.C.C.I. Gardner where the law library alone exceeded the square footage of the entire library space at the M.T.C. Said space is inadequate to house both the law and general libraries.

117.    At N.C.C.I. Gardner Stevens could obtain copies of relevant legal cases and pleadings as well as make copies of such materials to share with other prisoners.  At the M.T.C. the Superintendent refuses to allow the law library to copy anything other than a prisoners own original legal work.  Stevens is unable to get copies of grievances or personal, business and official correspondence

118.    At N.C.C.I. Gardner Stevens had access to the yard up to 49 hours per week.  At the M.T.C. Stevens has access to the yard up to 18.5 hours per week.  (Both figures are the maximum numbers of hours on days when daylight is the longest.)

119.    The yards (2) at N.C.C.I. Gardner held a combined total of two running tracks, a softball field, three basketball

6

courts, three horseshoe pits, six sets of various workout bars and a Bocci pit.  At Gardner there are numerous benches to sit on and read at and there are picnic tables for prisoners to play games at.  At the M.T.C. there are no benches, bleachers or picnic tables in the yard and prisoners are prohibited from bringing books, papers or games to the yard.  They are also restricted to the size of portable radio that can be brought to the yard, which is not the case at Gardner.

120.  At the M.T.C. there are no bathroom facilities available to prisoners while on the yard, and prisoners are only allowed egress from the yard during scheduled movements. At N.C.C.I. Gardner Stevens and other prisoners had access to the bathrooms in the gyms at all times from the yard.

121.  At N.C.C.I. Gardner, a level 4 prison with a substantial proportion of sex offender prisoners, there are prisoner vegetable gardens, and an ice cream "shack" in the yard that sells ice cream and soft drinks to prisoners in the summer.  At M.C.I. Norfolk, a comparable level 4 facility, prisoners are allowed to plant and tend extensive flower gardens in the yard and on the grounds.  At the M.T.C. there is not a single flower, shrub or tree on the yard or grounds and prisoners are not even allowed to use snow shovels to shovel the track in the winter time so it goes unshoveled.

122.  At N.C.C.I. Gardner prisoners have access to the gym an average of 39 hours per week.  At the M.T.C. prisoners have access to the gym a maximum of 15 hours per week and this amount is frequently further limited due to ineffective staffing.

7

123.   At the gyms (2) at N.C.C.I. Gardner there are extensive
free weights and cardiovascular exercise machines as well as
areas where prisoners could bring games to play and prisoners
could bring walkmans or radios to listen to.  At the M.T.C.
there are no free weights, only one exercise bike and prisoners
are not allowed to bring radios, walkmans or any games to the
gym.

124.   At the M.T.C. there are 5 pages of detailed rules
for visitors and prisoners.  If a visitor arrives after the
scheduled movement has been completed, the visitor will be made
to wait up to 50 minutes before the prisoner is allowed to go
to the visiting room.  At N.C.C.I. Gardner prisoners are allowed
to go to the visiting room immediatly upon the arrival of their
visitor.

125.   At the M.T.C. all prisoners including Stevens are
required to be strip searched after every visit including those
from attorneys and doctors.

126.   Stevens is restricted to purchasing the same food,
clothing and appliances at the M.T.C. as all prisoners at level
4 facilities can buy.  At M.C.I. Norfolk, a comparable level
4 facility, prisoners can purchase hamburger, chicken, onions
peppers, garlic, oranges, bananas, apples, pancake mix, flour,
Crisco oil, olive oil and four flavors of Ben and Jerrys ice
cream.

127.   At N.C.C.I. Gardner Stevens was not limited to the
frequency at which he was allowed to order clothing and appliances.
At the M.T.C. Stevens is restricted to making one order per
90 day period for clothing and/or appliances.

8

128.  At N.C.C.I. Gardner there was a substantial number
of prisoners (40) working in prison industries where they could
earn up to $40.00 per week.  At the M.T.C. there are only 15
industries job slots which earn a maximum of $2.00 per day.
The prisoners at the M.T.C. remain slaves of the state.

