ATTACHMENT A

| DATE | SCHE-DUALED LIB OPEN | ACTUAL LIB OPEN | LAW LIB ACCESS | LAW LIB CLOSE | ACTUAL LIB CLOSE | SCHE-DUALED LIB CLOSE | TOTAL SCHE-DUALED LIB TIME | ACTUAL TOTAL LIB TIME | TOTAL LAW LIB TIME |
|---|---|---|---|---|---|---|---|---|---|
| 8-19 | 1:00 | 2:30 | 2:40 | 3:30 | 3:40 | 4:00 | 180MIN | 70MIN | 50MIN |
| 8-20 | CLOSED | | | | | | | | |
| 8-21 | CLOSED | | | | | | | | |
| 8-22 | 1:00 | 1:45 | 1:55 | 2:20 | 2:30 | 4:00 | 180MIN | 45MIN | 25MIN |
| 8-23 | 8:30 | 9:10 | 9:20 | 10:30 | 10:40 | 10:50 | 150MIN | 90MIN | 70MIN |
| 8-24 | 1:00 | 1:30 | 1:40 | 2:35 | 2:45 | 4:00 | 180MIN | 75MIN | 55MIN |
| 8-24 | 7:00 | | | | | 8:45 | 105MIN | 0MIN | 0MIN |
| 8-25 | 8:30 | 9:15 | 9:25 | 10:30 | 10:40 | 10:50 | 150MIN | 85MIN | 65MIN |
| 8-26 | 1:00 | 1:30 | 1:40 | 1:50 | 2:00 | 4:00 | 180MIN | 30MIN | 10MIN |
| 8-27 | CLOSED | | | | | | | | |
| 8-28 | CLOSED | | | | | | | | |
| 8-29 | 1:00 | 1:40 | 1:50 | 2:20 | 2:30 | 4:00 | 180MIN | 50MIN | 30MIN |
| 8-30 | 8:30 | 9:10 | 9:20 | 10:10 | 10:20 | 10:50 | 150MIN | 70MIN | 50MIN |
| 8-31 | 1:00 | 1:45 | 1:55 | 3:35 | 3:45 | 4:00 | 180MIN | 120MIN | 100MIN |
| 8-31 | 7:00 | | | | | 8:45 | 105MIN | 0MIN | 0MIN |
| 9-1 | 8:30 | 9:15 | 9:25 | 10:30 | 10:40 | 10:50 | 150MIN | 85MIN | 65MIN |
| 9-2 | 1:00 | 1:45 | 1:55 | 2:20 | 2:30 | 4:00 | 180MIN | 45MIN | 25MIN |
| 9-3 | CLOSED | | | | | | | | |
| 9-4 | CLOSED | | | | | | | | |
| 9-5 | 1:00 | | | | | 4:00 | 180MIN | 0MIN | 0MIN |
| 9-6 | 8:30 | 9:15 | 9:25 | 10:30 | 10:40 | 10:50 | 150MIN | 85MIN | 65MIN |
| 9-7 | 1:00 | 1:45 | 1:55 | 3:35 | 3:45 | 4:00 | 180MIN | 120MIN | 100MIN |
| 9-7 | 7:00 | | | | | 8:45 | 105MIN | 0MIN | 0MIN |
| 9-8 | 8:30 | | | | | 10:50 | 150MIN | 0MIN | 0MIN |
| 9-9 | 1:00 | 2:05 | 2:15 | 2:20 | 2:20 | 4:00 | 180MIN | 15MIN | 5MIN |
| 9-10 | CLOSED | | | | | | | | |
| 9-11 | CLOSED | | | | | | | | |
| 9-12 | 1:00 | 2:00 | 2:10 | 3:30 | 3:40 | 4:00 | 180MIN | 100MIN | 80MIN |
| 9-13 | 8:30 | 9:00 | 9:10 | 10:30 | 10:40 | 10:50 | 150MIN | 100MIN | 80MIN |
| | | | | | | | 55H45M | 18H35M | 13H15 |

* The 10 minute difference between library access and access to legal materials is due to the fact that Pushkina refuses to allow access to the law library portion of the general library until movement has been completed.

* The 10 minute difference between law library close and general library close is due to the fact that Pushkina has implemented a policy that residents must return legal materials to the desk prior to inmate movement.

103 CMR 471.00: RELIGIOUS PROGRAMS AND SERVICES

Section

471.01: Purpose
471.02: Statutory Authorization
471.03: Cancellation
471.04: Applicability
471.05: Access to Regulations
471.06: Definitions
471.07: Inmate Access to Religious Programs and Services
471.08: Supervision of Inmate Religious Programs and Services
471.09: Range of Religious Activities and Services
471.10: Access of Visiting Clergy
471.11: Community Participation in Inmate Religious Activities
471.12: Access of Volunteer Chaplains
471.13: Program Assessment and Planning
471.14: Pre-Release Center Application
471.15: Annual Review Date
471.16: Severability Clause

471.01: Purpose

The purpose of 103 CMR 471.00 is to establish departmental guidelines regarding religious programs and services in the institutions of the Department of Correction. 103 CMR 471.00 is not intended to confer any procedural or substantive rights or any private cause of action not otherwise granted by state or federal law.

471.02: Statutory Authorization

103 CMR 471.00 is issued pursuant to M.G.L. c.124, §1 (c), (q), and c. 127, §§ 88 through 90.

471.03: Cancellation

103 CMR 471.00 cancels all previous departmental and institutional policy statements, bulletins, directives, orders, notices, rules or regulations regarding religious programs and services.

471.04: Applicability

103 CMR 471.00 is applicable to all employees and inmates at all state correctional institutions.

471.05: Access to Regulations

103 CMR 471.00 shall be maintained within the central policy file of the department and shall be accessible to all department employees. A copy shall also be maintained in each superintendent's central policy file and at each inmate library.

471.06: Definitions

Accredited Religious Group - A religious organization that is recognized by the Internal Revenue Service as a non-profit agency as designated for tax purposes.

Accredited Representative - Clergy authorized by the central or local governing body of a recognized religious group or denomination to represent that group or denomination in performing religious programs and services.

Approved Visiting Area - Areas so designated by the superintendent or a designee where inmates and their visitors may conduct visits.

471.07: continued

(d) All recognized inmate religious groups shall have equal access to the physical space, equipment and services which the institution normally provides for religious purposes.

(2) Security. No portion of 103 CMR 471.00 shall be interpreted or implemented in such a way as to threaten the security, safety or well-being of the institution, its visitors, inmates or staff.

(3) Limitation of Access. The superintendent or designee may limit religious programs, practices or services if such would threaten the security, safety or well-being of the institution, its visitors, inmates or staff, and where there are specific facts to substantiate the threat. Superintendents with questions regarding the limitation of religious programs, practices or services should contact the associate commissioner. All limitations of religious programs, practices and services will be documented via a letter to the associate commissioner.

(4) Cancellation of Programs and Services. The superintendent or designee shall have the right, without notice, to cancel, postpone, restrict, or limit an inmate's participation in any religious program, practice or service. This responsibility will be exercised only if the religious activity, or the inmate's participation in the activity, might jeopardize the security, safety or well-being of the institution, its visitors, inmates or staff. All cancellations, postponements or restrictions will be documented by the shift commander, and written notification and explanation will be given to the chaplain.

471.08: Supervision of Inmate Religious Programs and Services

(1) General. Inmate services and religious programs will be planned, supervised and directed by institution chaplains or by staff members connected with the chaplain's office who are charged by the superintendent with this responsibility.

(2) Institution Chaplain. The services of an institution chaplain shall be made available upon request at all institutions. The chaplain shall work under the direction of the program coordinator as well as the director of treatment or program director when on site at an institution. The program coordinator shall ensure that quality assurance standards are met by all chaplains.

(3) Qualifications for Selecting a Chaplain. The primary criterion in selecting a chaplain shall be the ability to meet the spiritual needs of prisoners. Indicators of that ability include seminary training, pastoral experience, prior experience in chaplaincy, clinical pastoral experience, counseling experience, and the ability to converse with, encourage and guide people who have spiritual and psychological needs. All candidates for chaplain positions must have one unit of clinical pastoral education or an equivalent training program. In order to establish the respect and confidence of the people the chaplain will be ministering, it is expected that a chaplain will bring to this ministry a sincere belief in the particular faith.

(4) Ecclesiastical Endorsement. The Jewish chaplain will have the endorsement of a rabbinical chaplaincy commission. The Catholic chaplain will have the endorsement of the Cardinal. The Protestant chaplain will have the endorsement of his/her local church and the appropriate ecclesiastical authority. The Muslim Chaplain will have the endorsement of the Imam of his local Masjid.

(5) Posting of Chaplain Positions. When a vacancy exists in any chaplaincy, postings will be made in accordance with Department policy. All postings will be approved by the associate commissioner.

(6) Appointment of Chaplains. When a vacancy exists in any chaplaincy, whether part-time or full-time, the following procedures will govern the selection of a chaplain. An interview committee will be coordinated by the program coordinator consisting of two members of the advisory committee on chaplains in state institutions, one institution chaplain, the program coordinator, and the superintendent of the institution or designee. In all possible cases, the institution chaplain should be at the institution where the vacancy exists. At least one member of the committee must be an accredited representative of the religious group for which the chaplain is being hired. All resumes received in application for a vacant position will be reviewed by the program coordinator.

471.09: continued

(b) Where religious holidays specify particular dietary requirements (e.g., Passover, month of Ramadan), special arrangements should be made so that inmates shall be able to adhere to their religious beliefs.

(6) Facilities for Services. Adequate space and equipment shall be provided for the conduct and administration of religious programs. Each institution shall make non-inmate clerical staff available to assist in handling confidential material. Accredited religions shall be provided a place for services. Based on security needs, the size of groups at services may be restricted if a determination is made of such a need by the superintendent or designee.

(7) Scheduling. To keep inmates and staff informed of religious program opportunities, institution chaplains will post religious program and service schedules in appropriate housing units.

(8) Special Services. With approval of the superintendent, special religious services may be scheduled with visitors and inmates.

(9) Religious publications. Inmates may have access to a reasonable number of religious publications. (See 103 CMR 481.00 *MAIL*.)

471.10: Access of Visiting Clergy

(1) General. Clergy of accredited religious groups shall be allowed access to the correctional facility under the conditions set forth in M.G.L. c.127, § 36A and 103 CMR 486.00, pertaining to attorney access.

(2) Normal and Special Visits. Clergy visits shall take place during normal visiting hours. However, under extenuating circumstances, special visits with clergy may be permitted for any reasonable purpose with the authorization of the superintendent or designee.

(3) Special Visiting Areas. Clergy visits shall normally be held in approved visiting areas. However, if these areas do not provide the degree of privacy which the clergy member deems appropriate for the purpose of the visit, then the clergy member may request that a special visiting area be provided. The superintendent of the institution or designee may identify any area of the institution as a special visiting area for clergy visits.

(4) Institution Access. Clergy members shall be expected to remain within approved visiting areas whenever they are visiting inmates. However, clergy members will be permitted access to all other areas of the institution used by the inmates (including living quarters and work areas), for any reasonable purpose, provided that the clergy member first obtains authorization from the superintendent or designee.

(5) Visiting clergy may be permitted to meet with more than one inmate where the following procedure is utilized:

(a) Any inquiries regarding pastoral visits will be referred to an institution chaplain.

(b) The institution chaplain will verify, on a case-by-case basis, the status of the inquiring clergy. After verification is made, the chaplain will notify the director of treatment.

(c) Clergy may then schedule visits with the inmates.

471.11: Community Participation in Inmate Religious Activities

(1) General. Each institution will actively encourage clergy and other members of community religious organizations to become involved in the inmate religious activities.

(2) Community Religious Volunteers. Any member of the community who is interested in acting as a volunteer in the inmate religious program shall initially be directed to the chaplain. Each person must be approved as a volunteer. (See 103 CMR 485.00 *VOLUNTEERS AND VOLUNTEER PROGRAMS*.)

# 103 CMR 478.00: LIBRARY SERVICES

Section

478.01: Purpose
478.02: Statutory Authorization
478.03: Cancellation
478.04: Applicability
478.05: Access to 103 CMR 478.00
478.06: Definitions
478.07: Staff
478.08: Budget
478.09: Facilities and Equipment
478.10: General Library Services
478.11: Legal Services
478.12: Operating Procedures
478.13: Collection Development
478.14: Responsible Staff
478.15: Annual Review
478.16: Severability

## 478.01: Purpose

The purpose of 103 CMR 478.00 is to establish department policy regarding library services e objective of 103 CMR 478.00 is to provide a guide for the planning, implementation and evaluation of li y services in all state correctional institutions.

## 478.02: Statutory Authorization

103 CMR 478.00 is issued pursuant to M.G.L. c. 124, § 1(c),(q)., and is consistent with M.G.L. c 7 § 19E(4).

## 478.03: Cancellation

103 CMR 478.00 cancels all previous Department policy statements, bulletins, directives, o d , notices, rules or regulations regarding Library Services.

## 478.04: Applicability

103 CMR 478.00 is applicable to all employees and inmates at all correctional institutions with n e Department of Correction.

## 478.05: Access to 103 CMR 478.00

103 CMR 478.00 shall be maintained within the Central Policy File of the Department and w ll e accessible to all Department employees. A copy of 103 CMR 478.00 shall also be maintained in e h Superintendent's Central Policy File and in each inmate library.

## 478.06: Definitions

Access - use of general and law library services on a scheduled basis.

Associate Commissioner of Reentry and Reintegration – the senior staff person whose duties include, but a e t limited to, the management of classification, programs, education, reentry and reintegration.

Audio-visual Equipment - any equipment needed to facilitate the use of non-print library material, such as il , filmstrips, slides, recordings, videos, *etc*.

Board of Library Commissioners - ("BLC") the state agency responsible for the establishment and develop n t of library media centers in state institutions.