129.  At N.C.C.I. Gardner there were educational programs
including; welding, small engine repair, horticulture, food
services and barber school.  At the M.T.C. there are no education
programs beyond the G.E.D. programs

130.  At N.C.C.I. Gardner, while working in the library,
Stevens had access to a word processor and typewriter with both
memory and spell check.  Prisoners who were housed at the M.T.C.
prior to 1997 are still allowed to keep personal computers and
printers in there cells while all new detainees and prisoners
are limited to using a plain electric typewriter without spell
check or memory.  Requests to the Superintendent for the purchase
of computers, by prisoners, are routinely unanswered or denied.

131.  At N.C.C.I. Gardner all of the showers used by Stevens
had standard shower controls which allowed Stevens to adjust
the water temperature and keep the water running for the entire
shower.  At the M.T.C. all showers have a push button control
which leaves the water tepid and on for only 15 -20 seconds
at a time.

132.  At N.C.C.I. Gardner Stevens could freely exchange
newspapers and magazines with other prisoners.  At the M.T.C.
Stevens is subjected to disciplinary action for doing so.

133.  At N.C.C.I. Gardner the chow hall was large enough
to accomodate the inmate population and allow sufficient time

9

to eat the meal.  At the M.T.C. there are not enough tables
to seat even a portion of the population, at its current level,
a level that continues to increase.  The prisoners are herded
through the chow hall at a rate that doesn't allow the D.O.C.s
allotted 20 minutes for prisoners to eat.  Stevens and other
prisoners have had to stand and eat their meals because no seats
were available which in turn causes the guards to begin yelling
at prisoners, telling them to "move out".

134.  The three week menu cycle of food served at the M.T.C.
is the same menu that is served at all other prisons by the
D.O.C.  While the food, if prepared in the manner prescribed
by the D.O.C. nutritionist in the Food Service Manual (issued
twice yearly and available at Gardner but not the M.T.C.), it
would undoubtably be nutritious, the preparation, at best
indifferent at worst attrocious and unpaletable, frequently
denying Stevens proper daily nutritional values.  There is no
accountability for mistakes in preparation, drastic deviation
from the recipies created by the D.O.C. nutritionist or portions
that are incorrect in size.  Superintendent Murphy has greeted
complaints about this with complete indifference and these
problems continue to recur.

135.  The same regulations and restrictions which apply
to criminals, whose conditions of confinement are designed to
punish, in the D.O.C. are applied to prisoners at the M.T.C.
It has been Stevens' experience that these regulations, set
out in Title 103 of the Code of Massachusetts Regulations, are
more zealously inforced at the M.T.C. than at other prison
facilities Stevens has been confined to.

136.  At N.C.C.I. Gardner as well as other prisons there is some form of a council which is, at least to a limited extent allowed to advocate on behalf of the prisoners with the prison administration, other comparable facilities also have "lifers" groups.  No such groups exist at the M.T.C.

137.  At the M.T.C. all "new" (post 1997) prisoners, including Stevens, are not allowed to purchase reading lamps. As a prisoner at N.C.C.I. Gardner Stevens, if assigned to a two man cell, would have had a reading lamp issued as part of the cell furniture.  Prisoners at the M.T.C. prior to 1997 who had lamps are allowed to keep them.  The cells at the M.T.C. are lit by a single 2 bulb, 4 foot, florescent fixture mounted in the center of the ceiling so that the top bunk completely blocks out the light from it.  In addition the prisoner housed in the top bunk has the light glaring into his eyes from 3 feet away.  The existing lighting was not designed for the instalation of bunk beds and is inadequate on the bottom bunk and over-whelming on the top bunk.