Attachment 1

478.06: continued

Circulation - the activity of a library in lending books and other materials to borrowers and keeping records of the loans.

Collection - the total accumulation of all library materials provided by the library for its users, also called resources or holdings. It may consist of books, periodicals, pamphlets, records or tapes, filmstrips, slides, pictures, games, *etc*.

Commissioner - the Commissioner of Correction.

Inmate Management Systems (IMS) – The Department of Correction's automated information system that provides processing, storage and retrieval of inmate related information needed by Department personnel and other authorized users within the criminal justice system.

Inter-library Loan - a cooperative arrangement among libraries by which one library may borrow material from another.

Library Materials - the total bibliographic holdings or resources of the library consisting of books, periodicals, pamphlets, records, tapes, filmstrips, slides, pictures, games, etc.

Library Services - the total services rendered by the library to its users, including provision of information, reference, bibliographic aid, lending materials, reading guidance, etc.

Manager of Library Services - an employee designated by the Commissioner of the Department of Correction as being responsible for coordination of library services.

Media - printed and audiovisual forms of communication and any necessary equipment required to make them usable.

Network - a cooperative organization formed to provide services to members.

Superintendent – the Chief Administrative Officer of a state correctional institution.

Technical Services - all activities concerned with obtaining, organizing and processing library materials for use.

478.07: Staff

(1) Institution Librarian - A full time staff member holding either a Master's Degree in Library Science or Certification as a Professional Librarian. All institutions with an inmate population over 200 should be staffed with an institution librarian. All institution librarians shall be selected with the approval of the manager of library services.

(2) Library Aide - A staff member with either prior library experience or professional library assignment by the Superintendent to coordinate library services under the supervision of the Manager of Library Services at those institutions with an inmate population under 200 which do not have an institution librarian.

(3) Manager of Library Services - A full time staff member of the Department of Correction who coordinates and supervises library services for all institutions in the system. The Manager of Library Services shall have
a Master's Degree in Library Services or Certification as
a Professional Librarian. The Manager of Library Services, in conjunction with the appropriate institution personnel, shall participate in the goal setting and review process for all institution librarians and shall be a co-signatory on all librarian reviews.

(4) Institution librarians shall meet regularly to form and maintain a network for the purpose of communication, resource sharing, continuing education and training, and the development of cooperative projects and/or grant proposals. Librarians shall maintain communications and establish liaisons with their counterparts in similar institutions and in all types of libraries outside the institution.

478.07: continued

(5) Specifications for library personnel shall be written, to the extent feasible, with cooperation of the Department's Manager of Library Services, the institutional Director of Treatment, and the Consultant for Services to Institutions from the Massachusetts Board of Library Commissioners.

(6) Institutions may use inmates as library clerks, subject to the approval of the Superintendent and the institution librarian. Each institution shall develop procedures for the selection of inmate library clerks. This procedure shall include an application process through which each inmate is screened for eligibility as a library clerk. All inmate applicants must demonstrate basic literacy skills. Inmates must complete the approved training course prior to selection as a law library clerk. At IMS sites, institutional procedures ensure that special requirements of these positions shall be provided to the work assignment officer who shall enter the information in the Create Job Assignment Screen.

(7) The institution librarian shall be responsible for training inmates as general and law library clerks. Each institution shall develop procedures to insure that general and law library clerks are trained to perform routine library duties as circulation and technical services assistants. No inmate will be hired as a law library clerk without passing a qualifying exam. Each institution with an inmate population over 200 shall develop procedures for the delivery of the approved training course to train potential law library clerks

478.08: Budget

Each institution librarian or library aide shall make annual budget recommendations to the Superintendent and the Manager of Library Services. Advisory guidelines can be found in the *Library Standards for Adult Correctional Institutions.*

478.09: Facilities and Equipment

It is recommended that the correctional library be functional in design and inviting in appearance. The types of equipment and machinery will vary depending upon the services and programs of the institution and its library. All libraries should have typewriters, copying equipment, and audio-visual equipment.

478.10: General Library Services

(1) Purpose - The library is an information center for the institution. Library services support, broaden and strengthen the institution's program. The library provides a variety of services, materials and programs comparable to a public library. Advisory guidelines can be found in the *Library Standards for Adult Correctional Institutions.*

(2) The library should encompass a variety of services, materials, and programs. These should include but not be limited to:

(a) planned and continuous acquisition of materials;
(b) logical organization of materials for convenient use;
(c) circulation of materials to maximize use and satisfy informational, educational and recreational needs of users;
(d) reference and information services;
(e) reader's advisory services;
(f) promotional activities to publicize the library's resources;
(g) audio-visual programs; and
(h) motivational programs to attract users and encourage activities and participation in a variety of projects.

(3) The library should have cooperative inter-library loan affiliations with various segments of the library community to supplement its own print and non-print resources.

(4) In institutions with fewer than 200 inmates, the Manager of Library Services and the institutional staff member assigned by the Superintendent to be responsible for library services shall determine the best method for providing those services.

478.10: continued

(5) The library shall have copies of all unrestricted department and institution policies available for the staff and inmates.

478.11: Legal Services

(1) General - The constitutional right of access to the courts requires that, when requested, inmates receive assistance in preparing and filing legal papers. This assistance may include access to law library facilities, instruction in the use of legal materials and reference assistance. However, such assistance shall not include legal advice or direction of legal research on the part of library personnel.

(2) Law Collection - Each institution with an inmate population over 200 shall have a law collection. As suggested by federal and state court rulings and national standards, the law library should include at a minimum: state and federal constitutions, state statutes, state decisions, procedural rules and decisions and related commentaries, federal case law, court rules, practice treatises, citators, legal periodicals and digests.

(a) The law collection shall be maintained and updated by the institution librarian.

(b) Legal materials, with the exception of photocopies, shall not be circulated.

(3) Access - Library access shall be scheduled and coordinated by the librarian and shall be provided to all inmates within the institution. An inmate of any state correctional institution without an adequate law collection may request transportation to an institution with a law collection for the purpose of conducting legal research. This request shall be made in writing to the Superintendent or a designee. The Superintendent may provide access to legal assistance in lieu of Law Library Services as deemed appropriate.

(4) Photocopies

(a) Photocopying services shall be for the purpose of duplicating original legal documents. The Superintendent shall designate the staff members responsible for photocopying legal documents and legal reference materials.

(b) All photocopy requests shall be compiled within reasonable amounts at no charge. In order to provide photocopying services to all inmates, the Superintendent may establish guidelines and limits, subject to the review of the Commissioner or a designee.

(c) No photocopy request shall be processed unless the Department of Correction Legal Photocopying Request Form is completed and attached to the original legal document to be copied.

(d) The librarian shall make reasonable efforts to secure materials not in an institution's collection but available through established inter-library loan procedures.

(5) Supplies

(a) The institution shall make reasonable efforts to assist inmates in the preparation and processing of their legal documents. Items such as paper, pencils, envelopes and typewriters shall be provided to all inmates who request them and should be available free of charge. The Superintendent may establish guidelines and limits for such services, subject to the approval of the reviewing authority.

(b) Records shall be kept of access, photocopy use and supplies dispersed, including to whom supplies were dispersed.

478.12: Operating Procedures

(1) Library Services staff with the approval of the Superintendent, shall post a schedule of library hours and activities.

(2) Written procedures regarding daily operating procedures shall be established by the librarian with the approval of the Superintendent.

(3) An inventory of equipment and materials shall be conducted annually by the librarian.

478.12: continued

(4) Each Superintendent in cooperation with the librarian should establish procedures to ensure the s c ity of the library and the library collection.

(5) At IMS sites, supervisory staff shall ensure that all programs and activities are entered in the Cr te Institution Schedule screen. For programs or activities that require advance sign up, inmates shall be p a l on waiting lists and/or enrolled in Program Enrollment screen. This screen shall also be utilized to disc a ge inmates from programs. Program attendance should be documented daily in the Program/Work Attend n screen for all programs or activities where attendance is taken.

(6) At IMS sites, for programs/activities for which good time may be awarded, institutional proc d s shall ensure that program facilitators complete the Performance Rating screen on a monthly basis. Additionally, for those programs that require the completion of the program prior to the awarding of go c time, supervisory staff shall complete the Good Time for Program Completion screen after discharging h inmate from the program.

(7) At IMS sites, institutional procedures shall ensure that staff schedule inmate activities such as l library usage when such scheduling is done on an individual basis rather than on a unit or group basis u i the Inmate Schedule screen.

(8) At IMS sites, special events shall be documented in the Incident Report screen utilizing incid n type of "Institution Related: Special Event."

478.13: Collection Development

Library materials should be selected to meet the educational, informational, legal, cultur l d recreational needs of its users. These materials should be relevant to the needs and interests of the popu a n, reflect different reading levels, languages, special interest and ethnicity of inmates. See the *Library Standa d r Adult Correctional Institutions.*

To ensure that materials meet these needs, each library should have a written statement of poli y at defines the principles, purposes and criteria to be considered in the selection and maintenance of library materials. This statement should apply to gif s d donations as well as to purchased items. In addition, inmates may make suggestions for acquisitions o e librarian.

478.14: Responsible Staff

(1) The Manager of Library Services, under the direction of the Associate Commissioner of Reentr d Reintegration, is responsible for coordinating all programs and services for libraries within the Departm r of Correction and for monitoring and reviewing 103 CMR 478.00. The Manager shall also be the liaison w h e Board of Library Commissioners.

(2)The Superintendent of each institution in conjunction with the Library Services staff is responsibl r implementing 103 CMR 478.00 and developing procedures pursuant to its application.

478.15: Annual Review

103 CMR 478.00 shall be reviewed annually by the Commissioner or a designee. The party or p r s conducting the review shall develop a memorandum to the Commissioner with a copy to the Central Polic e indicating revisions, additions, or deletions which shall be included for the Commissioner's written appr .

478.16: Severability

If any article, section, subsection, sentence, clause or phrase of 103 CMR 478.00 is for any reason held to be unconstitutional, contrary to statute, in excess of the authority of the Commissioner or otherwise inoperative, such decision shall not affect the validity of any other article, section, subsection, sentence, clause or phrase of 103 CMR 478.00.

REGULATORY AUTHORITY

103 CMR 478.00: M.G.L. c. 124, § 1(c), (q).

**ATTACHMENT C**

## Ethical Principles of Psychologists and Code Of Conduct
## 2002

History and Effective Date Footnote

CONTENTS

INTRODUCTION AND APPLICABILITY

PREAMBLE

GENERAL PRINCIPLES

Principle A: Beneficence and Nonmaleficence
Principle B: Fidelity and Responsibility
Principle C: Integrity
Principle D: Justice
Principle E: Respect for People's Rights and Dignity

ETHICAL STANDARDS

*1. Resolving Ethical Issues*
1.01 Misuse of Psychologists' Work
1.02 Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority
1.03 Conflicts Between Ethics and Organizational Demands
1.04 Informal Resolution of Ethical Violations
1.05 Reporting Ethical Violations
1.06 Cooperating With Ethics Committees
1.07 Improper Complaints
1.08 Unfair Discrimination Against Complainants and Respondents

*2. Competence*
2.01 Boundaries of Competence
2.02 Providing Services in Emergencies
2.03 Maintaining Competence
2.04 Bases for Scientific and Professional Judgments
2.05 Delegation of Work to Others
2.06 Personal Problems and Conflicts

*3. Human Relations*
3.01 Unfair Discrimination
3.02 Sexual Harassment
3.03 Other Harassment
3.04 Avoiding Harm
3.05 Multiple Relationships
3.06 Conflict of Interest
3.07 Third-Party Requests for Services
3.08 Exploitative Relationships
3.09 Cooperation With Other Professionals
3.10 Informed Consent
3.11 Psychological Services Delivered To or Through Organizations
3.12 Interruption of Psychological Services

*4. Privacy And Confidentiality*
4.01 Maintaining Confidentiality
4.02 Discussing the Limits of Confidentiality
4.03 Recording
4.04 Minimizing Intrusions on Privacy
4.05 Disclosures
4.06 Consultations
4.07 Use of Confidential Information for Didactic or Other Purposes

*5. Advertising and Other Public Statements*
5.01 Avoidance of False or Deceptive Statements
5.02 Statements by Others
5.03 Descriptions of Workshops and Non-Degree-Granting Educational Programs
5.04 Media Presentations
5.05 Testimonials
5.06 In-Person Solicitation

*6. Record Keeping and Fees*
6.01 Documentation of Professional and Scientific Work and Maintenance of Records
6.02 Maintenance, Dissemination, and Disposal of Confidential Records of Professional and Scientific Work
6.03 Withholding Records for Nonpayment
6.04 Fees and Financial Arrangements
6.05 Barter With Clients/Patients
6.06 Accuracy in Reports to Payors and Funding Sources
6.07 Referrals and Fees

*7. Education and Training*
7.01 Design of Education and Training Programs
7.02 Descriptions of Education and Training Programs
7.03 Accuracy in Teaching
7.04 Student Disclosure of Personal Information
7.05 Mandatory Individual or Group Therapy
7.06 Assessing Student and Supervisee Performance
7.07 Sexual Relationships With Students and Supervisees

*8. Research and Publicatio*
8.01 Institutional Approval
8.02 Informed Consent to R s rch
8.03 Informed Consent for R rding Voices and Images in Resea
8.04 Client/Patient, Student, a Subordinate Research Parti nts
8.05 Dispensing With Inform Consent for Research
8.06 Offering Inducements f r Research Participation
8.07 Deception in Research
8.08 Debriefing
8.09 Humane Care and Use f Animals in Research
8.10 Reporting Research Re s
8.11 Plagiarism
8.12 Publication Credit
8.13 Duplicate Publication o ta
8.14 Sharing Research Data c Verification
8.15 Reviewers

*9. Assessment*
9.01 Bases for Assessments
9.02 Use of Assessments
9.03 Informed Consent in Assessments
9.04 Release of Test Data
9.05 Test Construction
9.06 Interpreting Assessmen sults
9.07 Assessment by Unquali Persons
9.08 Obsolete Tests and Out d Test Results
9.09 Test Scoring and Interp e ion Services
9.10 Explaining Assessment R ults
9.11. Maintaining Test Secur

*10. Therapy*
10.01 Informed Consent to T py
10.02 Therapy Involving Cou or Families
10.03 Group Therapy
10.04 Providing Therapy to T e Served by Others
10.05 Sexual Intimacies With C rent Therapy Clients/Patients
10.06 Sexual Intimacies With Relatives or Significant Othe f Current Therapy Clients/Pati
10.07 Therapy With Former S al Partners
10.08 Sexual Intimacies With F mer Therapy Clients/Patients
10.09 Interruption of Therapy
10.10 Terminating Therapy



**INTRODUCTION AND APPLICABILITY**

The American Psychological Association's (APA's) Ethical Principles of Psychologists and Code of Conduct (here ir fter referred to as the Ethics Code) consists of an Introduction, a Preamble, five General Principles (A – E), and spec fi Ethical Standards. The Introduction discusses the intent, organization, procedural considerations, and scope of application of the Ethics Code. The Preamble and General Principles are aspirational goals to guide psychologist ward the highest ideals of psychology. Although the Preamble and General Principles are not themselves enforceable u s, they should be considered by psychologists in arriving at an ethical course of action. The Ethical Standards set fc rt enforceable rules for conduct as psychologists. Most of the Ethical Standards are written broadly, in order to appl psychologists in varied roles, although the application of an Ethical Standard may vary depending on the context. T e Ethical Standards are not exhaustive. The fact that a given conduct is not specifically addressed by an Ethical St n ard does not mean that it is necessarily either ethical or unethical.