138.  At N.C.C.I. Gardner Stevens had access to the 15' x 30' space provided for Wiccan religious use mornings, afternoons and evenings six days a week.  Stevens had access to corporate worship items ie: candles, incense, chalices, altar, altar pentacle, altar statues of his deities and other miscellaneous accoutrements.  These items were all provided by the institution, out of programs and treatment funds.  These sacred items were available to Stevens at any time that Stevens had access to the religious space provided by Gardner.  Also contained within this space was an extensive resource and book library of Wiccan material.  On Wiccan holidays called Sabbats, the wiccan members

11

were allowed to provide canteen or garden food items for prep-
aration by the group for Sabbat feasts. For the 8 annual Sabbats
the Wiccan group met for all 3 movements of the day, or, for in
excess of 7 hours. At the M.T.C. an 8' x 8' room is provided for
a maximum of 90 minutes twice a week, there are no corporate
worship items, no resources or books, a $2\frac{1}{2}$ cubic foot locker
for storage which is kept at the far end of the institution,
a 10"x14"x12" box to use as an altar and for Sabbats the M.T.C.
provides whatever leftover and usually stale cake is left in
the chow hall.

139. At N.C.C.I. Gardner Stevens was allowed at least
a modicum of dignity during mandatory urinalyses in that he
was able to remain fully clothed while urinating into a cup.
At the M.T.C. Stevens and the other prisoners are required to
strip naked prior to giving a specimen.


COUNT X TELEPHONES

140. At the M.T.C., as well as all other correctional
facilities run by the D.O.C., all telephone calls made by
Stevens and all other prisoners are subject to monitoring and
recording. A recorded announcement interupts the the call
approximately every 7 - 8 minutes to announce that "this call
is from a correctional facility and is subject to monitoring
and recording." Stevens is limited to a pre-authorized list
of 15 phone numbers; 5 attorney numbers and 10 other persons
to whom calls can be made. The primary home phone numbers of
Stevens' immediate family; mother, father, sister and step-
siblings alone total 11 numbers, this list doesn't include
grandparents, Aunts, Uncles or cousins. Stevens may only

update his preapproved phone list once every three months.

141.  All phone calls made by Stevens and all other prisoners at the M.T.C. must be made collect using a carrier under contract with the D.O.C.

142.  The rates charged by the carrier under contract to the D.O.C. are substantially more expensive than those paid by the general public, particularly compared to rates charged when using pre-paid phone cards.

143.  For each call Stevens makes to family members, none of which are within the state of Massachusetts, the cost of the call is $3.95 for the first minute and $ .69 for each additional minute using the D.O.C. carrier.  The calls are further limited to 30 minutes requiring that the $3.69 cost of the first minute be paid each time the 30 minute limit expires.

144.  Under the contract with the carrier and regulations of the D.O.C. the carrier pays a commission on telephone tolls paid by Stevens and all other prisoners directly to the General Fund of the Commonwealth of Massachusetts.  103 CMR 482.07 (6).

145.  There is no authorization in the General Laws of Massachusetts for a commission to be charged prisoners for collect phone calls and to be paid into the General Fund.

146.  Limiting the number of persons Stevens may call, the duration of those calls, not allowing the use of custom calling features and the monitoring and recording of those calls is more restrictive than justified by any compelling government interest.

147.  In July 2003 the D.O.C. changed carriers for prisoner phone calls.  The new carrier will not allow collect phone calls from Stevens and other prisoners to a number of other carriers

13

including the carrier used by Stevens' father there-by denying
Stevens telephone contact with a key member of his support
structure.

## COUNT XI WAIVER OF CONFIDENTIALITY

148.  The defendants have refused to provide Stevens with
further sex offender treatment, unless Stevens agrees to waive
his Fifth Amendment Right not to incriminate himself and to
have his communications with a social worker or psychotherapist
remain confidential as provided by M.G.L. c. 112 § 135A and
c. 233 § 20B, and the Health Information Privacy Protection
Act.  A copy of the waiver of confidentiality the defendants
require Stevens and other prisoners to sign as a condition of
treatment is attached as exhibit 18 of this complaint.

## COUNT XII FAILURE TO PROVIDE TREATMENT

149.  To be detained or committed as a sexually dangerous
person as defined by M.G.L. c. 123A § 1, Stevens and all other
prisoners at the M.T.C. must have a mental abnormality or a
presonality disorder which "makes the person likely to engage
in sexual offenses if not confined to a secure facility."