This Ethics Code applies only to psychologists' activities that are part of their scientific, educational, or profession al les as psychologists. Areas covered include but are not limited to the clinical, counseling, and school practice of psyc ogy; research; teaching; supervision of trainees; public service; policy development; social intervention; development f assessment instruments; conducting assessments; educational counseling; organizational consulting; forensic ac es; program design and evaluation; and administration. This Ethics Code applies to these activities across a variety f contexts, such as in person, postal, telephone, internet, and other electronic transmissions. These activities shall b distinguished from the purely private conduct of psychologists, which is not within the purview of the Ethics Code.

Membership in the APA commits members and student affiliates to comply with the standards of the APA Ethics e and to the rules and procedures used to enforce them. Lack of awareness or misunderstanding of an Ethical Sta rd is not itself a defense to a charge of unethical conduct.

The procedures for filing, investigating, and resolving complaints of unethical conduct are described in the curren les and Procedures of the APA Ethics Committee. APA may impose sanctions on its members for violations of the s a lards of the Ethics Code, including termination of APA membership, and may notify other bodies and individuals of its a ns. Actions that violate the standards of the Ethics Code may also lead to the imposition of sanctions on psychologist students whether or not they are APA members by bodies other than APA, including state psychological associat , other professional groups, psychology boards, other state or federal agencies, and payors for health services. In a ition, APA may take action against a member after his or her conviction of a felony, expulsion or suspension from an af il ed state psychological association, or suspension or loss of licensure. When the sanction to be imposed by APA is le s han expulsion, the 2001 Rules and Procedures do not guarantee an opportunity for an in-person hearing, but generall provide that complaints will be resolved only on the basis of a submitted record.

The Ethics Code is intended to provide guidance for psychologists and standards of professional conduct that car applied by the APA and by other bodies that choose to adopt them. The Ethics Code is not intended to be a basi civil liability. Whether a psychologist has violated the Ethics Code standards does not by itself determine whether the psychologist is legally liable in a court action, whether a contract is enforceable, or whether other legal consequer c occur.

The modifiers used in some of the standards of this Ethics Code (e.g., *reasonably, appropriate, potentially*) are in ed in the standards when they would (1) allow professional judgment on the part of psychologists, (2) eliminate injustic inequality that would occur without the modifier, (3) ensure applicability across the broad range of activities condu by psychologists, or (4) guard against a set of rigid rules that might be quickly outdated. As used in this Ethics Code, th term *reasonable* means the prevailing professional judgment of psychologists engaged in similar activities in similar circumstances, given the knowledge the psychologist had or should have had at the time.

In the process of making decisions regarding their professional behavior, psychologists must consider this Ethics le in addition to applicable laws and psychology board regulations. In applying the Ethics Code to their professional w r psychologists may consider other materials and guidelines that have been adopted or endorsed by scientific and professional psychological organizations and the dictates of their own conscience, as well as consult with others n the field. If this Ethics Code establishes a higher standard of conduct than is required by law, psychologists must mee e higher ethical standard. If psychologists' ethical responsibilities conflict with law, regulations, or other governing le a authority, psychologists make known their commitment to this Ethics Code and take steps to resolve the conflict ir responsible manner. If the conflict is unresolvable via such means, psychologists may adhere to the requirements c he law, regulations, or other governing authority in keeping with basic principles of human rights.

## PREAMBLE

Psychologists are committed to increasing scientific and professional knowledge of behavior and people's understanding of themselves and others and to the use of such knowledge to improve the condition of individuals, organizations, and society. Psychologists respect and protect civil and human rights and the central importance of freedom of inquiry and expression in research, teaching, and publication. They strive to help the public in developing informed judgments and choices concerning human behavior. In doing so, they perform many roles, such as researcher, educator, diagnostician, therapist, supervisor, consultant, administrator, social interventionist, and expert witness. This Ethics Code provides a common set of principles and standards upon which psychologists build their professional and scientific work.

This Ethics Code is intended to provide specific standards to cover most situations encountered by psychologists. It has as its goals the welfare and protection of the individuals and groups with whom psychologists work and the education of members, students, and the public regarding ethical standards of the discipline.

The development of a dynamic set of ethical standards for psychologists' work-related conduct requires a personal commitment and lifelong effort to act ethically; to encourage ethical behavior by students, supervisees, employees, and colleagues; and to consult with others concerning ethical problems.

## GENERAL PRINCIPLES

This section consists of General Principles. General Principles, as opposed to Ethical Standards, are aspirational in nature. Their intent is to guide and inspire psychologists toward the very highest ethical ideals of the profession. General Principles, in contrast to Ethical Standards, do not represent obligations and should not form the basis for imposing sanctions. Relying upon General Principles for either of these reasons distorts both their meaning and purpose.

### Principle A: Beneficence and Nonmaleficence

Psychologists strive to benefit those with whom they work and take care to do no harm. In their professional actions, psychologists seek to safeguard the welfare and rights of those with whom they interact professionally and other affected persons, and the welfare of animal subjects of research. When conflicts occur among psychologists' obligations or concerns, they attempt to resolve these conflicts in a responsible fashion that avoids or minimizes harm. Because psychologists' scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence. Psychologists strive to be aware of the possible effect of their own physical and mental health on their ability to help those with whom they work.

### Principle B: Fidelity and Responsibility

Psychologists establish relationships of trust with those with whom they work. They are aware of their professional and scientific responsibilities to society and to the specific communities in which they work. Psychologists uphold professional standards of conduct, clarify their professional roles and obligations, accept appropriate responsibility for their behavior, and seek to manage conflicts of interest that could lead to exploitation or harm. Psychologists consult with, refer to, or cooperate with other professionals and institutions to the extent needed to serve the best interests of those with whom they work. They are concerned about the ethical compliance of their colleagues' scientific and professional conduct. Psychologists strive to contribute a portion of their professional time for little or no compensation or personal advantage.

### Principle C: Integrity

Psychologists seek to promote accuracy, honesty, and truthfulness in the science, teaching, and practice of psychology. In these activities psychologists do not steal, cheat, or engage in fraud, subterfuge, or intentional misrepresentation of fact. Psychologists strive to keep their promises and to avoid unwise or unclear commitments. In situations in which deception may be ethically justifiable to maximize benefits and minimize harm, psychologists have a serious obligation to consider the need for, the possible consequences of, and their responsibility to correct any resulting mistrust or other harmful effects that arise from the use of such techniques.

### Principle D: Justice

Psychologists recognize that fairness and justice entitle all persons to access to and benefit from the contributions of psychology and to equal quality in the processes, procedures, and services being conducted by psychologists. Psychologists exercise reasonable judgment and take precautions to ensure that their potential biases, the boundaries of their competence, and the limitations of their expertise do not lead to or condone unjust practices.

**Principle E: Respect for People's Rights and Dignity**

Psychologists respect the dignity and worth of all people, and the rights of individuals to privacy, confidentiality, and self-determination. Psychologists are aware that special safeguards may be necessary to protect the rights and welfare of persons or communities whose vulnerabilities impair autonomous decision making. Psychologists are aware of and respect cultural, individual, and role differences, including those based on age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status and consider these factors when working with members of such groups. Psychologists try to eliminate the effect on their work of biases based on those factors, and they do not knowingly participate in or condone activities of others based upon such prejudices.

## ETHICAL STANDARDS

### 1. Resolving Ethical Issues

**1.01 Misuse of Psychologists' Work**
If psychologists learn of misuse or misrepresentation of their work, they take reasonable steps to correct or minimize the misuse or misrepresentation.

**1.02 Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority**
If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists make known their commitment to the Ethics Code and take steps to resolve the conflict. If the conflict is unresolvable via such means, psychologists may adhere to the requirements of the law, regulations, or other governing legal authority.

**1.03 Conflicts Between Ethics and Organizational Demands**
If the demands of an organization with which psychologists are affiliated or for whom they are working conflict with this Ethics Code, psychologists clarify the nature of the conflict, make known their commitment to the Ethics Code, and to the extent feasible, resolve the conflict in a way that permits adherence to the Ethics Code.

**1.04 Informal Resolution of Ethical Violations**
When psychologists believe that there may have been an ethical violation by another psychologist, they attempt to resolve the issue by bringing it to the attention of that individual, if an informal resolution appears appropriate and the intervention does not violate any confidentiality rights that may be involved. (See also Standards 1.02, Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority, and 1.03, Conflicts Between Ethics and Organizational Demands.)

**1.05 Reporting Ethical Violations**
If an apparent ethical violation has substantially harmed or is likely to substantially harm a person or organization and is not appropriate for informal resolution under Standard 1.04, Informal Resolution of Ethical Violations, or is not resolved properly in that fashion, psychologists take further action appropriate to the situation. Such action might include referral to state or national committees on professional ethics, to state licensing boards, or to the appropriate institutional authorities. This standard does not apply when an intervention would violate confidentiality rights or when psychologists have been retained to review the work of another psychologist whose professional conduct is in question. (See also Standard 1.02, Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority.)

**1.06 Cooperating With Ethics Committees**
Psychologists cooperate in ethics investigations, proceedings, and resulting requirements of the APA or any affiliated state psychological association to which they belong. In doing so, they address any confidentiality issues. Failure to cooperate is itself an ethics violation. However, making a request for deferment of adjudication of an ethics complaint pending the outcome of litigation does not alone constitute noncooperation.

**1.07 Improper Complaints**
Psychologists do not file or encourage the filing of ethics complaints that are made with reckless disregard for or willful ignorance of facts that would disprove the allegation.

**1.08 Unfair Discrimination Against Complainants and Respondents**
Psychologists do not deny persons employment, advancement, admissions to academic or other programs, tenure, or promotion, based solely upon their having made or their being the subject of an ethics complaint. This does not preclude taking action based upon the outcome of such proceedings or considering other appropriate information.

### 2. Competence

**2.01 Boundaries of Competence**
(a) Psychologists provide services, teach, and conduct research with populations and in areas only within the boundaries of their competence, based on their education, training, supervised experience, consultation, study, or professional experience.

(b) Where scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, or socioeconomic status is essential for effective implementation of their services or research, psychologists have or obtain the training, experience, consultation, or supervision necessary to ensure the competence of their services, or they make appropriate referrals, except as provided in Standard 2.02, Providing Services in Emergencies.

(c) Psychologists planning to provide services, teach, or conduct research involving populations, areas, techniques, or technologies new to them undertake relevant education, training, supervised experience, consultation, or study.

(d) When psychologists are asked to provide services to individuals for whom appropriate mental health services are not available and for which psychologists have not obtained the competence necessary, psychologists with closely related prior training or experience may provide such services in order to ensure that services are not denied if they make a reasonable effort to obtain the competence required by using relevant research, training, consultation, or study.

(e) In those emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists nevertheless take reasonable steps to ensure the competence of their work and to protect clients/patients, students, supervisees, research participants, organizational clients, and others from harm.

(f) When assuming forensic roles, psychologists are or become reasonably familiar with the judicial or administrative rules governing their roles.

**2.02 Providing Services in Emergencies**
In emergencies, when psychologists provide services to individuals for whom other mental health services are not available and for which psychologists have not obtained the necessary training, psychologists may provide such services in order to ensure that services are not denied. The services are discontinued as soon as the emergency has ended or appropriate services are available.

**2.03 Maintaining Competence**
Psychologists undertake ongoing efforts to develop and maintain their competence.

**2.04 Bases for Scientific and Professional Judgments**
Psychologists' work is based upon established scientific and professional knowledge of the discipline. (See also Standards 2.01e, Boundaries of Competence, and 10.01b, Informed Consent to Therapy.)

**2.05 Delegation of Work to Others**
Psychologists who delegate work to employees, supervisees, or research or teaching assistants or who use the services of others, such as interpreters, take reasonable steps to (1) avoid delegating such work to persons who have a multiple relationship with those being served that would likely lead to exploitation or loss of objectivity; (2) authorize only those responsibilities that such persons can be expected to perform competently on the basis of their education, training, or experience, either independently or with the level of supervision being provided; and (3) see that such persons perform these services competently. (See also Standards 2.02, Providing Services in Emergencies; 3.05, Multiple Relationships; 4.01, Maintaining Confidentiality; 9.01, Bases for Assessments; 9.02, Use of Assessments; 9.03, Informed Consent in Assessments; and 9.07, Assessment by Unqualified Persons.)