150.  The defendants are not providing treatment for Stevens
or any other prisoner at the M.T.C. which substantially conforms
to accepted professional judgement and practice or standards.

151.  There is a  clear consensus among professionals
involved in the treatment of sex offenders that there is no
cure for sexual predation.  Brief for the Association for the
Treatment of Sexual Abusers, Amicus Curia, in Kansas v. Crane,

534 U.S. 407 (1997)

152.    There is no significant correlation between receiving sex offender treatment and reduced recidivism by sex offenders. Hanson, K.R. and Brussiere, M.T. (1998) Predicting   Relapse: A Meta-Analysis of Sexual Offender Recidivism, Journal of Consulting Psychology, 66, 348 - 362.

153.    The sex offender treatment program offered by the defendants to prisoners still serving their prison term, and partially completed by Stevens, can be completed in four years. For prisoners committed to the M.T.C. the same treatment becomes interminable, with the average length of time spent in the M.T.C. being 17 years, often without the defendant or their agents ever certifying that the prisoner has completed treatment.

154.    As a prerequisite to treatment at the M.T.C. the defendants insist that Stevens repeat earlier, successfully completed, phases of treatment.

155.    On information and belief the defendants have kept no statistics or other evidence, and have not published or otherwise disseminated any statistics or evidence of the effectiveness or lack of effectiveness of the treatment offered and received by Stevens while in their custody.

156.    The defendants and/or their agents have never disclosed to Stevens the risks and/or benifits of participation in the sex offender treatment program, so that Stevens can make an informed decision as to whether to participate in the program.

157.    On information and belief, many or all of the staff employed by the defendants to provide sex offender treatment to Stevens and other prisoners are not professionally qualified or competent to do so.

158.   The provider of sex offender treatment for the defendants, Forensic Health Services, Inc., has a major conflict of interest in providing sex offender treatment under contract to the defendant on a per capita basis, while at the same time determining which prisoners will be recomended for release from the M.T.C. and which prisoners will be committed to it, in violation of M.G.L. c. 268A, which prohibits any state contractor from participating in decisions in which the contractor has a financial interest.

## COUNT XIII VIOLATION OF THE MINIMUM
## STANDARDS OF FITNESS FOR HUMAN HABITATION

159.   The Massachusetts Department of Public Health has promulgated regulations which prescribe mandatory minimun standards of fitness for human habitation at 105 CMR 410.  These minimum standards apply to all dwelling units, unless otherwise provided for in the code.  Correctional Facilities operated by the Department of Correction are not subject to 105 CMR 410, but are subject to 105 CMR 451.  The Supreme Judicial Court has recently reaffirmed that the M.T.C. is a "secure mental health facility" not a "correctional facility".  Commonwealth v. Knapp, 441 Mass. 157, 168, 804 N.E.2d 885, 894 (2004), citing Doe v Gaughan, 808 F. 2d 871, 879 (1st Cir. 1986).

160.   105 CMR 410 provides that:

> 410.440 Minimum Square Footage
> (A) Every dwelling unit shall contain at least 150 square feet of floor space for the first occupant, and at least 100 square feet of floor space for each additional occupant the floor space to be calculated on the basis of total habitable room area.
>
> (B) In a dwelling unit, every room occupied for sleeping purposes by one occupant shall contain at least 70

16

square feet of floor space; every room occupied for
sleeping purposes by more than one occupant shall
contain at least 50 square feet of floor space for
each occupant.

(C) In a rooming unit, every room occupied for sleeping
purposes by one occupant shall contain at least 80
square feet of floor space; every room occupied for
sleeping purposes by more than one occupant shall
contain at least 60 square feet per occupant.