**2.06 Personal Problems and Conflicts**
(a) Psychologists refrain from initiating an activity when they know or should know that there is a substantial likelihood that their personal problems will prevent them from performing their work-related activities in a competent manner.

(b) When psychologists become aware of personal problems that may interfere with their performing work-related duties adequately, they take appropriate measures, such as obtaining professional consultation or assistance, and determine whether they should limit, suspend, or terminate their work-related duties. (See also Standard 10.10, Terminating Therapy.)

## 3. Human Relations

**3.01 Unfair Discrimination**
In their work-related activities, psychologists do not engage in unfair discrimination based on age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, socioeconomic status, or any basis proscribed by law.

**3.02 Sexual Harassment**
Psychologists do not engage in sexual harassment. Sexual harassment is sexual solicitation, physical advances, or verbal or nonverbal conduct that is sexual in nature, that occurs in connection with the psychologist's activities or roles as a psychologist, and that either (1) is unwelcome, is offensive, or creates a hostile workplace or educational environment, and the psychologist knows or is told this or (2) is sufficiently severe or intense to be abusive to a reasonable person

the context. Sexual harassment can consist of a single intense or severe act or of multiple persistent or pervasive acts. (See also Standard 1.08, Unfair Discrimination Against Complainants and Respondents.)

**3.03 Other Harassment**
Psychologists do not knowingly engage in behavior that is harassing or demeaning to persons with whom they interact in their work based on factors such as those persons' age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, or socioeconomic status.

**3.04 Avoiding Harm**
Psychologists take reasonable steps to avoid harming their clients/patients, students, supervisees, research participants, organizational clients, and others with whom they work, and to minimize harm where it is foreseeable and unavoidable.

**3.05 Multiple Relationships**
(a) A multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person, (2) at the same time is in a relationship with a person closely associated with or related to the person with whom the psychologist has the professional relationship, or (3) promises to enter into another relationship in the future with the person or a person closely associated with or related to the person.

A psychologist refrains from entering into a multiple relationship if the multiple relationship could reasonably be expected to impair the psychologist's objectivity, competence, or effectiveness in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists

Multiple relationships that would not reasonably be expected to cause impairment or risk exploitation or harm are not unethical.

(b) If a psychologist finds that, due to unforeseen factors, a potentially harmful multiple relationship has arisen, the psychologist takes reasonable steps to resolve it with due regard for the best interests of the affected person and maximal compliance with the Ethics Code.

(c) When psychologists are required by law, institutional policy, or extraordinary circumstances to serve in more than one role in judicial or administrative proceedings, at the outset they clarify role expectations and the extent of confidentiality and thereafter as changes occur. (See also Standards 3.04, Avoiding Harm, and 3.07, Third-Party Requests for Services.)

**3.06 Conflict of Interest**
Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to (1) impair their objectivity, competence, or effectiveness in performing their functions as psychologists or (2) expose the person or organization with whom the professional relationship exists to harm or exploitation.

**3.07 Third-Party Requests for Services**
When psychologists agree to provide services to a person or entity at the request of a third party, psychologists attempt to clarify at the outset of the service the nature of the relationship with all individuals or organizations involved. This clarification includes the role of the psychologist (e.g., therapist, consultant, diagnostician, or expert witness), an identification of who is the client, the probable uses of the services provided or the information obtained, and the fact that there may be limits to confidentiality. (See also Standards 3.05, Multiple Relationships, and 4.02, Discussing the Limits of Confidentiality.)

**3.08 Exploitative Relationships**
Psychologists do not exploit persons over whom they have supervisory, evaluative, or other authority such as clients/patients, students, supervisees, research participants, and employees. (See also Standards 3.05, Multiple Relationships; 6.04, Fees and Financial Arrangements; 6.05, Barter With Clients/Patients; 7.07, Sexual Relationships With Students and Supervisees; 10.05, Sexual Intimacies With Current Therapy Clients/Patients; 10.06, Sexual Intimacies With Relatives or Significant Others of Current Therapy Clients/Patients; 10.07, Therapy With Former Sexual Partners; and 10.08, Sexual Intimacies With Former Therapy Clients/Patients.)

**3.09 Cooperation With Other Professionals**
When indicated and professionally appropriate, psychologists cooperate with other professionals in order to serve their clients/patients effectively and appropriately. (See also Standard 4.05, Disclosures.)

**3.10 Informed Consent**
(a) When psychologists conduct research or provide assessment, therapy, counseling, or consulting services in person or via electronic transmission or other forms of communication, they obtain the informed consent of the individual or individuals using language that is reasonably understandable to that person or persons except when conducting such activities without consent is mandated by law or governmental regulation or as otherwise provided in this Ethics Code.

(See also Standards 8.02, Informed Consent to Research; 9.03, Informed Consent in Assessments; and 10.01, Informed Consent to Therapy.)

(b) For persons who are legally incapable of giving informed consent, psychologists nevertheless (1) provide an appropriate explanation, (2) seek the individual's assent, (3) consider such persons' preferences and best interests, and (4) obtain appropriate permission from a legally authorized person, if such substitute consent is permitted or required by law. When consent by a legally authorized person is not permitted or required by law, psychologists take reasonable steps to protect the individual's rights and welfare.

(c) When psychological services are court ordered or otherwise mandated, psychologists inform the individual of the nature of the anticipated services, including whether the services are court ordered or mandated and any limits of confidentiality, before proceeding.

(d) Psychologists appropriately document written or oral consent, permission, and assent. (See also Standards 8.02, Informed Consent to Research; 9.03, Informed Consent in Assessments; and 10.01, Informed Consent to Therapy.)

**3.11 Psychological Services Delivered To or Through Organizations**
(a) Psychologists delivering services to or through organizations provide information beforehand to clients and when appropriate those directly affected by the services about (1) the nature and objectives of the services, (2) the intended recipients, (3) which of the individuals are clients, (4) the relationship the psychologist will have with each person and the organization, (5) the probable uses of services provided and information obtained, (6) who will have access to the information, and (7) limits of confidentiality. As soon as feasible, they provide information about the results and conclusions of such services to appropriate persons.

(b) If psychologists will be precluded by law or by organizational roles from providing such information to particular individuals or groups, they so inform those individuals or groups at the outset of the service.

**3.12 Interruption of Psychological Services**
Unless otherwise covered by contract, psychologists make reasonable efforts to plan for facilitating services in the event that psychological services are interrupted by factors such as the psychologist's illness, death, unavailability, relocation, or retirement or by the client's/patient's relocation or financial limitations. (See also Standard 6.02c, Maintenance, Dissemination, and Disposal of Confidential Records of Professional and Scientific Work.)

**4. Privacy And Confidentiality**

**4.01 Maintaining Confidentiality**
Psychologists have a primary obligation and take reasonable precautions to protect confidential information obtained through or stored in any medium, recognizing that the extent and limits of confidentiality may be regulated by law or established by institutional rules or professional or scientific relationship. (See also Standard 2.05, Delegation of Work to Others.)

**4.02 Discussing the Limits of Confidentiality**
(a) Psychologists discuss with persons (including, to the extent feasible, persons who are legally incapable of giving informed consent and their legal representatives) and organizations with whom they establish a scientific or professional relationship (1) the relevant limits of confidentiality and (2) the foreseeable uses of the information generated through their psychological activities. (See also Standard 3.10, Informed Consent.)

(b) Unless it is not feasible or is contraindicated, the discussion of confidentiality occurs at the outset of the relationship and thereafter as new circumstances may warrant.

(c) Psychologists who offer services, products, or information via electronic transmission inform clients/patients of the risks to privacy and limits of confidentiality.

**4.03 Recording**
Before recording the voices or images of individuals to whom they provide services, psychologists obtain permission from all such persons or their legal representatives. (See also Standards 8.03, Informed Consent for Recording Voices and Images in Research; 8.05, Dispensing With Informed Consent for Research; and 8.07, Deception in Research.)

**4.04 Minimizing Intrusions on Privacy**
(a) Psychologists include in written and oral reports and consultations, only information germane to the purpose for which the communication is made.

(b) Psychologists discuss confidential information obtained in their work only for appropriate scientific or professional purposes and only with persons clearly concerned with such matters.

**4.05 Disclosures**
(a) Psychologists may disclose confidential information with the appropriate consent of the organizational client, the individual client/patient, or another legally authorized person on behalf of the client/patient unless prohibited by law.

(b) Psychologists disclose confidential information without the consent of the individual only as mandated by law, or where permitted by law for a valid purpose such as to (1) provide needed professional services; (2) obtain appropriate professional consultations; (3) protect the client/patient, psychologist, or others from harm; or (4) obtain payment for services from a client/patient, in which instance disclosure is limited to the minimum that is necessary to achieve the purpose. (See also Standard 6.04e, Fees and Financial Arrangements.)

**4.06 Consultations**
When consulting with colleagues, (1) psychologists do not disclose confidential information that reasonably could lead to the identification of a client/patient, research participant, or other person or organization with whom they have a confidential relationship unless they have obtained the prior consent of the person or organization or the disclosure cannot be avoided, and (2) they disclose information only to the extent necessary to achieve the purposes of the consultation. (See also Standard 4.01, Maintaining Confidentiality.)

**4.07 Use of Confidential Information for Didactic or Other Purposes**
Psychologists do not disclose in their writings, lectures, or other public media, confidential, personally identifiable information concerning their clients/patients, students, research participants, organizational clients, or other recipients of their services that they obtained during the course of their work, unless (1) they take reasonable steps to disguise the person or organization, (2) the person or organization has consented in writing, or (3) there is legal authorization for doing so.

**5. <u>Advertising and Other Public Statements</u>**

**5.01 Avoidance of False or Deceptive Statements**
(a) Public statements include but are not limited to paid or unpaid advertising, product endorsements, grant applications, licensing applications, other credentialing applications, brochures, printed matter, directory listings, personal resumes or curricula vitae, or comments for use in media such as print or electronic transmission, statements in legal proceedings, lectures and public oral presentations, and published materials. Psychologists do not knowingly make public statements that are false, deceptive, or fraudulent concerning their research, practice, or other work activities or those of persons or organizations with which they are affiliated.

(b) Psychologists do not make false, deceptive, or fraudulent statements concerning (1) their training, experience, or competence; (2) their academic degrees; (3) their credentials; (4) their institutional or association affiliations; (5) th[illegible] services; (6) the scientific or clinical basis for, or results or degree of success of, their services; (7) their fees; or (8) their publications or research findings.

(c) Psychologists claim degrees as credentials for their health services only if those degrees (1) were earned from a regionally accredited educational institution or (2) were the basis for psychology licensure by the state in which they practice.

**5.02 Statements by Others**
(a) Psychologists who engage others to create or place public statements that promote their professional practice, products, or activities retain professional responsibility for such statements.

(b) Psychologists do not compensate employees of press, radio, television, or other communication media in return for publicity in a news item. (See also Standard 1.01, Misuse of Psychologists' Work.)

(c) A paid advertisement relating to psychologists' activities must be identified or clearly recognizable as such.

**5.03 Descriptions of Workshops and Non-Degree-Granting Educational Programs**
To the degree to which they exercise control, psychologists responsible for announcements, catalogs, brochures, or advertisements describing workshops, seminars, or other non-degree-granting educational programs ensure that they accurately describe the audience for which the program is intended, the educational objectives, the presenters, and the fees involved.

**5.04 Media Presentations**
When psychologists provide public advice or comment via print, internet, or other electronic transmission, they take precautions to ensure that statements (1) are based on their professional knowledge, training, or experience in accord with appropriate psychological literature and practice; (2) are otherwise consistent with this Ethics Code; and (3) do not indicate that a professional relationship has been established with the recipient. (See also Standard 2.04, Bases for Scientific and Professional Judgments.)

**5.05 Testimonials**
Psychologists do not solicit testimonials from current therapy clients/patients or other persons who because of their particular circumstances are vulnerable to undue influence.

**5.06 In-Person Solicitation**
Psychologists do not engage, directly or through agents, in uninvited in-person solicitation of business from actual or potential therapy clients/patients or other persons who because of their particular circumstances are vulnerable to undue influence. However, this prohibition does not preclude (1) attempting to implement appropriate collateral contacts for the purpose of benefiting an already engaged therapy client/patient or (2) providing disaster or community outreach services.

## 6. Record Keeping and Fees

**6.01 Documentation of Professional and Scientific Work and Maintenance of Records**
Psychologists create, and to the extent the records are under their control, maintain, disseminate, store, retain, and dispose of records and data relating to their professional and scientific work in order to (1) facilitate provision of services later by them or by other professionals, (2) allow for replication of research design and analyses, (3) meet institutional requirements, (4) ensure accuracy of billing and payments, and (5) ensure compliance with law. (See also Standard 4.01, Maintaining Confidentiality.)

**6.02 Maintenance, Dissemination, and Disposal of Confidential Records of Professional and Scientific Work**
(a) Psychologists maintain confidentiality in creating, storing, accessing, transferring, and disposing of records under their control, whether these are written, automated, or in any other medium. (See also Standards 4.01, Maintaining Confidentiality, and 6.01, Documentation of Professional and Scientific Work and Maintenance of Records.)

(b) If confidential information concerning recipients of psychological services is entered into databases or systems of records available to persons whose access has not been consented to by the recipient, psychologists use coding or other techniques to avoid the inclusion of personal identifiers.

(c) Psychologists make plans in advance to facilitate the appropriate transfer and to protect the confidentiality of records and data in the event of psychologists' withdrawal from positions or practice. (See also Standards 3.12, Interruption of Psychological Services, and 10.09, Interruption of Therapy.)