161.    The minimum health and sanitation standards for

correctional facilities regarding room size are recomended

standards and are not mandatory.   105 CMR 451.011 and 105 CMR 451.012

The recomended standards for room size in a correctional facility

are:

### 451.320 Cell Size: Existing Facilities

        Each cell or sleeping area in an existing facility
should contain at least 60 square feet of floor space
for each occupant, calculated on the basis of total
habitable room area, which does not include areas
where floor to ceiling height is less than eight feet.

### 451.321 Cell Size in New or Renovated Facilities

        Each cell in a new facility or a part of a facility
constructed after the effective date of 105 CMR 451.000
shoul contain:

(A)  For segregation and special management areas where
inmates are usually locked in for greater than ten
hours per day, at least 80 square feet of floor space
for a single inmate.

(B) For inmates usually locked in for less than ten
hours per day, contain at least 70 square feet of floor
space for a single inmate.
        Provided, however, two inmates may occupy a room
or cell designed for double occupancy which has a floor
space of 120 square feet.

162.  The cells at the MTC contain 80 square feet of total floor

sapce.   If one deducts the areas where the floor to ceiling

height is less than eight feet due to permanently attached

bunkbed, desk, toilet and wash basin, there is 57 square feet

of floor space in each cell at the M.T.C. where prisoners are

are secured in excess of ten hours per day.

163.    105 CMR 451.112 provides that:

> Each inmate and each employee shall have access to
> a toilet and hand washing sink at all times.

164.    Stevens and all other prisoners at the M.T.C. have
no access to a toilet when they are in the yard.  Stevens has
experienced extreme discomfort as a result of the lack of
toilet access.  Other prisoners simply relieve themselves against
the fence.

165.    Over five years ago the court in King v. Greenblatt,
53 F. Supp. 2d 117, 134, (D. Mass. 1999) noted:

> To be sure, there are issues in the day to day
> management of the Treatment Center.  Funds are being
> sought from capital planning funds to install toilet
> facilities accessable to the yard to attempt to address
> the residents' complaint about the lack of toilet
> facilities in the yard.

## COUNT XIV CLASSIFICATION

166.    Prior to being imprisoned at the M.T.C. Stevens
received a point based score under the defendnets' classification
system which would have classified Stevens to be placed in a
minimum security prison.  However, the defendents have arbitrarily
determined that no sex offenders shall be placed at a minimum
security prison or work release program.

167.    The M.T.C. is the sole institution for persons
imprisoned under  M.G.L. c. 123A, "and therefore it must
encompass all levels of security within one facility." King v.
Greenblatt, supra at 28.  Stevens is imprisoned at the M.T.C.
and is subject to the same high security procedures as apply
to other prisoners who have long histories of escapes, violence,

18

murder and rape, including rape while in prison or the M.T.C.

168.   Also imprisoned with Stevens at the M.T.C. are prisoners who are blind, paraplegic, elderly, infirm and suffering from profoundly disabling mental illness.

169.   There is no system of classification at the M.T.C. to provide different levels of security for different catagories of prisoners.

170.   An important element of sex offender treatment is to have a community access plan (CAP) which offers controlled access to the community.   King v. Greenblatt, supra at 131.

171.   There is no community access plan in operation at the M.T.C.

## COUNT XV LOSS OF PROPERTY

172.   On January 30, 2004 at 4:40 pm a petition to civilly commit Stevens was filed in the Barnstable Superior Court. The docket entery sheet for Commonwealth v. Stevens, Barnstable Superior Court Civil Case No. 04 cv    is attached as exhibit 19 of this complaint.

173.   This order was transmitted, presumably faxed, to the D.O.C. at sometime after the 4:40 pm. filing time.

174.   Stevens was informed by the cellhouse officer that he was being transfered to the M.T.C. shortly before 6:00pm.

175.   At that time Stevens was given (2) small trash bags (approximately 1 cubic foot each) to pack what he would be taking with him.

176.   Officer Amadon, senior cellhouse officer, instructed Stevens to place the remaining items of property in a wheeled

19

cart, place the cart in front of the officers station, and that the cart would be sent to property on February 2, 2004 when property re-opened.