**6.03 Withholding Records for Nonpayment**
Psychologists may not withhold records under their control that are requested and needed for a client's/patient's emergency treatment solely because payment has not been received.

**6.04 Fees and Financial Arrangements**
(a) As early as is feasible in a professional or scientific relationship, psychologists and recipients of psychological services reach an agreement specifying compensation and billing arrangements.

(b) Psychologists' fee practices are consistent with law.

(c) Psychologists do not misrepresent their fees.

(d) If limitations to services can be anticipated because of limitations in financing, this is discussed with the recipient of services as early as is feasible. (See also Standards 10.09, Interruption of Therapy, and 10.10, Terminating Therapy.)

(e) If the recipient of services does not pay for services as agreed, and if psychologists intend to use collection agencies or legal measures to collect the fees, psychologists first inform the person that such measures will be taken and provide that person an opportunity to make prompt payment. (See also Standards 4.05, Disclosures; 6.03, Withholding Records for Nonpayment; and 10.01, Informed Consent to Therapy.)

**6.05 Barter With Clients/Patients**
Barter is the acceptance of goods, services, or other nonmonetary remuneration from clients/patients in return for psychological services. Psychologists may barter only if (1) it is not clinically contraindicated, and (2) the resulting arrangement is not exploitative. (See also Standards 3.05, Multiple Relationships, and 6.04, Fees and Financial Arrangements.)

**6.06 Accuracy in Reports to Payors and Funding Sources**
In their reports to payors for services or sources of research funding, psychologists take reasonable steps to ensure the accurate reporting of the nature of the service provided or research conducted, the fees, charges, or payments, and where applicable, the identity of the provider, the findings, and the diagnosis. (See also Standards 4.01, Maintaining Confidentiality; 4.04, Minimizing Intrusions on Privacy; and 4.05, Disclosures.)

**6.07 Referrals and Fees**
When psychologists pay, receive payment from, or divide fees with another professional, other than in an employer-employee relationship, the payment to each is based on the services provided (clinical, consultative, administrative, or other) and is not based on the referral itself. (See also Standard 3.09, Cooperation With Other Professionals.)

**7. Education and Training**

**7.01 Design of Education and Training Programs**
Psychologists responsible for education and training programs take reasonable steps to ensure that the programs are designed to provide the appropriate knowledge and proper experiences, and to meet the requirements for licensure, certification, or other goals for which claims are made by the program. (See also Standard 5.03, Descriptions of Workshops and Non-Degree-Granting Educational Programs.)

**7.02 Descriptions of Education and Training Programs**
Psychologists responsible for education and training programs take reasonable steps to ensure that there is a current and accurate description of the program content (including participation in required course- or program-related counseling, psychotherapy, experiential groups, consulting projects, or community service), training goals and objectives, stipends and benefits, and requirements that must be met for satisfactory completion of the program. This information must be made readily available to all interested parties.

**7.03 Accuracy in Teaching**
(a) Psychologists take reasonable steps to ensure that course syllabi are accurate regarding the subject matter to be covered, bases for evaluating progress, and the nature of course experiences. This standard does not preclude an instructor from modifying course content or requirements when the instructor considers it pedagogically necessary or desirable, so long as students are made aware of these modifications in a manner that enables them to fulfill course requirements. (See also Standard 5.01, Avoidance of False or Deceptive Statements.)

(b) When engaged in teaching or training, psychologists present psychological information accurately. (See also Standard 2.03, Maintaining Competence.)

**7.04 Student Disclosure of Personal Information**
Psychologists do not require students or supervisees to disclose personal information in course- or program-related activities, either orally or in writing, regarding sexual history, history of abuse and neglect, psychological treatment, and relationships with parents, peers, and spouses or significant others except if (1) the program or training facility has clearly identified this requirement in its admissions and program materials or (2) the information is necessary to evaluate or obtain assistance for students whose personal problems could reasonably be judged to be preventing them from performing their training- or professionally related activities in a competent manner or posing a threat to the students or others.

**7.05 Mandatory Individual or Group Therapy**
(a) When individual or group therapy is a program or course requirement, psychologists responsible for that program allow students in undergraduate and graduate programs the option of selecting such therapy from practitioners unaffiliated with the program. (See also Standard 7.02, Descriptions of Education and Training Programs.)

(b) Faculty who are or are likely to be responsible for evaluating students' academic performance do not themselves provide that therapy. (See also Standard 3.05, Multiple Relationships.)

**7.06 Assessing Student and Supervisee Performance**
(a) In academic and supervisory relationships, psychologists establish a timely and specific process for providing feedback to students and supervisees. Information regarding the process is provided to the student at the beginning of supervision.

(b) Psychologists evaluate students and supervisees on the basis of their actual performance on relevant and established program requirements.

**7.07 Sexual Relationships With Students and Supervisees**
Psychologists do not engage in sexual relationships with students or supervisees who are in their department, agency, or training center or over whom psychologists have or are likely to have evaluative authority. (See also Standard 3.05, Multiple Relationships.)

## 8. Research and Publication

**8.01 Institutional Approval**
When institutional approval is required, psychologists provide accurate information about their research proposals and obtain approval prior to conducting the research. They conduct the research in accordance with the approved research protocol.

**8.02 Informed Consent to Research**
(a) When obtaining informed consent as required in Standard 3.10, Informed Consent, psychologists inform participants about (1) the purpose of the research, expected duration, and procedures; (2) their right to decline to participate and to withdraw from the research once participation has begun; (3) the foreseeable consequences of declining or withdrawing; (4) reasonably foreseeable factors that may be expected to influence their willingness to participate such as potential risks, discomfort, or adverse effects; (5) any prospective research benefits; (6) limits of confidentiality; (7) incentives for participation; and (8) whom to contact for questions about the research and research participants' rights. They provide opportunity for the prospective participants to ask questions and receive answers. (See also Standards 8.03, Informed Consent for Recording Voices and Images in Research; 8.05, Dispensing With Informed Consent for Research; and 8.07, Deception in Research.)

(b) Psychologists conducting intervention research involving the use of experimental treatments clarify to participants at the outset of the research (1) the experimental nature of the treatment; (2) the services that will or will not be available to the control group(s) if appropriate; (3) the means by which assignment to treatment and control groups will be made; (4) available treatment alternatives if an individual does not wish to participate in the research or wishes to withdraw once a study has begun; and (5) compensation for or monetary costs of participating including, if appropriate, whether reimbursement from the participant or a third-party payor will be sought. (See also Standard 8.02a, Informed Consent to Research.)

**8.03 Informed Consent for Recording Voices and Images in Research**
Psychologists obtain informed consent from research participants prior to recording their voices or images for data collection unless (1) the research consists solely of naturalistic observations in public places, and it is not anticipated that the recording will be used in a manner that could cause personal identification or harm, or (2) the research design includes deception, and consent for the use of the recording is obtained during debriefing. (See also Standard 8.07, Deception in Research.)

**8.04 Client/Patient, Student, and Subordinate Research Participants**
(a) When psychologists conduct research with clients/patients, students, or subordinates as participants, psychologists take steps to protect the prospective participants from adverse consequences of declining or withdrawing from participation.

(b) When research participation is a course requirement or an opportunity for extra credit, the prospective participant is given the choice of equitable alternative activities.

**8.05 Dispensing With Informed Consent for Research**
Psychologists may dispense with informed consent only (1) where research would not reasonably be assumed to create distress or harm and involves (a) the study of normal educational practices, curricula, or classroom management methods conducted in educational settings; (b) only anonymous questionnaires, naturalistic observations, or archival research for which disclosure of responses would not place participants at risk of criminal or civil liability or damage their financial standing, employability, or reputation, and confidentiality is protected; or (c) the study of factors related to job or organization effectiveness conducted in organizational settings for which there is no risk to participants' employability, and confidentiality is protected or (2) where otherwise permitted by law or federal or institutional regulations.

**8.06 Offering Inducements for Research Participation**
(a) Psychologists make reasonable efforts to avoid offering excessive or inappropriate financial or other inducements for research participation when such inducements are likely to coerce participation.

(b) When offering professional services as an inducement for research participation, psychologists clarify the nature of the services, as well as the risks, obligations, and limitations. (See also Standard 6.05, Barter With Clients/Patients.)

**8.07 Deception in Research**
(a) Psychologists do not conduct a study involving deception unless they have determined that the use of deceptive techniques is justified by the study's significant prospective scientific, educational, or applied value and that effective nondeceptive alternative procedures are not feasible.

(b) Psychologists do not deceive prospective participants about research that is reasonably expected to cause physical pain or severe emotional distress.

(c) Psychologists explain any deception that is an integral feature of the design and conduct of an experiment to participants as early as is feasible, preferably at the conclusion of their participation, but no later than at the conclusion of the data collection, and permit participants to withdraw their data. (See also Standard 8.08, Debriefing.)

**8.08 Debriefing**
(a) Psychologists provide a prompt opportunity for participants to obtain appropriate information about the nature, results, and conclusions of the research, and they take reasonable steps to correct any misconceptions that participants may have of which the psychologists are aware.

(b) If scientific or humane values justify delaying or withholding this information, psychologists take reasonable measures to reduce the risk of harm.

(c) When psychologists become aware that research procedures have harmed a participant, they take reasonable steps to minimize the harm.

**8.09 Humane Care and Use of Animals in Research**
(a) Psychologists acquire, care for, use, and dispose of animals in compliance with current federal, state, and local laws and regulations, and with professional standards.

(b) Psychologists trained in research methods and experienced in the care of laboratory animals supervise all procedures involving animals and are responsible for ensuring appropriate consideration of their comfort, health, and humane treatment.

(c) Psychologists ensure that all individuals under their supervision who are using animals have received instruction in research methods and in the care, maintenance, and handling of the species being used, to the extent appropriate to their role. (See also Standard 2.05, Delegation of Work to Others.)

(d) Psychologists make reasonable efforts to minimize the discomfort, infection, illness, and pain of animal subjects.

(e) Psychologists use a procedure subjecting animals to pain, stress, or privation only when an alternative procedure is unavailable and the goal is justified by its prospective scientific, educational, or applied value.

(f) Psychologists perform surgical procedures under appropriate anesthesia and follow techniques to avoid infection and minimize pain during and after surgery.

(g) When it is appropriate that an animal's life be terminated, psychologists proceed rapidly, with an effort to minimize pain and in accordance with accepted procedures.

**8.10 Reporting Research Results**
(a) Psychologists do not fabricate data. (See also Standard 5.01a, Avoidance of False or Deceptive Statements.)

(b) If psychologists discover significant errors in their published data, they take reasonable steps to correct such errors in a correction, retraction, erratum, or other appropriate publication means.

**8.11 Plagiarism**
Psychologists do not present portions of another's work or data as their own, even if the other work or data source is cited occasionally.

**8.12 Publication Credit**
(a) Psychologists take responsibility and credit, including authorship credit, only for work they have actually performed or to which they have substantially contributed. (See also Standard 8.12b, Publication Credit.)

(b) Principal authorship and other publication credits accurately reflect the relative scientific or professional contributions of the individuals involved, regardless of their relative status. Mere possession of an institutional position, such as department chair, does not justify authorship credit. Minor contributions to the research or to the writing for publications are acknowledged appropriately, such as in footnotes or in an introductory statement.

(c) Except under exceptional circumstances, a student is listed as principal author on any multiple-authored article that is substantially based on the student's doctoral dissertation. Faculty advisors discuss publication credit with students as early as feasible and throughout the research and publication process as appropriate. (See also Standard 8.12b, Publication Credit.)

**8.13 Duplicate Publication of Data**
Psychologists do not publish, as original data, data that have been previously published. This does not preclude republishing data when they are accompanied by proper acknowledgment.

**8.14 Sharing Research Data for Verification**

(a) After research results are published, psychologists do not withhold the data on which their conclusions are based from other competent professionals who seek to verify the substantive claims through reanalysis and who intend to use such data only for that purpose, provided that the confidentiality of the participants can be protected and unless legal rights concerning proprietary data preclude their release. This does not preclude psychologists from requiring that such individuals or groups be responsible for costs associated with the provision of such information.

(b) Psychologists who request data from other psychologists to verify the substantive claims through reanalysis may use shared data only for the declared purpose. Requesting psychologists obtain prior written agreement for all other uses of the data.

**8.15 Reviewers**

Psychologists who review material submitted for presentation, publication, grant, or research proposal review respect the confidentiality of and the proprietary rights in such information of those who submitted it.

9. Assessment

**9.01 Bases for Assessments**

(a) Psychologists base the opinions contained in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, on information and techniques sufficient to substantiate their findings. (See also Standard 2.04, Bases for Scientific and Professional Judgments.)

(b) Except as noted in 9.01c, psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations. (See also Standards 2.01, Boundaries of Competence, and 9.06, Interpreting Assessment Results.)

(c) When psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations.

**9.02 Use of Assessments**

(a) Psychologists administer, adapt, score, interpret, or use assessment techniques, interviews, tests, or instruments in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of the techniques.

(b) Psychologists use assessment instruments whose validity and reliability have been established for use with members of the population tested. When such validity or reliability has not been established, psychologists describe the strengths and limitations of test results and interpretation.

(c) Psychologists use assessment methods that are appropriate to an individual's language preference and competence, unless the use of an alternative language is relevant to the assessment issues.

**9.03 Informed Consent in Assessments**

(a) Psychologists obtain informed consent for assessments, evaluations, or diagnostic services, as described in Standard 3.10, Informed Consent, except when (1) testing is mandated by law or governmental regulations; (2) informed consent is implied because testing is conducted as a routine educational, institutional, or organizational activity (e.g., when participants voluntarily agree to assessment when applying for a job); or (3) one purpose of the testing is to evaluate decisional capacity. Informed consent includes an explanation of the nature and purpose of the assessment, fees involvement of third parties, and limits of confidentiality and sufficient opportunity for the client/patient to ask questions and receive answers.