177.  Between February 6, 2004 and April 8, 2004 Stevens made numerous inquiries regarding the status of the items of property he was forced to leave at N.C.C.I. Gardner.

178.  On April 8, 2004 Stevens filed grievance number 04-3362.  (Exhibit 20)

179.  On May 6, 2004 Stevens received a decision denying grievance 04-3362.  (Exhibit 20)

180.  As a part of Stevens' appeal to the decision denying grievance # 04-3362 Stevens made a Freedom of Information Act request pursuant to M.G.L. c. 66, Section 10, asking for any documents or records which contained any information indicating when the D.O.C. was notified of the order for detention, when transportation was notified as well as other documents which would prove that Stevens could not have had the conversation with D.O.C. Property Officers LaBrack and Tardiff which was used as the primary basis for denying grievance # 04-3362. (Exhibit 20)


COUNT XVI THE GRIEVANCE PROCESS

181.  The Superintendent has failed to provide Stevens with a fair, impartial, speedy and effective grievance process pursuant to M.G.L. c. 127, §38E.

182.  The Institutional Grievance Coordinator , Sargent Edington, is frequently moved to other job locations within the institution, which is ulitmately the decision of the Superintendent.

20

183.    This decision to staff the Institutional Grievance
Coordinators Office, on what amounts to a part time basis causes
substantial delays in the grievance process.

184.    Stevens has been frequently been subjected to
extensive delays between the time he has placed a grievance in
the institutional mail, the approved method of filing grievances,
and notification that the grievance has been received by the
grievance officer.

185.    Stevens has frequently been subjected to further
delays by the issuance of ten day extentions by the grievance
officer, in total disregard for the fact that 103 CMR 491.18
only allows ten day extentions to be granted by the Superintendent.

186.    Stevens has on few occasions had the grievance process
decided in his favor only to have that decision totally ignored
by the defendants. (See Exhibits 4, 9 and 21)

187.    Stevens has brought this to the attention of Edington,
the Superintendent and the D.O.T. at staff access.

188.    The defendants have taken no action to rectify the
non-compliance with grievance decisions issue, even though
specifically asked to by Stevens.


ADDITIONAL CAUSES OF ACTION


189.    The actionas of the defendant Pushkina in refusing
to make Stevens copies, which he is entitled to under regulations
of the Massachusetts Department of Corrections violates the
plaintiff's First Amendment Rights of freedom of expression and
to seek redress of grievance, and the plaintiff's rights under

the Fourteenth Amendment to access to the courts.  These violations of the plaintiffs rights entitle the plaintiff to damages and injunctive relief under 42 U.S.C. § 1983.

190.  The defendents have violated Stevens' right to substantive due process of law under the Fourteenth Amendment to the United States Constitution, and his rights  under M.G.L. c. 123A § 6A, by holding Stevens in conditions of confinement which far exceed the least restrictive alternative and which are substantially more restrictive than the punitive conditions of confinement under which Stevens was held while still serving his prison sentence.  Stevens is entitled to damages and injunctive relief against the defendent pursuant to 42 U.S.C. 1983 and declaratory and injunctive relief pursuant to M.G.L. c. 231A.

191.  Stevens is entitled to adequate treatment while being involuntarily confined by the defendents, as a matter of substantive due process under the Fourteenth Amendment to the United States Constitution.  Stevens may not be forced to waive his Fifth  Amendment right against self incrimination and his statutory rights to confidentiality in professional treatment as as condition of receiving the treatment which he is entitled to under the Fourteenth Amendment.  The defendents' failure to provide adequate treatment and their attempts to compel Stevens to waive his right to not incriminate himself and to have confidential professional treatment violate Stevens' civil rights and entitle Stevens to damages and injunctive relief under 42 U.S.C. § 1983.

192.  If the M.T.C. is a "secure mental health facility not a correctional facility" as the Massachusetts Supreme Judicial Court has ruled in Commonwealth v. Knapp, 441 Mass.