(b) Psychologists inform persons with questionable capacity to consent or for whom testing is mandated by law or governmental regulations about the nature and purpose of the proposed assessment services, using language that is reasonably understandable to the person being assessed.

(c) Psychologists using the services of an interpreter obtain informed consent from the client/patient to use that interpreter, ensure that confidentiality of test results and test security are maintained, and include in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, discussion of any limitations on the data obtained. (See also Standards 2.05, Delegation of Work to Others; 4.01, Maintaining Confidentiality; 9.01, Bases for Assessments; 9.06, Interpreting Assessment Results; and 9.07, Assessment by Unqualified Persons.)

**9.04 Release of Test Data**
(a) The term *test data* refers to raw and scaled scores, client/patient responses to test questions or stimuli, and psychologists' notes and recordings concerning client/patient statements and behavior during an examination. Those portions of test materials that include client/patient responses are included in the definition of *test data*. Pursuant to a client/patient release, psychologists provide test data to the client/patient or other persons identified in the release. Psychologists may refrain from releasing test data to protect a client/patient or others from substantial harm or misuse or misrepresentation of the data or the test, recognizing that in many instances release of confidential information under these circumstances is regulated by law. (See also Standard 9.11, Maintaining Test Security.)

(b) In the absence of a client/patient release, psychologists provide test data only as required by law or court order.

**9.05 Test Construction**
Psychologists who develop tests and other assessment techniques use appropriate psychometric procedures and current scientific or professional knowledge for test design, standardization, validation, reduction or elimination of bias, and recommendations for use.

**9.06 Interpreting Assessment Results**
When interpreting assessment results, including automated interpretations, psychologists take into account the purpose of the assessment as well as the various test factors, test-taking abilities, and other characteristics of the person being assessed, such as situational, personal, linguistic, and cultural differences, that might affect psychologists' judgments or reduce the accuracy of their interpretations. They indicate any significant limitations of their interpretations. (See also Standards 2.01b and c, Boundaries of Competence, and 3.01, Unfair Discrimination.)

**9.07 Assessment by Unqualified Persons**
Psychologists do not promote the use of psychological assessment techniques by unqualified persons, except when such use is conducted for training purposes with appropriate supervision. (See also Standard 2.05, Delegation of Work to Others.)

**9.08 Obsolete Tests and Outdated Test Results**
(a) Psychologists do not base their assessment or intervention decisions or recommendations on data or test results that are outdated for the current purpose.

(b) Psychologists do not base such decisions or recommendations on tests and measures that are obsolete and not useful for the current purpose.

**9.09 Test Scoring and Interpretation Services**
(a) Psychologists who offer assessment or scoring services to other professionals accurately describe the purpose, norms, validity, reliability, and applications of the procedures and any special qualifications applicable to their use.

(b) Psychologists select scoring and interpretation services (including automated services) on the basis of evidence of the validity of the program and procedures as well as on other appropriate considerations. (See also Standard 2.01b and c, Boundaries of Competence.)

(c) Psychologists retain responsibility for the appropriate application, interpretation, and use of assessment instruments, whether they score and interpret such tests themselves or use automated or other services.

**9.10 Explaining Assessment Results**
Regardless of whether the scoring and interpretation are done by psychologists, by employees or assistants, or by automated or other outside services, psychologists take reasonable steps to ensure that explanations of results are given to the individual or designated representative unless the nature of the relationship precludes provision of an explanation of results (such as in some organizational consulting, preemployment or security screenings, and forensic evaluations), and this fact has been clearly explained to the person being assessed in advance.

**9.11. Maintaining Test Security**
The term *test materials* refers to manuals, instruments, protocols, and test questions or stimuli and does not include *test data* as defined in Standard 9.04, Release of Test Data. Psychologists make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations, and in a manner that permits adherence to this Ethics Code.

## 10. <u>Therapy</u>

**10.01 Informed Consent to Therapy**
(a) When obtaining informed consent to therapy as required in Standard 3.10, Informed Consent, psychologists inform clients/patients as early as is feasible in the therapeutic relationship about the nature and anticipated course of therapy, fees, involvement of third parties, and limits of confidentiality and provide sufficient opportunity for the client/patient to ask

questions and receive answers. (See also Standards 4.02, Discussing the Limits of Confidentiality, and 6.04, Fees and Financial Arrangements.)

(b) When obtaining informed consent for treatment for which generally recognized techniques and procedures have not been established, psychologists inform their clients/patients of the developing nature of the treatment, the potential risks involved, alternative treatments that may be available, and the voluntary nature of their participation. (See also Standards 2.01e, Boundaries of Competence, and 3.10, Informed Consent.)

(c) When the therapist is a trainee and the legal responsibility for the treatment provided resides with the supervisor, the client/patient, as part of the informed consent procedure, is informed that the therapist is in training and is being supervised and is given the name of the supervisor.

**10.02 Therapy Involving Couples or Families**
(a) When psychologists agree to provide services to several persons who have a relationship (such as spouses, significant others, or parents and children), they take reasonable steps to clarify at the outset (1) which of the individuals are clients/patients and (2) the relationship the psychologist will have with each person. This clarification includes the psychologist's role and the probable uses of the services provided or the information obtained. (See also Standard 4.02, Discussing the Limits of Confidentiality.)

(b) If it becomes apparent that psychologists may be called on to perform potentially conflicting roles (such as family therapist and then witness for one party in divorce proceedings), psychologists take reasonable steps to clarify and modify, or withdraw from, roles appropriately. (See also Standard 3.05c, Multiple Relationships.)

**10.03 Group Therapy**
When psychologists provide services to several persons in a group setting, they describe at the outset the roles and responsibilities of all parties and the limits of confidentiality.

**10.04 Providing Therapy to Those Served by Others**
In deciding whether to offer or provide services to those already receiving mental health services elsewhere, psychologists carefully consider the treatment issues and the potential client's/patient's welfare. Psychologists discuss these issues with the client/patient or another legally authorized person on behalf of the client/patient in order to minimize the risk of confusion and conflict, consult with the other service providers when appropriate, and proceed with caution and sensitivity to the therapeutic issues.

**10.05 Sexual Intimacies With Current Therapy Clients/Patients**
Psychologists do not engage in sexual intimacies with current therapy clients/patients.

**10.06 Sexual Intimacies With Relatives or Significant Others of Current Therapy Clients/Patients**
Psychologists do not engage in sexual intimacies with individuals they know to be close relatives, guardians, or significant others of current clients/patients. Psychologists do not terminate therapy to circumvent this standard.

**10.07 Therapy With Former Sexual Partners**
Psychologists do not accept as therapy clients/patients persons with whom they have engaged in sexual intimacies.

**10.08 Sexual Intimacies With Former Therapy Clients/Patients**
(a) Psychologists do not engage in sexual intimacies with former clients/patients for at least two years after cessation or termination of therapy.

(b) Psychologists do not engage in sexual intimacies with former clients/patients even after a two-year interval except in the most unusual circumstances. Psychologists who engage in such activity after the two years following cessation or termination of therapy and of having no sexual contact with the former client/patient bear the burden of demonstrating that there has been no exploitation, in light of all relevant factors, including (1) the amount of time that has passed since therapy terminated; (2) the nature, duration, and intensity of the therapy; (3) the circumstances of termination; (4) the client's/patient's personal history; (5) the client's/patient's current mental status; (6) the likelihood of adverse impact on the client/patient; and (7) any statements or actions made by the therapist during the course of therapy suggesting or inviting the possibility of a posttermination sexual or romantic relationship with the client/patient. (See also Standard 3.05, Multiple Relationships.)

**10.09 Interruption of Therapy**
When entering into employment or contractual relationships, psychologists make reasonable efforts to provide for orderly and appropriate resolution of responsibility for client/patient care in the event that the employment or contractual relationship ends, with paramount consideration given to the welfare of the client/patient. (See also Standard 3.12, Interruption of Psychological Services.)

**10.10 Terminating Therapy**

(a) Psychologists terminate therapy when it becomes reasonably clear that the client/patient no longer needs the service, is not likely to benefit, or is being harmed by continued service.

(b) Psychologists may terminate therapy when threatened or otherwise endangered by the client/patient or another person with whom the client/patient has a relationship.

(c) Except where precluded by the actions of clients/patients or third-party payors, prior to termination psychologists provide pretermination counseling and suggest alternative service providers as appropriate.

**History and Effective Date Footnote**

This version of the APA Ethics Code was adopted by the American Psychological Association's Council of Representatives during its meeting, August 21, 2002, and is effective beginning June 1, 2003. Inquiries concerning the substance or interpretation of the APA Ethics Code should be addressed to the Director, Office of Ethics, American Psychological Association, 750 First Street, NE, Washington, DC 20002-4242. The Ethics Code and information regarding the Code can be found on the APA web site, http://www.apa.org/ethics. The standards in this Ethics Code will be used to adjudicate complaints brought concerning alleged conduct occurring on or after the effective date. Complaints regarding conduct occurring prior to the effective date will be adjudicated on the basis of the version of the Ethics Code that was in effect at the time the conduct occurred.

The APA has previously published its Ethics Code as follows:

American Psychological Association. (1953). Ethical standards of psychologists. Washington, DC: Author.

American Psychological Association. (1959). Ethical standards of psychologists. American Psychologist, 14, 279-282.

American Psychological Association. (1963). Ethical standards of psychologists. American Psychologist, 18, 56-60.

American Psychological Association. (1968). Ethical standards of psychologists. American Psychologist, 23, 357-361.

American Psychological Association. (1977, March). Ethical standards of psychologists. APA Monitor, 22-23.

American Psychological Association. (1979). Ethical standards of psychologists. Washington, DC: Author.

American Psychological Association. (1981). Ethical principles of psychologists. American Psychologist, 36, 633-638.

American Psychological Association. (1990). Ethical principles of psychologists (Amended June 2, 1989). American Psychologist, 45, 390-395.

American Psychological Association. (1992). Ethical principles of psychologists and code of conduct. American Psychologist, 47, 1597-1611.

Request copies of the APA's Ethical Principles of Psychologists and Code of Conduct from the APA Order Department, 750 First Street, NE, Washington, DC 20002-4242, or phone (202) 336-5510.

Ethics Code 2002.doc 10/8/02

© 2002 American Psychological Association

RECEIVED
MAR 20 2004
By_____

**ATTACHMENT** D

EXHIBIT 17
Page 1

ATTACHMENT "A"

DEPARTMENT OF CORRECTION
**INMATE GRIEVANCE FORM**
**FORWARD TO THE INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)**

**SECTION "A"**

NAME: William G. Stevens INSTITUTION: Mass. Treatment Center

NUMBER: M-85829 HOUSING UNIT: D-1 DATE OF INCIDENT: Mar. 15, 2004

COMPLAINT: Please see attached.

(ATTACH ADDITIONAL PAGE IF NECESSARY)

REMEDY REQUESTED: Please see attached.

INMATE SIGNATURE: [signature] DATE: Mar. 15 2004

STAFF RECIPIENT: [signature] DATE: 3-20-04

DATE RECEIVED: 3-20-04

**SECTION "B"**

ASSIGNED GRIEVANCE NUMBER: 2004-3150

DECISION RENDERED: ___ APPROVED
✓ DENIED

SUMMARY OF FINDINGS:
Grievance is denied
The Massachusetts Treatment Center subscribes to services which provide updated cases as these cases become available. There is no requirement that the MTC provide copies of decisions for attorneys. You may cite the case in your letter to your attorney for his reference.

IGC SIGNATURE: [signature] DATE: 4-1-04

(DENIED GRIEVANCES MAY BE APPEALED TO THE SUPERINTENDENT WITH 10 DAYS OF IGC'S DECISION)

**SECTION "C"**

**INMATE GRIEVANCE RECEIPT**

INMATE NAME: Stevens, William INSTITUTION: MTC

NUMBER: M85829 DATE RECEIVED: 3-20-04

SIGNATURE (IGC): [signature] TITLE: Sgt.

#3150

EXHIBIT 17
Page 2

Grievance regarding refusal of Law Library to copy a Supreme
Court Decision.

On March 16, 2004, I submitted a letter to my lawyer in
which I referenced the decision of Crawford v. Washington a
brand new Supreme Court Decision which was issued on March 9, 2004
I wanted to enclose a copy of the decision which had been
mailed into my cell mate Joel Pentlarge. At the present time
Law Library has not received a copy of this decision. Because
the decision potentially affects what materials the qualified
examiners can review before interviewing me, the decision and
my attorney's consideration of it is highly time sensitive.

My cell mate is unwilling to give up the only copy of this
decision which he has. In addition there are many other prisoners
in this correctional facility who may be directly impacted by
this decision who would like to have a copy of it.

The librarian refused to copy this case citing 103 MTC VI,
f.  "Legal Book Materials will not be copied."

The code of Mass Regulations 103 CMR 478.11(4)  provides

Photocopies

(a)  Photocopying services shall be for the purpose of
duplicating original legal documents and for the purpose of
increasing access to the legal collection.    The superintendent
shall designate the staff members responsible for photocopying
legal documents and legal reference materials.

This CMR which has the force of law makes it clear that law
books, i.e. "legal reference materials", are to be copied for
inmates as a way to increase access to the legal collection.

Access to the law library is severely restricted. Access
is limited to between 2 and 3 hours per day, five  days per
week.  One way to increase access to the legal collection is
to allow prisoners to make copies of legal case decisions.  This
was allowed at Gardner.  Allowing adequate access to the legal
materials is required by Bounds v. Smith and Cepulonis v. Fair,
563 F.Supp. 659.

Please note that the Librarian also refused to make a
copy of this grievance which is an original legal document
and is absolutely required as prerequesite to filing any action
against the DOC for failure to comply with the CMR's.