22

157, 168 (2004), then the minimum standards of fitness for human
habitation set out in 105 CMR 410 apply, and Stevens is entitled
to injunctive relief to enforce the minimum standards of human
habitation as provided by M.G.L. c. 111, § 127A, et seq.

193.  If the minimum standards of fitness for human habitation
set out in 105 CMR 410 do not apply, Stevens and all other persons
imprisoned at the M.T.C. are being deprived of equal protection
of the laws guaranteed by the Fourteenth Amendment to the
United States Constitution  by the defendants, and Stevens is
entitled to damages and innunctive relief pursuant to 42 U.S.C.
§1983.

194.  As applied to Stevens and all other persons imprisoned
at the M.T.C., M.G.L. c. 123A violates Stevens' right to substantive
due process.  As applied the statute is not narrowly tailored
to further a legitimate and compelling governmental interest.
The conditions of confinement at the M.T.C. are indistinguishable,
and in many cases more punitive than those of prison.  By design
the defendants have mandated that the same regulations apply
to both the M.T.C. and all other prisons of the Department of
Corrections.  In practice the conditions of confinement at the
M.T.C. are substantially more restrictive than the prison in
which Stevens was held in prior to the start of M.G.L. c. 123A
proceedings.  Although the courts have ended conditions which
were barbaric and inhumane at the M.T.C. in the 1970's, the
conditions of confinement still are no better than a poorly
run prison.  (See King v. Greenblatt, supra, for a description
of the appalling conditions which existed at the M.T.C. in the
1970's.)  The defendants continue to ignore major components

23

of prior court orders, including failing to implement a class-
ification system, a community access program, and least restrictive
non-punitive conditions of confinement. With the reenactment
of civil commitment in September of 1999 and the resultant
substantial influx of newly committed persons, the defendants
have made no provisions for adequate space for these newly committed
persons, and instead have willfully created a situation of
overcrowding in a facility that was already overcrowded by the
defendants' decision to treat state inmates using the same facilities.
There is neither the legislative, executive nor judicial will
to implement true civil commitment. Instead what is called
"civil commitment" is as chimerical as "seperate but equal"
and is nothing more than extended punishment. Stevens is entitled
to damages and injunctive relief under 42 U.S.C., §1983, because
M.G.L. c. 123A is unconstitutional as applied to himself.

195. Stevens is entitled to judicial review of the Super-
intendent and Edington's grievance decisions under M.G.L. c. 127,
§ 38H, in accordance with the standards set out in M.G.L. c. 30A,
§14, because the decisions are:

   a)  not supported by substantial evidence. (Exhibit 19)

   b)  based on errors of law, (Exhibits 4, 9, 17)

   c)  made upon unlawful procedure, (Exhibit 4, 9 and 17)

   d)  in excess of the statutory authority or jurisdiction
   of the D.O.C., (Exhibits 4, 9 and 17) and

   e)  arbitrary or capricious, an abuse of discression, or
   otherwise not in accordance with the law. (Exhibits 4, 9, 19 & 20)

196.   Stevens is further entitled to declaratory and injunctive relief under 42 U.S.C. §1983 and M.G.L. c. 231A declaring that the grievance procedure followed at the M.T.C. as applied to Stevens and all other prisoners at the M.T.C. violates M.G.L. c. 127, § 38E.


AMENDED CLASS ACTION

197.   As amended the plaintiff class also consists of all persons at the M.T.C. who are:

a)  being held in conditions of confinement which far exceed least restrictive alternative;

b)  being held in conditions which are far more punitive than prison;

c)  being denied adequate treatment;

d)  being compelled to choose between receiving treatment and waiving their Fifth Amendment right not to incriminate themselves as well as their statutory rights to confidential treatment;

e)  housed in a secure mental health facility which does not meet the minimum standards of fitness for human habitation;

f)  being subjected to "civil detainment" or "commitment" but as applied to the class is nothing more than an increase and continuation of the punishment for the crimes for which class members have completed their prison sentences; and

g)  who are being charged an unauthorized fee for telephone services.