Relief Requested

The MTC procedural statement be changed to conform to 103
CMR 478.11(4) and the library begin  copying legal reference
materials including copies of Supreme Court decisions and original
legal materials including grievances.



RECEIVED
MAR 20 2004
By

ATTACHMENT D

EXHIBIT 17
Page

ATTACHMENT "A"

DEPARTMENT OF CORRECTION
INMATE GRIEVANCE FORM
FORWARD TO THE INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

**SECTION "A"**

NAME: William G. Stevens INSTITUTION: Mass. Treatment Center

NUMBER: M-85829 HOUSING UNIT: D-1 DATE OF INCIDENT: Mar. 15, 2004

COMPLAINT: Please see attached.

(ATTACH ADDITIONAL PAGE IF NECESSARY)

REMEDY REQUESTED: Please see attached.

INMATE SIGNATURE: [signature] DATE: Mar. 15, 2004

STAFF RECIPIENT: [signature] DATE: 3-20-04

DATE RECEIVED: 3-20-04

**SECTION "B"**

ASSIGNED GRIEVANCE NUMBER: 2004-3150

DECISION RENDERED: ___ APPROVED
✓ DENIED

SUMMARY OF FINDINGS:
Grievance is denied
The Massachusetts Treatment Center subscribes to services which provide updated cases as these cases become available. There is no requirement that the MTC provide copies of decisions for attorneys. You may cite the case in your letter to your attorney for his reference.

IGC SIGNATURE: [signature] DATE: 4-1-04

(DENIED GRIEVANCES MAY BE APPEALED TO THE SUPERINTENDENT WITH 10 DAYS OF IGC'S DECISION)

**SECTION "C"**

INMATE GRIEVANCE RECEIPT

INMATE NAME: Stevens, William INSTITUTION: MTC

NUMBER: M85829 DATE RECEIVED: 3-20-04

SIGNATURE (IGC): [signature] TITLE: Sgt.

#3150

EXHIBIT 17

Page 2

Grievance regarding refusal of Law Library to copy a Supreme Court Decision.

On March 16, 2004, I submitted a letter to my lawyer in which I referenced the decision of Crawford v. Washington a brand new Supreme Court Decision which was issued on March 9, 2004 I wanted to enclose a copy of the decision which had been mailed into my cell mate Joel Pentlarge. At the present time Law Library has not received a copy of this decision. Because the decision potentially affects what materials the qualified examiners can review before interviewing me, the decision and my attorney's consideration of it is highly time sensitive.

My cell mate is unwilling to give up the only copy of this decision which he has. In addition there are many other prisoners in this correctional facility who may be directly impacted by this decision who would like to have a copy of it.

The librarian refused to copy this case citing 103 MTC VI, f. "Legal Book Materials will not be copied."

The code of Mass Regulations 103 CMR 478.11(4) provides

Photocopies

(a) Photocopying services shall be for the purpose of duplicating original legal documents and for the purpose of increasing access to the legal collection. The superintendent shall designate the staff members responsible for photocopying legal documents and legal reference materials.

This CMR which has the force of law makes it clear that law books, i.e. "legal reference materials", are to be copied for inmates as a way to increase access to the legal collection.

Access to the law library is severely restricted. Access is limited to between 2 and 3 hours per day, five days per week. One way to increase access to the legal collection is to allow prisoners to make copies of legal case decisions. This was allowed at Gardner. Allowing adequate access to the legal materials is required by Bounds v. Smith and Cepulonis v. Fair 563 F.Supp. 659.

Please note that the Librarian also refused to make a copy of this grievance which is an original legal document and is absolutely required as prerequesite to filing any action against the DOC for failure to comply with the CMR's.

Relief Requested

The MTC procedural statement be changed to conform to 103 CMR 478.11(4) and the library begin copying legal reference materials including copies of Supreme Court decisions and original legal materials including grievances.

EXHIBIT 17
04-08-04 P03:16 Page 3

ATTACHMENT "C"

DEPARTMENT OF CORRECTION
**INSTITUTION APPEAL FORM**
**FORWARD TO THE INSTITUTIONAL SUPERINTENDENT**

SECTION A

NAME: William Stevens INSTITUTION: Mass. Treatment Center

NUMBER: M85829 HOUSING UNIT: D-1 DATE OF INCIDENT: 3/ /04

APPEAL: Denial of my grievance for refusal of the library to make a copy of a brand new U.S. Supreme Court Case Crawford v. Washington, which is very relevant to my case and which I wanted to send to my lawyer immediately.

(ATTACH ADDITIONAL PAGE IF NECESSARY)

REMEDY REQUESTED: Comply with 103 CMR 478.11(4), which is designed to guarantee my right to communicate with my attorney, and stop censoring the materials which I wish to send copies of to my attorney.

INMATE SIGNATURE: [signature] DATE: 4/5/04

STAFF RECIPIENT: DATE:

DATE RECEIVED:

**SECTION B**

**ASSIGNED GRIEVANCE NUMBER:** 2004-3150

**ASSIGNED INSTITUTION APPEAL NUMBER:**

**DECISION RENDERED:** ___ **APPROVED** ✓ **DENIED**

**SUMMARY OF FINDINGS:** MTC procedural statement to 103 CMR 478, states in S. VII(?) 'Legal books materials will not be copied.' This language will not be revised and consistently is applied to all requests for legal copying.

SUPERINTENDENT'S SIGNATURE: [signature] DATE: 4/12/04

**SECTION C**

**INMATE APPEAL RECEIPT** Library Copy Grie.

INMATE NAME: William Stevens D-1 INSTITUTION: MTC

NUMBER: M85829 DATE RECEIVED: 4/12/04

RECEIPTING STAFF: Gerry Miranda TITLE: AAI

01/05/01

# COMMONWEALTH OF MASSACHUSETTS

EXHIBIT 17

Page 4

## DEPARTMENT OF CORRECTION

## INMATE GRIEVANCE APPEAL FORM

## FORWARD TO SUPERINTENDENT

**Name** STEVENS WILLIAM G **Institution** MASS. TREATMENT CENTER

**Number** M85829 **Housing** D1 **Appeal Date** 05-APR-2004 **Date Of Grievance** 15-MAR-2004

**Appeal Received Date** 12-APR-2004

**Appeal** denial of my grievance for refusal of the library to make copy of a brand new U.S. Supreme Court Case, Crawford v. Washington ,which is very relevant to my case and which I wanted to send to my lawyer immediately.

**Remedy Requested** comply with 103 CMR 478.11 (4), which is designed to guarantee my right to communicate with my attorney,and stop censorring the materials which I wish to send copies of to my attorney.

**Staff Recipient** Edington Glenn E CO II

**Signature**

## DECISION BY SUPERINTENDENT

**Appeal Received Date** 12-APR-2004 **Decision Date** 14-APR-2004 **Decision** Denied

**Decision By** Murphy Robert F CO II

**Reasons** MTC procedural statement to 103 CMR 478 states in S.VII (f), "legal book materials will not be copied ". This language will not be revised and consistently is applied to all requests for legal copying.

**Signature**

6/1/04 - In accordance with 103 CMR 491, I have reviewed grievance/grievance appeal #3150 concerning your request to copy of a court case to send to your attorney.

Please be advised that I support the Superintendent's decision to deny your grievance, as your attorney has the means to view obtain court cases cited by you. Therefore, I concur that it is not necessary for you to provide your attorney with photocopies. Furthermore, because you have regular access to the library, you may copy the court case by hand or by utilizing available typewriters.

Kristie Ladouceur

Kristie Ladouceur
Department Grievance Coordinator

Date

## INMATE RECEIPT

**Inmate's Name** STEVENS WILLIAM G **Institution** MASS. TREATMENT CENTE

**Number** M85829 **Appeal Received Date** 12-APR-2004

**Staff Recipient** Edington Glenn E CO II

**Superintendent's Signature**

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE FORM
### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

**Name** SHEDLOCK PAUL F **Grievance#** 12453 **Institution** MASS. TREATMENT CENTER

**Commit No.** M82011 **Housing** D2 **Date Of Incident** 20050805 **Date Of Grievance** 20050805

**Complaint** The librarian at this facility refuses to copy legal materials or case law out of books so that I can continue to work on current cases when the library is either closed or not accessible (either through not getting in or because the civil population does not have access to the building. This refusal is allegedly, part of a policy. Pursuant to the CMRS, there is no policy which prohibits the copying of legal materials or case law from books. Nor is there any copyright infringement. As such, the refusal to copy these materials is either the librarian's own rule, or it a policy of her employer. In any event, this policy, without being ameliorated by access in some other viable manner, effectively deprives me of meaningful access to the courts under both the state and federal constitutions.

**Remedy Requested**
1. Provide greater access to the law library or legal materials.
2. Provide satellite law libraries which are accessible during off hours.
3. Provide copies of legal materials and case law so that I can continue my legal work in my cell.

**Staff Recipient** Hartfield Doreen M CLERK V

**Staff Involved**

**Signature**

### RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20050811 **Decision Date** 20050824

**Signature** Edington Glenn E CO II

**Final Decision** DENIED

**Decision** Grievance is denied. Access to the Law Library will remain in accordance to the times as defined in MTC Procedural Attachment to 103 CMR 478, Library Services, and may be subject to change without notice, based on operational and staffing needs of the institutional. Legal photocopying services is provided to the institution's population pursuant to MTC Procedural Attachment to 103 CMR 478. Request for satellite libraries, legal research copies, and a paralegal is denied. Specially trained law clerks are available in the law library. No library services will be provided when the library is closed.

**Signature** Sgt. Glenn Edington **Date** 8-24-05

**Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.**

### INMATE RECEIPT

**Name** SHEDLOCK PAUL F **Institution** MASS. TREATMENT CENTER

**Commit No.** M82011 **Grievance#** 12453 **Date Received** 20050811

**Signature.** Hartfield Doreen M CLERK V

#12453

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**
**INMATE GRIEVANCE FORM**

| **INMATE'S NAME:** Paul F. Shedlock | **INMATE'S #:** M82011 | **DATE:** 8/ /05 |
|---|---|---|
| **INSTITUTION:** Nemansket Correctional Center (MTC) | | **DATE OF INCIDENT:** 8/5/05/continuous |

**INSTRUCTIONS:**
1. Refer to 103 CMR 491, Inmate Grievance Policy.
2. Check off a grievance type that best describes your grievance in **Block A.**
3. In **Block B**, give a brief and understandable summary of your complaint/issue.
4. List any actions you may have taken to resolve this matter in **Block C**. Be sure to include the identity of staff members you have contacted.
5. Provide a Requested Remedy in **Block D.**

**A. Check off one grievance type only (Listed on reverse side). When filing an Emergency Grievance select Emergency and one additional grievance type.**

______**EMERGENCY**

**B. Give a brief and understandable summary of your complaint/issue. Additional paper may be used if necessary.**

The librarian at this facility refuses to copy legal materials or case law out of books so that I can continue to work on current cases when the library is either closed or not accessible (either through not getting in or because the civil population does not have access to the building).

This refusal is, allegedly, part of a policy.

Pursuant to the CMRs, there is no policy which prohibits the copying of legal materials or case law from books. Nor is there any copyright infringement. As such, the refusal to copy these materials is either the librarian's own rule, or it a policy of her employer. In any event, this policy, without being ameliorated by access in some other viable manner, effectively deprives me of <u>meaningful</u> access to the courts under both the state and federal constitutions.

**C. List any action taken to address/resolve this matter. Include the identity of staff members you have contacted.**

This is my first complaint relative to access to the law library or legal materials.

**D. Provide your Requested Remedy.**

1. Provide greater access to the law library or legal materials.
2. Provide satellite law libraries which are accessible during off hours.
3. Provide copies of legal materials and case law so that I can continue my legal work in my cell.

Inmate's Signature *Paul F. Shedlock* Date: 8/5/05

Staff Recipient *Doreen Hatfield Clerk* Date: 8-11-05

**DENIED GRIEVANCES MAY BE APPEALED TO THE REVIEWING AUTHORITY WITHIN 10 BUSINESS DAYS.

(Inmate receipts/responses will be generated via the Inmate Management System.)

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**
**INMATE GRIEVANCE FORM**

\# 6487

ATTACHMENT E

| **INMATE'S NAME:** WILLIAM G. STEVENS | M-65829 | **DATE:** 10/21/04 |
|---|---|---|
| **INSTITUTION:** MASS TREATMENT CENTER | **DATE OF INCIDENT:** 9/29/04 10/6, 13 &20/04 | |

**INSTRUCTIONS:**

1. Refer to 103 CMR 491, Inmate Grievance Policy.
2. Check off a grievance type that best describes your grievance in **Block A.**
3. In **Block B**, give a brief and understandable summary of your complaint/issue.
4. List any actions you may have taken to resolve this matter in **Block C**. Be sure to include the identity of staff members you have contacted.
5. Provide a Requested Remedy in **Block D.**

**A. Check off one grievance type only (Listed on reverse side). When filing an Emergency Grievance select Emergency and one additional grievance type.**

**______EMERGENCY**

**B. Give a brief and understandable summary of your complaint/issue. Additional paper may be used, if necessary.** On the above listed Wednesday nights I have attempted to access the Library for the purpose of working on my various legal actions I am currently pursuing. Though the Library, according to MTC schedule, is suposed to be open at 7:00p.m. on these nights, I have been turned away due to "staffing shortages". These "staffing shortages" however, do not seem to effect the several officers who congregate in the hall between B & C Units at this time or the officers (5 of them) who were available to gather in the C - cellhouse therapy room to watch the playoff game 10/20/04. There is little enough access to the Library to work on legal actions that closing for no legitamate reason is nothing more than delaying access to the courts.

**C. List any action taken to address/resolve this matter. Include the identity of staff members you have contacted.**

**D. Provide your Requested Remedy.** That the Library be opened during allscheduled times (even if it interferes with sporting events).
That the Librarian provide residents with copies of case law pursuant to the CMRs and not deny the request pursuant to the MTCs so that legal work can be accomplished in the cell.

**Inmate's Signature** [signature] **Date:** 10/21/04

**Staff Recipient** Sgt [signature] **Date:** 10-30-04

****DENIED GRIEVANCES MAY BE APPEALED TO THE REVIEWING AUTHORITY WITHIN 10 BUSINESS DAYS.**
**(Inmate receipts/responses will be generated via the Inmate Management System.)**

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE FORM
### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

**Name** STEVENS WILLIAM G **Grievance#** 6487 **Institution** MASS. TREATMENT CENTER

**Commit No.** M85829 **Housing** C1 **Date Of Incident** 20041020 **Date Of Grievance** 200· 1 21

**Complaint** On the following Wednesday nights 9/29, 10/6, 10/13/and 10/20/04 , I hav: attempted to access the library for the purpose of working on my various ..gal actions, I am currently pursuing. Though the library, according to MTC sc dule , is suposed to be open at 7:00 PM on these nights, I have been turned away le to "staffing shortages". These staffing shortages however, do not seem to ef: t the several officers who congregate in the hall between B & C Units at this t.. or the officers (5 of them) who were available to gather in the C -cellhouse erapy room to watch the playoff game 10/20/04. There is little enough access to e library to work on legal actions that closing for no legitamate reason is thing more than delating access to the courts.

**Remedy Requested** That the library be opened during all scheduled times (even if it interfe: with sporting events). That the librarian provide residents with copies of cas: aw pursuant to the CMRs and not deny the request pursuant to the MTCs so tha: egal work can be accomplished in the cell.

**Staff Recipient** Edington Glenn E CO II

**Staff Involved**

**Signature**

### RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20041030 **Decision Date** 20041107

**Signature** Edington Glenn E CO II

**Final Decision** DENIED

**Decision** Access to the Wednesday evening library period is contingent upon security staff availability. There was no specific security staff available for library : verage on any of the cited dates. It is suggested grievant make arrangements to attend the library during the morning and afternoon periods. Request for Libraria to provide copies of case law is denied.

**Signature** [signature] **Date** 11-7-04

**Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.**

### INMATE RECEIPT

**Name** STEVENS WILLIAM G **Institution** MASS. TREATMENT CENTER

**Commit No.** M85829 **Grievance#** 6487 **Date Received** 20041030

**Signature.** Edington Glenn E CO II

#8350

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**
**INMATE GRIEVANCE FORM**

| INMATE'S NAME: | INMATE'S #: | DATE: |
|---|---|---|
| William G. Stevens | M-85829 | 1/28/05 |

| INSTITUTION: | DATE OF INCIDENT: |
|---|---|
| Mass Treatment Center | 1/28/05 |

**INSTRUCTIONS:**

1. Refer to 103 CMR 491, Inmate Grievance Policy.
2. Check off a grievance type that best describes your grievance in Block A.
3. In Block B, give a brief and understandable summary of your complaint/issue.
4. List any actions you may have taken to resolve this matter in Block C. Be sure to include the identity of staff members you have contacted.
5. Provide a Requested Remedy in Block D.

**A. Check off one grievance type only (Listed on reverse side). When filing an Emergency Grievance select Emergency and one additional grievance type.**

______**EMERGENCY**

**B. Give a brief and understandable summary of your complaint/issue. Additional paper may be used if necessary.** On 1/27/05 I took legal papers to the library for copying. I was told that legal copies were not being made that day because no one had approved them. I was informed that copies would be done on Friday (1/28/05) On 1/28/05 I delivered my legal work to the librarian for copies at the 1330 hrs movement. I was told to pick them up at the 1530 movement. At 1500 hrs it was announced that the library (amongst other places) was closing. I went to the library to pick up my copies at that time (1500). When I entered the library I was rudely informed by Natalia that the library was closed and there were no copies. I questioned this and was told by her that there was no time limit to how long she could take to make copies. When I requested that my legal origionals be returned to me she told me that they (?) had closed the library and I must leave. When I again asked for my legal work, Natalia, in an agressive manner, said dont make me call the officer. You must leave. The legal work I was attempting to have copied is time sensitive and must be returned to the court. This delay could have an adverse effect on my case, and is effectively denying me access to the courts. (a common occurance here?)

**C. List any action taken to address/resolve this matter. Include the identity of staff members you have contacted.**

**D. Provide your Requested Remedy.** Inform the librarian that she may NOT keep legal origionals when their return has been requested.
Set up some time limit for the copying of legal work. (the library was open for in excess of 90 minutes yet no copies were made)
If Natalia is unable to handle the approval process for legal work as well as other duties assign the approval process to someone else.

**Inmate's Signature** [signature] **Date:** 1-28-05

**Staff Recipient** Sgt. A. Eaton [signature] **Date:** 2-5-05

****DENIED GRIEVANCES MAY BE APPEALED TO THE REVIEWING AUTHORITY WITHIN 10 BUSINESS DAYS.**
**(Inmate receipts/responses will be generated via the Inmate Management System.)**

A

# COMMONWEALTH OF MASSACHUSETTS

## DEPARTMENT OF CORRECTION

### INMATE GRIEVANCE FORM

### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

**Name** STEVENS WILLIAM G **Grievance#** 8350 **Institution** MASS. TREATMENT CENTER

**Commit No.** M85829 **Housing** C1 **Date Of Incident** 20050128 **Date Of Grievance** 20050128

**Complaint** On 1-27-05 I took legal papers to the library for copying. I was told that the legal copies were not being made that day because no one had approved them. I was informed that the copies would be done on Friday (1-28-05). On 1-28-05 I delivered my legal work to the librarian for copies at the 1330 hrs movement. I was told to pick them up at the 1500 movement. At 1500 hrs it was announced that the library (amongst other places) was closing. I went to the library to pick up my copies at that time. When I entered the library I was rudely informed by Natalia that the library was closed and there were no copies. I questioned this and was told by her that there was no time limit to how long she take to make copies. When I requested that my legal origionals be returned to me she told me that they (?) had closed the library and I must leave. When I again asked for my legal work, Natalia, in an aggressive manner, said don't make me call the officer. You must leave. The legal work I was attempting to have copied is time sensitive and must be returned to the court. This delay could have adverse effect on my case and is effectively denying me access to the courts. (a common occurance).

**Remedy Requested** Inform the librarian that she may not keep legal origionals when their return has been requested. Set up some time limit for the copying of legal work. (the library was open for an access of 90 minutes yet no copies were made)
If Natalia is unable to handle the approved process for legal work as well as other duties assign the approval process to someone else.

**Staff Recipient** Edington Glenn E CO II

**Staff Involved**

**Signature**

## RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20050205 **Decision Date** 20050213

**Signature** Edington Glenn E CO II

**Final Decision** DENIED

**Decision** Grievance is denied. Grievant reportedly entered the Library on an unauthorized visit shortly after the Institution had announced it's closing and instructing the population's return to their housing units. Grievant requested of Librarian Pushkina the return of his legal paperwork. She reportedly denied his request and ordered grievant to leave, informing him, she would call an officer if he did not comply. Grievant was reported to have complied and left the area. Photocopying of grievant's legal paperwork was pending and awaiting library service, (prior to the closing period of the library). The Library does not issue legal paperwork during closing periods. The Library Services policy does not define a time frame for legal photocopying services. The Librarian's actions were reasonable and appropriate. Requested remedies, is denied.

**Signature** Sgt Glenn Edington **Date** 2-13-05

Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.

FORM "B"

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**
**INMATE GRIEVANCE APPEAL FORM**

| INMATE'S NAME: | INMATE'S #: | DATE: |
|---|---|---|
| William Stevens | M-85829 | 2/13/05 |

| INSTITUTION: | ASSIGNED GRIEVANCE #: |
|---|---|
| MTC | 8350 |

**INSTRUCTIONS:**

1. Refer to 103 CMR 491, Inmate Grievance Policy.
2. Provide your appeal argument in **Block A**, in a brief and understandable manner.
3. Provide your requested remedy in **Block B.**

**A. Provide your appeal argument in a brief and understandable manner.** I am appealing the decision to this grievance because Sgt Edington was incorrect on several points. First I did not "enter the library on an unauthorized visit",I accessed the library during the 1500hrs movement after signing out of the unit. I do not feel comfortable leaving my original legal work in the library due to the fact that my leagle work has been gone through on a previous time I was forced to leave it in Pushkina's office. I requested that she return my legal work to me so I could keep it in my cell for the weekend. Pushkina then became belligerent, as she usually does when anyone dares to question her pronouncements, and threatened to call an officer if I did not get out. The clerk already had my leagle work ready for me to take with me, so allowing me to take the paperwork at that time would have caused no further delay in shutting down the library.(early again I might add).

**B. Provide your requested remedy** Instruct Pushkina that she may NOT retain my original legal work once I have requested it back from her. Develop a time schedual governing the amount of time the library has to complete legal copies. (In the case in question the library had been open for 2 hours but no copies had been completed. Keep the library open for all scheduled times so I can complete my legal work in a timely manner.

**Inmate's Signature** [signature] **Date:** 2/13/05

**Staff Recipient** Jessica Dutra **Date:**

**(Inmate receipts/responses will be generated via the Inmate Management System.)**

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE APPEAL FORM
### FORWARD TO SUPERINTENDENT

**Name** STEVENS WILLIAM G **Institution** MASS. TREATMENT CEN E

**Number** M85829 **Housing** C1 **Appeal Date** 13-FEB-2005 **Date Of Grievan e** 28-JAN-2005

**Appeal Received Date** 16-FEB-2005

**Appeal** I am appealing the decision to this grievance because Sgt. Edington was incorrect on several points. First I did n t nter the library on an unauthorized visit", I accessed the library during the 1500hrs. movement after signing out of the unit. I do c eel comfortable leaving my original legal work in the library due to the fact that my legal work has been gone through o a previous time. I was forced to leave it in Pushkina's office. I requested that she return my legal work to me so I could kee n my cell for the weekend. Pushkina then became belligerent, as she usually does when anyone dares to question her prono c nents, and threatened to call an officer if I did not get out. The clerk already had my legal work ready for me to take with me s allowing me to take the paperwork at that time would have caused no further delay in shutting down the library. (early again I mi h dd).

**Remedy Requested** Instruct Pushkinda that she may NOT retain my original legal work once I have requested it back from her. Deve o a time schedule governing the amount of time the library has to complete legal copies. (In the case in question the library had be n pen for 2 hours but no copies has been completed.) Keep the library open for all scheduled times so I can complete my legal wor a timely manner.

**Staff Recipient** Edington Glenn E CO II

**Signature**

## DECISION BY SUPERINTENDENT

**Appeal Received Date** 16-FEB-2005 **Decision Date** 16-FEB-2005 **Decision** DENIED

**Decision By** Murphy Robert F SUPERINTENDENT

**Reasons** Appeal denied. Request for legal copies was completed in accordance to 103 CMR 478, Institution Attachment to L ary Services Regulation, section VII. Grievant had been properly instructed that Library was closed and he would be given his c ments and copies at a later time. Library was closed due to operational needs of the facility.

**Signature** [signature] **Date** 2-16-05

## INMATE RECEIPT

**Inmate's Name** STEVENS WILLIAM G **Institution** MASS. TREATMENT CE T R

**Number** M85829 **Appeal Received Date** 16-FEB-2 0

**Staff Recipient** Edington Glenn E CO II

**Superintendent's Signature**

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
## INMATE GRIEVANCE FORM

#11216

| INMATE'S NAME: William Stevens | INMATE'S #: M-85829 | DATE: 6-[illegible]-05 |
|---|---|---|

| INSTITUTION: MTC | DATE OF INCIDENT: June 8,9,10,11,12,[illegible] 14,05 |
|---|---|

**INSTRUCTIONS:**

1. Refer to 103 CMR 491, Inmate Grievance Policy.
2. Check off a grievance type that best describes your grievance in **Block A.**
3. In **Block B**, give a brief and understandable summary of your complaint/issue.
4. List any actions you may have taken to resolve this matter in **Block C.** Be sure to include the identity o[f] staff members you have contacted.
5. Provide a Requested Remedy in **Block D.**

**A. Check off one grievance type only (Listed on reverse side). When filing an Emergency Grievanc[e] [s]elect Emergency and one additional grievance type.**

______**EMERGENCY**

**B. Give a brief and understandable summary of your complaint/issue. Additional paper may be us[ed] if necessary.** On June 8, 2005 I received notice from the Court that t[he]y had not received a document mailed to them by me on April 22, 05. I we[nt] to the library the evening of 6-8 to get a copy of the document made a[n]d was told that there was no one to authorize the copy. I returned to the [li]brary on 6-9 in the morning and was again informed that no one was availa[b]le to authorize copies, I continued to check back in the library on the [a]fternoon of 6-10, the afternoon of 6-13, and was, on each occasion, infor[m]e[d] that no one was available to authorize copies. On June 14, 2005 everyo[ne] was denied access to the library. This has delayed my court case by ov[er] a week and frequently recurs due to a lack of authorized people to approve [l]egal copies in the library.

**C. List any action taken to address/resolve this matter. Include the identity of staff members you ha[ve] contacted.** Increase the number of people who are allowed to author[iz]e the making of legal copies so these delays don*t continue. Much le[g]al work is timew sensitive, and an eight day delay in mailing out copies co[ul]d be detremental to someones legal case

**D. Provide your Requested Remedy.**

**Inmate's Signature** [signature] **Date:** 6/15/05

**Staff Recipient** Sgt. [signature] **Date:** 6/18/05

****DENIED GRIEVANCES MAY BE APPEALED TO THE REVIEWING AUTHORITY WITHIN 1[0] BUSINESS DAYS.**

**(Inmate receipts/respo[nses] [illegible] the Inmate Management System.)**