## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**WILLIAM STEVENS,**

   **Plaintiff,**

  **v.**            **C.A. No. 04-11938-JLT**

**ROBERT HOWLAND, et al.,**

   **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

  Defendants, Kathleen M. Dennehy, Robert Murphy, Joseph Murphy, and Robert Howland, through counsel, hereby submit this memorandum of law in support of their Cross-Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56.

## INTRODUCTION

  Plaintiff William Stevens ("Plaintiff") is an individual under civil commitment to the Massachusetts Treatment Center for Sexually Dangerous Men ("Treatment Center") (also known as the Nemasket Correctional Center) pursuant to M.G.L. c. 123A.  Named as defendants are Kathleen M. Dennehy, Commissioner of the Massachusetts Department of Correction ("DOC"); Robert Murphy, Treatment Center Superintendent; Joseph Murphy, Treatment Center Deputy Superintendent; and Robert Howland, Treatment Center recreation officer ("Defendants").

  Plaintiff's complaint alleges violations of his free exercise of religion and raises claims under 42 U.S.C. § 1983; 42 U.S.C. § 2000ccc (Religious Land Use and Institutionalized Persons Act) ("RLUIPA"); 28 U.S.C. § 2201;  M.G.L. c. 127, § 88; M.G.L. c. 231A, § 2; M.G.L. c. 127 § 38E & H; and DOC regulations, 103 CMR 471.00 *et seq*.  Specifically, plaintiff alleges a violation of his rights where defendants: 1) failed to provide him with cake and juice as part of

his religious services on several occasions between January and July, 2004; 2) failed to provide a larger room and additional times for Wiccan corporate worship; 3) failed to provide a Wiccan volunteer; and 4) failed to provide additional books, tapes and corporate worship items.

Plaintiff's complaint does <u>not</u> allege that he has suffered any emotional, psychological or physical injuries as a result of the challenged Treatment Center and DOC policies or the actions of any named defendant. *See Response of Plaintiff William G. Stevens to Defendants' First Set of Interrogatories,* Nos. 14 & 15. (Attached hereto as Exhibit 1).

## STATEMENT OF UNDISPUTED FACTS

1.    Plaintiff William Stevens is currently under involuntary civil commitment to the Treatment Center, located in Bridgewater, Massachusetts, pursuant to M.G.L. c. 123A. Complaint, ¶ 1; Affidavit of Joseph Murphy, ¶ 3 (Attached as Exhibit 2).

2.    Plaintiff professes to be an adherent of Wiccan practices.  Complaint, ¶ 15.

3.    The Treatment Center currently houses two populations of adult male sex offenders: (i) persons civilly committed as "sexually dangerous persons" ("SDPs") for an indefinite period of one day to life pursuant to G.L. c. 123A, and persons who have completed their criminal sentences and are awaiting adjudication as SDP's pursuant to G.L. c. 123A, §§ 12-14; and (ii) inmates serving a criminal sentence who are participating in DOC's voluntary sex offender treatment program ("SPIs").  Murphy Aff., ¶ 4.

4.    As a result of the Superior Court's July, 2001 decision in <u>Durfee v. Maloney</u>, Consolidated Suffolk Civil Actions Nos. 98-2523B & 98-3082B, the DOC keeps SDPs and SPIs separate and apart at all times.  Murphy Aff., ¶ 5.

5.    The implementation of the "separate and apart" management policy necessitated that the two populations be divided for purposes of access to the common areas of the facility

(such as the gym, exercise yard, dining hall, visiting room, religious activities and library). The Treatment Center houses 626 men, with 316 SDPs and 312 SPIs. Murphy Aff., ¶ 6.

6. The DOC recognizes fifteen (15) religions, including Buddhist, Christian Scientists, Greek Orthodox, Hare Krishnas, Muslims, Jehovahs' Witnesses, Jews, Mormons, Native Americans, Protestants, Rastafarians, Quakers, Roman Catholics, Scientologists and Wiccans. The DOC employs a number of chaplains who are Catholic, Muslim, Protestant and Jewish and are assigned to many of its prisons. The Treatment Center has part-time Catholic, Muslim, and Protestant chaplains on site. Any Treatment Center resident may meet with and seek counseling with a DOC chaplain, no matter what the denomination. Murphy Aff., ¶ 7; DOC Religious Programs and Services, 103 CMR 471.00 *et seq.* (Attached as Exhibit 3).

7. Currently, Treatment Center residents engage in religious activities for Catholics, Jews, Protestants, Muslims, Native Americans, Jehovah Witnesses, Buddhists and Wiccans. The religious groups meet in the facility's chapel, on the "D" corridor. However, because of the need to provide separate meeting space for SDP and the SPI residents, the Treatment Center also uses a room on the "B" corridor to accommodate additional religious group meetings. The dimensions of the "B" corridor therapy room are 16 feet, 9 inches by 10 feet, 4 inches and the dimensions of the chapel are 15 feet, 6 inches by 15 feet, 6 inches. The "B" corridor room is used for religious programs because is provides correctional staff with excellent visibility of the activities held in the room. The "B" corridor room is more than sufficient to accommodate the four or five SDPs that generally attend the Wiccan meetings. Murphy Aff., ¶ 8.

8. The Treatment Center provides a schedule of meeting times for the chapel ("D" corridor) and the "B" corridor room. Generally, the SDPs have access to the chapel and the "B" corridor room on Wednesdays and Fridays and the SPIs have access to the rooms on Tuesdays

and Thursdays.  There are no activities in the two rooms Monday through Friday between 11:00 a.m. and 1:00 p.m. and between 4:00 p.m. and 7:00 p.m. because the residents are to be in their cells for the standing counts and then go to lunch or dinner.  Murphy Aff., ¶ 9.

9.     The "C" corridor therapy room is used solely for conducting behavior therapy and is not available for use by any religious groups.  The dimensions of the "C" corridor therapy room are 16 feet, 6 inches by 11 feet, 6 inches.  Murphy Aff., ¶ 10.

10.    SDP Wiccans meet weekly from 7:00 p.m. to 8:40 p.m. on Wednesday and Friday nights.  Deposition of William Stevens at 20:17-21:2 (Attached as Exhibit 4); Murphy Aff., ¶ 9.

11.    Plaintiff has been advised that he was not permitted to lead Wiccan religious services since no inmate is permitted to be in a position of authority over other inmates. *Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment,* Ex. 2.  Plaintiff is able to educate other Wiccan members on the fundamentals of Wicca.  Stevens Depo., 21:6-20.

12.    There are no Wiccan volunteers at the Treatment Center or any other DOC facility.  The DOC has made reasonable efforts to locate Wiccan volunteers for the Treatment Center.  Plaintiff has made no effort to locate a Wiccan volunteer for the Treatment Center on his own.  Affidavit of William Milhomme (Attached as Exhibit 5); Stevens Depo., 21:16-26:15.

13.    While living on Cape Cod prior to his incarceration in 1999, plaintiff was an adherent to Wiccan practices but never attended any Wiccan Sabbat ceremonies on the Cape. Instead, plaintiff attended two or three Sabbat ceremonies in Kentucky and engaged in daily meditations and personal observance of Wiccan rituals.  Stevens Depo., 10:1-12:15.

14.    During the regular Wiccan services at the Treatment Center, the Wiccan adherents will mediate, watch a Wicca videotape or CD, play Wiccan music, talk, dance and engage in

Wiccan rituals.  The Wiccans at the Treatment Center are provided with cake and juice for the celebration of the Sabbats.  Stevens Depo., 27:18-46-11; 48:18-49:12; Murphy Aff., ¶ 18.

15.    During the period of time when Joseph Murphy was temporarily reassigned from his duties as the Treatment Center's Director of Treatment to assist in the launch of the Department's computerized information system, from January, 2004 to May, 2004, there were several occasions in which, due to staff miscommunications, the Wiccans did not receive cake and juice for their Sabbats.  The communication problems were resolved upon Mr. Murphy's return to his duties at the Treatment Center.  Murphy Aff., ¶ 18; Stevens Depo., 85:14-86:13.

16.    Wiccans at the Treatment Center have access to a number of religious property items, including, Tarot cards, an altar cloth and altar bowls, runes and cloth bag, magic circle, brass bells, worry stones, meditation CDs, Book of Shadows, black feathers and a wand for use in corporate worship.   However, due to security concerns, candles may only be used for corporate worship if a volunteer is present.  The Treatment Center has several sets of CDs for use by Wiccans in corporate worship, including meditation CDs and has purchased six posters for use by the Wiccans.  Plaintiff can purchase a medallion, prayer oil and books pertaining to Wiccan practices through approved vendors.   Requests for religious property not presently approved by the DOC must be made through the Religious Services Review process.  103 CMR 403.10(9).  Murphy Aff. ¶ 19; Stevens Depo., 51:1-70:10.

17.    According to Treatment Center sign-in sheets, the last time plaintiff attended a Wiccan service or meeting was on November 11, 2005.   Murphy Aff., ¶ 21 and Attachments.

18.    DOC regulations place strict limits on the type and amount of personal property inmates may keep within their cells. 103 CMR 403.10.  The restrictions on personal property are

necessary to reduce fire hazards, reduce areas where inmates can secrete contraband, facilitate quicker and more thorough cell searches, and reduce sanitation and housekeeping hazards. Murphy Aff., ¶ 11; Inmate Property 103 CMR 403.00 *et seq.* (Attached as Exhibit 6).

19.    In order to process and fairly accommodate the multitude of practices and religious property item requests by inmates, the DOC developed a Religious Services Handbook ("Handbook"), first issued in April of 1999 and periodically revised, as a reference tool to assist administrators when evaluating inmate religious requests.  Murphy Aff., ¶ 12.

20.    The Handbook includes a section outlining commonly accepted practices for the above-referenced faiths, including information related to Wiccan practices.  The Handbook outlines approved practices and property items by religion and institution security level and provides that inmates may purchase religious property items from a list of approved items from an approved vendor.  Restricting inmates to the purchase of religious items from a single vendor enables the DOC to ensure consistency in the religious items it allows into its prisons, to screen religious items for possible security concerns, decreases the likelihood of the introduction of contraband into prisons through incoming property, and reduces the burdens on staff who must process and inspect all incoming property.  Murphy Aff., ¶¶ 13, 14.

21.    A copy of the Handbook is available to all Treatment Center residents in the facility's library.  The Handbook sets out the process an inmate must follow in order to obtain permission to acquire a religious item or religious practice not presently allowed by the DOC. The inmate must submit his request, using the Inmate Religious Services Request Form with supporting documentation, to the Superintendent of an institution or his designee, and the

Superintendent will forward the information, along with his or her recommendation, to the Religious Services Review Committee ("RSRC").  Murphy Aff., ¶ 15.

22.    The RSRC will review the request and may seek further information regarding the request from a variety of sources, including the DOC's chaplains, and outside religious groups. 103 CMR 403.10(9).  The RSRC is comprised of three Assistant Deputy Commissioners who represent the Department of Correction's penultimate security concerns and the Director of Program Services, who functions as chairperson of the committee. 103 CMR 403.10(9).  All recommendations made by the RSRC regarding inmate requests for religious services and property are forwarded to the Commissioner for her final decision.  Murphy Aff., ¶ 16.

23.    Pursuant to the DOC's Inmate Management policy, 103 DOC 400.00 *et seq.*, inmates are not permitted to be placed in a position of authority or control over other inmates. The purpose of this policy is to avoid situations where an inmate can use a superior position to take advantage of other inmates and exert an undue influence over other inmates.  This is especially problematic in the context of religious activities and Treatment Center residents are not permitted to lead any religious worship services.  *See* 103 DOC 400.06 (Attached as Exhibit 7); Murphy Aff. ¶ 20.

24.    Some of the Treatment Center religious groups for the SDPs and the SPIs may meet more than twice a week where there are volunteers from the community who are willing to come to the Treatment Center and lead additional groups.  For example, there are three separate religious groups from the community who come in and lead groups for the SDP and SPI Protestants at the Treatment Center: the Emmaus Bible Study groups, the Zion Bible Study groups and the Spanish-English services.  Murphy Aff., ¶ 22.

25.    For security reasons, including concerns for escape, no Treatment Center groups are permitted to meet outdoors.  Murphy Aff., ¶ 23.

## ARGUMENT

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Only those facts in dispute that might affect the outcome of the suit under the governing law will bar the entry of summary judgment.  *See LeBlanc v. Great American Insurance Co.*, 6 F.3d 836, 841-42 (1st Cir. 1993).

In order to succeed on a request for a permanent injunction, a court must find: 1) plaintiff prevails on the merits; 2) plaintiff would suffer irreparable harm without an injunction; 3) the harm to plaintiff would exceed the harm to defendant from the imposition of an injunction; and 4) the public interest would not be adversely affected by an injunction.  *See Pagan v. Calderon*, 284 F.3d 184, 191 (1st Cir. 2002).  Injunctive relief is "to be used sparingly, and only in a clear and plain case." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976).  When a government agency is involved, the requirement that the government be granted the "widest latitude in the dispatch of its own internal affairs" must be observed. *Id*. at 378-379.  Such considerations are strengthened when a state agency is involved due to federalism concerns. *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974) ("proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers").  Injunctive relief against a state officer is warranted only when "irreparable injury" is demonstrated. *City of Los Angles v.*

*Lyons*, 461 U.S. 95, 111 (1983); *Lewis v. Casey*, 518 U.S. 343 (1996) (courts are limited to providing relief to claimants who have suffered, or will imminently suffer, actual harm).

## II.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE RLUIPA CLAIM.

Section 3 of RLUIPA prohibits state governments from placing a substantial burden on the religious exercise of institutionalized persons unless the government demonstrates that the burden is in furtherance of a compelling government interest and is the least restrictive means of furthering that compelling interest.  42 U.S.C. § 2000cc-1(a).

An inmate's religious practices are substantially burdened where the state policy has a tendency to coerce the individual into acting contrary to their religious beliefs. *See Lyng v. Northeast Indian Cemetery Protective Association*, 485 U.S. 439, 450-451 (1988) ("Incidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs [do not] require government to bring forward a compelling justification for its otherwise lawful actions"); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).  However, no substantial burden results from a restriction of a particular accommodation if the inmate has ample alternative means to pursue his religion.  *Diaz v. Collins*, 114 F.3d 69, 72 (6th Cir. 1997).

A prison's interest in safety, security and institutional integrity constitute compelling interests in support of state policies that are determined to substantially burden an inmate's religious practices. *See Cutter v. Wilkinson*, 544 U. S. 709, 721-724 (2005) (compelling interest standard to be applied with due deference to need to maintain order, security, and discipline in prison); *Collins-Bey v. Thomas*, 2004 U.S. Dist. LEXIS 21348 (N.D. Ill. 2004) ("Ensuring safety within a prison is a compelling government interest."); *Rasheed v. Commissioner of Correction*, 446 Mass. 463, 473-474 (2006).

A.    **Plaintiff Has Not Demonstrated A Substantial Burden.**

In the case at bar, plaintiff has failed to demonstrate that the DOC policies have substantially burdened his religious practices in violation of RLUIPA.  In support of his claim of a violation of his free exercise of religion, plaintiff alleges that: 1) the Wiccan group was not provided with cake and juice for several Sabbat ceremonies between January and July, 2004; 2) Wiccans were denied access to a larger room for their meetings and not provided with additional meeting times; 3) Wiccans were not provided with a volunteer to lead corporate worship meetings; 4) and requests for Wiccan books and videotapes and other corporate worship items were only partially granted.  However, plaintiff has not demonstrated that these issues have substantially burdened his religious practices.  The lack of cake and juice for several Sabbat ceremonies was only temporary and the result of a miscommunication among staff.  It is undisputed that DOC policies provide that Wiccans are to have access to cake and juice for Sabbat ceremonies.  Stevens Depo., 85:14-86:13; Murphy Aff. at 18.  Plaintiff has not shown that the lack of cake and juice for several Sabbats substantially burdened his religious practices.

Nor has plaintiff demonstrated that the lack of a Wiccan volunteer from the community has substantially burdened his religious practices.  Plaintiff has acknowledged that he engaged in Wiccan practices at the North Central Correctional Institution for four and one half years without benefit of a Wiccan volunteer.  Stevens Depo., 22:14-20.  Plaintiff states that he is not aware of any Wiccan groups in the vicinity of the Treatment Center and has made no attempts while at the Treatment Center to contact any Wiccan groups to inquire about the existence of Wiccans in the area.  Stevens Depo., 21:16-22:13; 23:9-26:8.  Moreover, plaintiff has stated that as a practicing Wiccan prior to his incarceration he only attended two or three Sabbat ceremonies over a period of several years and was able to practice his Wiccan beliefs through daily mediations and

personal observance of Wiccan rituals. Stevens Depo., 10:19-12:8.  Accordingly, plaintiff has not shown how the absence of a Wiccan volunteer has substantially burdened his ability to engage in Wiccan practices.

Plaintiff's allegation that he needs to engage in more frequent Wiccan meetings in a larger space also fails to support a claim of a substantial burden to his religious practices.  First, as the Wiccan sign-up sheets evidence, even when plaintiff did attend the Wiccan meetings, the groups consisted of no more than five individuals.  Plaintiff has not shown why a room measuring 16 feet, 9 inches by 10 feet, 4 inches is too small to accommodate a group of that size. Second, while plaintiff's complaint seeks access to the "C" corridor therapy room for Wiccan meetings, the dimensions of that room are 16 feet, 6 inches by 11 feet, 6 inches, only slightly larger than the "B" corridor room presently available for the Wiccans.  Murphy Aff., ¶¶ 8-10. Similarly, plaintiff has not demonstrated why he requires additional meeting times for his religious practices, especially in light of the fact that plaintiff has not attended a Wiccan meeting in nine months.  Murphy Aff., ¶ 21.  Plaintiff is able to engage in daily mediations for Wicca at the Treatment Center.  Stevens Depo., 73:2-3.

Finally, plaintiff has not demonstrated what religious items he has been denied access to and how the lack of these items substantially burdens his religious practices.  It is undisputed that Wiccans at the Treatment Center have access to a number of religious items, including Tarot cards, an altar cloth and altar bowls, runes and cloth bag, magic circle, feathers, brass bells, worry stones, meditation tapes, Book of Shadows and a wand for use in corporate worship.  The Treatment Center has several sets of CDs for use by Wiccans in corporate worship, including meditation CDs and six posters for use by the Wiccans.  Plaintiff may purchase medallions, prayer oil and books for his individual practices.  Murphy Aff., ¶ 19; Stevens Depo., 47:1-66:6.

Where plaintiff has not shown that he is unable to engage in the practice of Wicca due to the absence of a volunteer, some items of property and the size of the room, he has failed to prove that he has suffered a substantial burden to his religious practices. Certainly, where plaintiff has not attended a Wiccan meeting since November, 2005, he cannot complain about the meeting times, the size of the room and the lack of some items of corporate worship.

**B.    DOC Policies Are Based On Compelling Interests And Are Least Restrictive.**

Even assuming *arguendo*, that plaintiff is able to demonstrate that the DOC policies substantially burden his religious practices, the restrictions placed on plaintiff's religious practices are supported by compelling state interests and are least restrictive means of furthering the state interests.

The restrictions placed on the types of religious property items plaintiff may use for individual and corporate worship are based on defendants' concerns for safety and security. Treatment Center residents are restricted as to the type and amount of personal property they may keep in their cells in order to reduce fire hazards, reduce areas where residents can secrete contraband, facilitate quicker and more thorough cell searches, and reduce sanitation and housekeeping hazards. 103 CMR 403.10; Murphy Aff., ¶ 11.

In addition, limiting inmates to the purchase of religious items from a list of items available from a single approved vendor furthers the DOC's compelling interests by ensuring the consistency in the religious items it allows into its prisons, allows the DOC to screen religious items for possible security concerns, decreases the likelihood of the introduction of contraband into the institutions through incoming property, and reduces the burdens on staff who must process and inspect all incoming property. Murphy Aff., ¶ 14. *See Rasheed v. Commissioner of*

*Correction*, 446 Mass. 463, 473-475 (2006) ("Prison officials must be permitted latitude in determining what products can come into the prison and what vendors can provide them.").

The DOC policy that prohibits Treatment Center residents and inmates from being placed in a position of authority over other inmates, including leading religious activities, is based on the compelling government interest in promoting internal order, discipline and safety.  In his affidavit, Deputy Superintendent Murphy stated that permitting an inmate to be in a position of authority over other inmates provides opportunities for the inmate to exert undue influence and control over other inmates and to take advantage of the inmates, including seeking money and or favors.  Murphy Aff. at ¶ 20.

Finally, the limits placed on the times and location of the Wiccan corporate meetings are based on the interests of promoting safety, security and internal order.  The Treatment Center maintains a management policy which keeps the civil SDPs and incarcerated SPI populations separate.  This policy requires that the Treatment Center provide double the normal number of activities available to the population.  Plaintiff and other SDP Wiccans permitted to meet in the "B" corridor room instead of the "C" corridor therapy room because the "B" corridor room has greater visibility which assists correctional staff in monitoring the meetings.  Murphy Aff. at ¶ 8.

Defendants are entitled to judgment on this claim where the challenged policies do not substantially burden plaintiff's religious practices and further compelling state interests in a least restrictive manner.

## III.    CLAIMS UNDER 42 U.S.C. § 1983.

### A.    No Violation of First Amendment Rights.

Courts have utilized a two step process for the review of prisoner free exercise of religion claims under the First Amendment.  The first step asks whether the challenged policies deprived

the prisoner of the right to exercise his religion under the First Amendment. The initial inquiry requires the "court to evaluate the 'quality of the claims' alleged to be religious." *Abdullah v. Fard*, 974 F. Supp. 1112, 1117 (N.D. Ohio 1997) (*quoting Wisconsin v. Yoder*, 406 U.S. 205 (1972)); *McEachin v. McGuinnis*, 357 F.3d 197 (2nd Cir. 2004) ("a court must determine when an impediment to a religious practice is significant to warrant judicial intervention"). Next, if the prisoner demonstrates a burden on his right to free exercise of religion, the court must then determine whether the burden is reasonably related to legitimate penological interests. *See Turner v. Safley*, 482 U.S. 78 (1987); *O'Lone v. Shabazz*, 482 U.S. 342 (1987).

Assuming *arguendo*, that plaintiff is able to establish that defendants' policies burden his right to the free exercise of religion, it is clear that the complained of policies are reasonably related to legitimate penological goals. The Supreme Court has held that the "free exercise" right is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *O'Lone*, 482 U.S. at 348. The *O'Lone* Court stated that prisoners' constitutional rights are subject to restrictions based on "valid penological objectives, including deterrence of crime, rehabilitation of prisoners and institutional security." The *O'Lone* Court adopted the standard of review set out in *Turner v. Safley*, 482 U.S. at 89. In *Turner*, 482 U.S. at 89, the Supreme Court held that "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests" and set out four factors to be considered in determining when a regulation is reasonably related to the identified interests. First, there must be a "valid rational connection between the prison regulation and the legitimate government interest put forward to justify it." *Id*. at 89. Second, courts must consider whether there are "alternative means of exercising the right that remain open to prison inmates." *Id*. Third, what is

14

the "impact of accommodation of the asserted right on guards and other inmates, and on the allocation of prison resources generally." *Id*.  Fourth, courts must ascertain whether there are "ready alternatives" available to the regulation. *Id*.  However, "neither the *Turner* nor *O'Lone* decisions require a court to weigh evenly, or even consider, each of these factors." *Scott v. Mississippi Dept. of Corrections*, 961 F.2d 77 (5th Cir. 1992).

Further, prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974); *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979).

In the instant case, it is clear that the restrictions placed on plaintiff's religious practices are based on legitimate penological goals.  Limitations on the location and times of Wiccan corporate worship are based on the need to keep the two Treatment Center populations separate and apart and due to limited number of rooms that are appropriate for religious meetings.  The requirement that plaintiff obtain religious property items, including religious books, from an approved vendor is also related to the need to ensure consistency in the religious items it allows into its prisons, decrease the likelihood of the introduction of contraband into prisons through incoming property, and reduce the burdens on staff who must process and inspect all incoming property.  Murphy Aff., ¶¶ 13, 14.  While the DOC policies permit plaintiff to have a Wiccan volunteer to lead Wiccan corporate services, there is no Wiccan volunteer at the Treatment Center despite the efforts of DOC staff to locate Wiccan volunteers.  *See* Milhomme Aff., ¶ 4.

Second, it is undisputed that plaintiff has access to many opportunities to exercise his religious beliefs, including access to numerous religious items for corporate or personal worship, the ability to purchase religious books, to attend twice weekly corporate worship and to engage

in daily meditations. Third, accommodating plaintiff's requests for additional meeting times and a larger meeting room would have an adverse impact upon other inmates where it may require that another religious group give up some of their scheduled meeting times in order to accommodate plaintiff's request for additional meeting times. Lifting restrictions on obtaining religious property and books would increase burdens on correctional staff and increase opportunities for contraband to enter the facility, endangering both inmates and staff. *Id*. Fourth, there are no "ready alternatives" to the Treatment Center policies which allow for security concerns. Defendants are entitled to judgment on the claims under the First Amendment. [1]

### B. Defendants Are Entitled To Judgment On The Equal Protection Claim.

Plaintiff has alleged that as a Wiccan he is not provided with the same benefits as are available to adherents of the other religions, including access to a Wiccan chaplain and additional meeting times and religious property items. However, unequal treatment among inmates is justified if it is rationally related to legitimate penological interests. The standard of review of an equal protection claim is the reasonableness test adopted in *Turner*, 482 U.S. at 89. *See Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977) ("[i]t is precisely in matters such as this, the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused."). *See also Hudson v. Palmer*, 468 U.S. 517, 522-523 (1984). Nor is there an equal protection violation where differences result from reasonable efforts to accommodate the requirements of different religions. *Cruz v. Beto*,

---

[1]  Where the DOC policies meets the compelling interest test of RLUIPA, it is axiomatic that the policy meets the less demanding *Turner v. Safley* reasonableness test under 42 U.S.C. § 1983

405 U.S. 319, 322 n. 2 (1972) (not every religious sect or group within a prison is required to have identical facilities or personnel).

To succeed on an equal protection claim, a plaintiff must also show that a discriminatory purpose was the motivating factor in the creation of the unequal treatment. *See Washington v. Harper*, 426 U.S. 229 (1976); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994), *cert denied*, 514 U.S. 1108 (1995) (to prove equal protection violation, plaintiff must demonstrate that action taken with discriminatory intent.); *Rasheed*, 446 Mass. at 477-478 (inmate failed to show that differences in how religious groups were treated was the result of a discriminatory intent).

In the case at bar, defendants are entitled to judgment on the equal protection claim where plaintiff has failed to demonstrate that he has been treated unequally as compared to other Treatment Center religious groups. While there are part-time chaplains for Catholics, Protestants and Muslims at the Treatment Center, there are no chaplains or volunteers available for the other religious groups, including Buddhists, Native Americans, and Jehovah's Witnesses. Nor does the DOC provide chaplains for Greek Orthodox, Hare Krishna, Mormon, Rastafarian, Quaker or Scientologist groups. Certainly, where numerous religious groups are without a DOC chaplain of their faith, plaintiff's claim that the failure to provide him with a Wiccan chaplain constitutes unequal treatment is meritless. Similarly, the Treatment Center schedules for the chapel and "B" corridor room demonstrate that the various religious groups are provided with meeting times that are more or less equal. The only difference concerns the Protestants, who, as a result volunteers from three different community organizations, have additional prayer meetings. *See* Murphy Aff., ¶ 22. Nor has plaintiff demonstrated that other Treatment Center religious groups are provided with more religious items for corporate worship. While some of the corporate worship property items sought by plaintiff may not have been approved by the RSRC based on security

concerns, plaintiff has failed to demonstrate that he has been treated unequally as compared to other religious groups with regard to corporate items. To the extent that differences in worship time and the property items for corporate worship are the result of differences in religious beliefs among different religions, there is no equal protection violation.

Finally, plaintiff has failed demonstrate that, to the extent differences exist between Wiccans and other Treatment Center religious groups in access to corporate worship times, locations, property and chaplains, the differences are the result of a discriminatory intent on the part of the defendants. Accordingly, defendants are entitled to judgment on this claim.

## IV.    RELIEF UNDER FEDERAL DECLARATORY RELIEF ACT.

Plaintiff's complaint also seeks relief under the federal Declaratory Judgment Act, 28 U.S.C. § 2201. "The Declaratory Judgment Act is uncommon in that it neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies," and thus is entirely discretionary. *El Dia Inc. v. Hernandez-Colon*, 963 F.2d 488, 493 (1st Cir. 1992), *quoting Green v. Mansour*, 474 U.S. 64, 72 (1985). The First Circuit, in *El Dia Inc.*, 963 F.2d at 494, held that "[e]specially when matters of great public moment are involved, declaratory judgments should not be pronounced 'unless the need is clear, not remote or speculative.'" (*quoting Washington Public Power Supply Sys. v. Pacific Northwest Power Co.*, 332 F.2d 87, 88 (9th Cir. 1964)). The *El Dia Inc.* Court set out several factors to be considered by a court in review of a request for relief under the Declaratory Judgment Act: 1) courts should utilized declaratory judgment actions to decide issues of constitutional law only when absolutely necessary; 2) the matter must be ripe for adjudication; 3) courts should consider the desirability of abstaining when issues of federalism are raised; 4) federal declaratory relief should be avoided where comity with state courts may be at issue; and

5) courts should not act in equity where there is an adequate remedy at law available and should only be exercised in the public interest. *El Dia Inc.*, 963 F.2d at 495-498.

It is also well established that the operation of Declaratory Judgment Act is procedural only, *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937), and the Act merely expands the relief available through litigation, [and] does not affect parties' substantive rights. *Colonial Penn Group, Inc. v. Colonial Deposit Co.*, 834 F.2d 229, 232 (1st Cir. 1987). "Declaratory relief pursuant to 28 U.S.C. § 2201 is not an independent claim but an alternative form of relief." *Atkins v. Penobscot Nation*, 130 F.3d 482, 490 n. 9 (1st Cir. 1997).

In the case at bar, relief under the federal Declaratory Judgment Act is not warranted where this action raises issues of constitutionality, challenges statues and regulations enacted by the Commonwealth to provide for safety, security and internal order in its prisons, where and declaratory relief is not in the public interest. *See El Dia Inc.*, *supra.*

## V.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE CLAIMS BROUGHT UNDER STATE LAW.

### A.    Defendants Are Entitled To Judgment On The State Constitution Claims.

Plaintiff's complaint has alleged, in conclusory fashion, that the Treatment Center policies have violated his rights under Articles 1, 2, 3, 11 and 19 of the Declaration of Rights of the Massachusetts Constitution. While Article 2 of the Declaration of Rights pertains to the free exercise of religion, plaintiff has failed to provide any factual basis for the claims under Articles 1, 3, 11 and 19 and defendants are entitled to judgment on the claims under these articles.

With regard to the free exercise of religion claim under Article 2, the Supreme Judicial Court has recently held that the compelling interests standard set out in the case of *Attorney General v. Desilets*, 418 Mass. 316, 320-21 (1994) is applicable to free exercise of religion claims brought by inmates under the State Constitution. *See Rasheed*, 446 Mass. at 466-467;

*Ahmad v. Department of Correction*, 446 Mass. 479, 485-486 (2006).  Accordingly, the analysis of plaintiff's claims under RLUIPA, discussed *infra* at II A & B, is applicable here, and defendants are entitled to judgment on the Article 2 claim.[2]

**B.    Defendants Are Entitled To Judgment On The M.G.L. c. 127, § 88 Claim.**

M.G.L. c. 127, § 88, entitled "inmate religious services," provides that while inmates are entitled to the free exercise of religion, the right shall not be construed to "impair the discipline of any such institution so far as may be needful for the good government and safe custody of its inmates...." M.G.L. c. 127, § 88. *See Jackson v. Hogan*, 388 Mass. 376 (1983) (restrictions on inmate's ability to attend religious services based on security concerns upheld under M.G.L. c. 127, § 88); *Rasheed*, 446 Mass. at 475-476; *Abdul-Alazim v. Superintendent, M.C.I. Cedar Junction,* 546 Mass. App. Ct. 449, 453 (2002).  Pursuant to the statute, the DOC has promulgated regulations providing for the free exercise of religion in prison. *See* 103 C.M.R. 471.00 *et seq.*

As discussed, *infra* at parts II A & B, plaintiff has failed to demonstrate that the complained of Treatment Center policies have substantially burdened his ability to practice his religion.  The challenged policies are necessary to provide for safety, security and internal order at the Treatment Center.  Accordingly, defendants are entitled to judgment on this claim.

**C.    Defendants Are Entitled To Judgment On The Claim Brought Under DOC Regulations.**

Nor can plaintiff obtain relief for alleged violations of DOC Religious Services regulations, 103 CMR 471.00 *et seq.*  It is well established under Massachusetts law that without reference in the enabling statute to the possibility of a private action in equity or damages, an

---

[2]  Plaintiff is unable to state a claim for damages directly under the Massachusetts Constitution. *See Martino v. Hogan*, 37 Mass. App. 710, 719-20 (1994), rev. denied, 419 Mass. 1106 (1995) (finding that there was no authority upon which to base a claim for damages directly upon the Constitution's Declaration of Rights and that the existence of the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11(H & I), would appear to preclude a claim for damages directly under the State Constitution).

agency's regulations do not create a private right of action which would confer standing on plaintiff to seek declaratory, injunctive or monetary relief.  *See Loffredo v. Center for Addictive Behaviors*, 426 Mass. 541 (1998) (no private cause of action under regulation in absence of clear legislative intent to create a private cause of action for person injured by a regulation violation); Massachusetts courts, in related contexts, have consistently found it improbable that the Legislature, in granting a state agency the authority to promulgate regulations was also empowering the agency to create possible civil liability. *See Martino v. Hogan*, 37 Mass. App. Ct. 710, 720-21 (1994), *rev. denied* 419 Mass. 1106 (1995) ("implausible" that Legislature intended to delegate to Department of Correction the authority to establish personal liability in event of breach of classification regulations); *Dinsky v. Framingham*, 386 Mass. 801, 804-810 (1982) (nothing in State Building Code evidenced legislative intent to create a private right of action for enforcement of building code).  The reluctance of courts to view the violation of any administrative regulation as conferring a private remedy for damages or equity is also based on a well-founded concern that such a policy would discourage agencies from promulgating any standards for fear of encountering endless litigation. *See Touche Ross & Co. v. Reddington*, 442 U.S. 581, 578 (1979).  Such considerations are properly addressed to the legislature. *Id.* at 579.

In addition, the Attorney General, as the Commonwealth's chief law enforcement officer, is the appropriate party to maintain a civil action to establish an official's duty to enforce DOC regulations. *Attorney General v. Sheriff of Worcester County*, 382 Mass. 57, 58-59 (1980).

Finally, under Massachusetts law, "an agency's interpretation of its own regulations [should be accorded] considerable deference unless arbitrary, unreasonable, or inconsistent with the plain terms of the regulations themselves." *Rasheed*, 446 Mass. at 476; *Boston Police Superior Officers Federation v. Boston*, 414 Mass. 458, 462 (1993) ("So long as the agency's

interpretation of its regulations and statutory mandate is rational, and adhered to consistently, it should be respected.").

Here, where the enabling statute, M.G.L. c. 124, §§ 1(c) and 1(q), is without mention of the creation of a private action in equity or damages, it is clear that plaintiff lacks standing to raise a claim in equity or damages under the DOC Religious Services regulations.

### D. Declaratory Relief Under M.G.L. c. 231A.

Plaintiff is not entitled to declaratory relief under M.G.L. c. 231A where his claims do not question of the constitutional validly of the Department's policies or regulations, but seek to assert individual claims. The Commonwealth has only consented to suit in the manner and to the extent expressed in § 2 of the Act, which provides that declaratory judgment may be sought:

> to obtain a determination of the legality of the administrative practices and procedures of any…state agency or official which practices or procedures are alleged to be in violation of the Constitution of the United States or the constitution or laws of the commonwealth, or are in violation of rules or regulations promulgated under the authority of such laws, which violation has been consistently repeated…For the purpose of this section practices or procedures mean the customary and usual method of conducting…state agency or official business.

M.G.L. c. 231A, § 2.

*See Executive Air Service, Inc. v. Division of Fisheries and Game*, 342 Mass. 356, 357-58 (1961). The Supreme Judicial Court has determined that the Declaratory Relief Act "provides relief in certain circumstances, including the determination of any question of construction or validity…of an administrative regulation." *Nelson v. Commissioner*, 390 Mass. 379, 387 (1983). The plain language of § 2 states that a declaratory judgment may be sought to obtain a determination of the administrative practices and procedures of a state agency. M.G.L. c. 231A, § 2. Thus, under § 2, the Commonwealth consented to suit for declaratory judgment where the constitutional validity of its practices or procedures, such as policies and regulations, are in

question. Section 2 does not extend declaratory relief where the question of the constitutional validly of the Department's policies or regulations are not at issue.

Here, plaintiff is not seeking a determination that the DOC's regulations or policies are unconstitutional, but he seeks a determination that he has been denied access to sufficient corporate worship in violation of state and federal law.[3] Since plaintiff's claims depend entirely upon his personal circumstances, showing actual prejudice, they cannot be brought under § 2. Plaintiffs' claims are distinguishable from those in *Nelson*, where declaratory judgment was an appropriate method of relief because the plaintiffs' claim concerned a challenge to the validity of a departmental regulation. *Nelson supra* at 388; *see Williams v. Sec. of the Exec. Office of Human Serv. and Comm'r of Mental Health*, 414 Mass. 551 (1993); *Henderson v. Comm. of Barnstable County*, 49 Mass. App. Ct. 455 (2000). Defendants are entitled to judgment.

### E.    Inmate Grievance Procedures

Plaintiff's complaint alleges, in conclusory fashion, that the Commissioner of Correction has violated a state statute requiring her to "promulgate regulations to establish a fair, impartial, speedy and effective system for the resolution of grievances filed against the department, its officers or employees, by inmates who are committed to or held by or in the custody of the department in a state, county, or federal correctional facility, or the Massachusetts treatment center." M.G.L. c. 127, § 38E. However, where the DOC has promulgated regulations concerning inmate grievances, 103 CMR 491.00 *et seq.*, it is clear that this claim has no merit.

The complaint further seeks judicial review of the defendants' decisions denying plaintiff's grievances regarding religious issues. However, the Eleventh Amendment bars suit against a state by its own citizens unless the state has waived its sovereign immunity. *Will v.*

---

[2]  Plaintiffs have not challenged the constitutionality of the DOC's Religious Services policy, 103 CMR 471.00 et seq. (Exhibit 10).

*Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) (the Supreme Court has consistently held that the Eleventh Amendment precludes such suits in the absence of the state's consent to suit).  The Massachusetts Legislature has provided a limited waiver of sovereign immunity with regard to judicial review of inmate grievances under M.G.L. c. 127 § 38H, allowing suit only in its own courts:

> A final decision with respect to a grievance shall be subject to judicial review in accordance with section 14 of chapter 30A, in the superior court for the county in which the inmate is incarcerated or otherwise being held, or in Suffolk county.  A complaint filed with the court by an inmate in accordance with this section shall be accompanied by a copy of the final decision for which review is sought, if any, and a complaint not so accompanied subject to the exclusion in section 38F shall not be accepted for filing.  The availability of review under this section shall not be construed to limit any judicial remedies otherwise available.

M.G.L. c. 127 § 38H.  The statute contains "neither an express nor a necessarily implicit consent by the Commonwealth to suit in Federal courts....  Where, as here, the Commonwealth consents to suits in its own courts, 'it can be impleaded only in the manner and to the extent expressed...[by] statute.'"  *Irwin v. Commissioner of the Dept. of Youth Services*, 388 Mass. 810, 819-21 (1983) (*quoting Broadhurst v. Director of the Div. of Employment*, 373 Mass. 720, 722 (1977)); *Cf Rivera v. Commonwealth of Massachusetts*, 16 F. Supp.2d 84, 87 (D. Mass. 1998) (federal courts lack jurisdiction over Mass. Tort Claims Act claim in absence of waiver of sovereign immunity).  Defendants are entitled to judgment on the inmate grievance claims.

## VI.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

The doctrine of qualified immunity seeks to protect government officials from the burdens of vindictive and harassing lawsuits which may inhibit them from properly exercising their powers, while, at the same time, protecting private citizens from oppressive or malicious

government action.  *Knight v. Mills*, 836 F.2d 659, 665 (1st Cir. 1987) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 238 (1974)).  The Supreme Court has held that government officials performing discretionary functions are shielded with a qualified immunity "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987);  *Davis v. Scherer*, 468 U.S. 182, 195 (1984); *Harlow v. Fitzgerald*, 457 U.S. 810 (1982); *Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Crawford-El v. Britton*, 523 U.S. 574 (1998).[4]

The analysis of a state actor's claim of qualified immunity requires a court to utilize a three-part test. *Saucier v. Katz*, 533 U.S. 194 (2001); *Hope v. Pelzer*, 536 U.S. 730 (2002); *Suboh v. District Attorney Office of Suffolk District*, 298 F.3d 81, 89-90 (1st Cir. 2002).  The initial inquiry is whether the plaintiff's allegations, if true, establish a constitutional violation. The second prong concerns whether the right was clearly established at the time of the alleged violation.  The third prong is whether a reasonable actor, similarly situated, would have understood that his conduct violated that clearly established right.  *Saucier*, 533 U.S. at 201; *Hope*, 536 U.S. at 740; *Wilson v. Layne*, 526 U.S. 609 (1999); *Suboh*, 298 F.3d at 89-90; *Guiterrez*, 437 Mass. at 403-404.  The constitutional right must be asserted with sufficient particularity.  *Anderson*, 483 U.S. at 639 (courts warned against using generalized definitions of constitutional rights in qualified immunity inquiry);  *Suboh*, 298 F.3d at 90.  If plaintiff's allegations establish a constitutional violation, it must then be determined whether the constitutional right was clearly established at the time of the defendant's actions to ensure that the state actor had "fair warning" that the alleged action was unconstitutional.  *See Hope*, 536

---

[4]   Massachusetts has adopted the standard of qualified immunity for public officials under 42 U.S.C. § 1983 and incorporated it for claims brought under the MCRA. *Duarte v. Healy*, 405 Mass. 43, 47 (1989); *Guiterrez v. Mass. Bay. Trans. Auth.*, 437 Mass. 396 403 (2002) (qualified immunity principles developed under federal law also shield public officials from liability under the MCRA).  The definition of discretionary function established under § 1983 has also been adopted for claims under the state civil rights act. *Duarte, supra* at 47-48.

U.S. at 740 (officers sued in a civil action for damages have the same right to fair notice as do defendants charged with a criminal offense); *Saucier*, 533 U.S. at 202 ("The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."); *Suboh*, 298 F.3d at 90. The Supreme Court has determined that the inquiry into whether the constitutional right was clearly established must take into consideration the particular circumstances at issue in the case. *Saucier*, 533 U.S. at 201 ("this inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition"); *Suboh*, 298 F.3d at 93. Next, if plaintiff shows that the constitutional right at issue was clearly established, the inquiry focuses on whether an objectively reasonable official in defendant's position would have understood that the alleged action violated plaintiff's rights. *Saucier*, 533 U.S. at 208 ("The question is what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards."). Qualified immunity is available to a state actor who violates a clearly established right if he acted under the mistaken but reasonable belief that his actions were lawful. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law"); *Fletcher v. Town of Clinton*, 196 F.3d 41, 50-51 (1st Cir. 1999); *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (qualified immunity may exist even though in hindsight a court might determine that the action of the official violated the Constitution). This is consistent with the purpose of qualified immunity to avoid chilling official action by exposing officials to personal liability for good faith judgments. *Harlow*, 457 U.S. at 814-815.

In defining what conduct constitutes discretionary acts under § 1983, the Supreme Court has held that a "law that fails to specify the precise action that the official must take in each

instance creates only discretionary authority." *Davis*, 468 U.S. at 196-97 n. 14; *Horta v. Sullivan*, 4 F.3d 2, 12 (1st Cir. 1993); *Duarte*, 405 Mass. at 48.

Defendants, Commissioner Dennehy, Treatment Center Superintendent Robert Murphy and Deputy Superintendent Joseph Murphy are alleged to have established and implemented polices which infringed upon plaintiff's free exercise of religion. However, establishing and carrying out such policies are clearly within the defendants' discretionary functions. There are no statutes or regulations that state precisely what actions must be taken by the defendants in determining such issues as the frequency of religious meetings, size of rooms, types of religious property, and availability of volunteers. State statute provides Commissioner Dennehy with wide discretion in establishing policies, rules and regulations regarding inmate religious programs. *See* M.G.L. C. 124, § 1(q). *See also* M.G.L. c. 124, § 2 ("Duties of commissioner and deputies"); M.G.L. c. 125, § 14 ("Powers and duties of superintendent"). Pursuant to her statutory duties, the Commissioner has promulgated regulations pertaining to inmate religious programs, entitled Religious Programs and Services, 103 CMR 471.00 *et seq*. Nowhere in the regulations is the Commissioner's discretion or the discretion of her administrative staff limited with regard to the issues raised in the complaint. *See* 103 CMR 471.07. Further, an agency's interpretation of its own regulations and statutes is entitled to deference. *Hastings*, 424 Mass. at 50 n. 10. Decisions of correction officials concerning institutional security issues are entitled to deference. Defendants' complained of conduct falls within their discretionary functions.

Defendants are entitled to qualified immunity for the claims raised under state and federal laws where the plaintiff's allegations do not establish constitutional violations. Nor has plaintiff demonstrated that the law was clearly established in 2004 such that the defendants had "fair warning" that inmates were required to have access to a religious volunteer or a chaplain, and

were to have unfettered access to religious property and religious services. *See Rasheed, supra.* Further, plaintiff has not demonstrated that the defendants would have reasonably understood that their policies violated clearly established rights. *See Saucier*, 533 U.S. at 201; *Hope*, 536 U.S. at 740; *Suboh*, 298 F.3d at 89-90; *Guiterrez, supra*.

## VII.  PLAINTIFF DOES NOT FACE A REAL AND IMMEDIATE THREAT OF HARM.

In order to pursue a claim for injunctive relief, a plaintiff must show a "real and immediate threat" of ongoing or future irreparable harm. *City of Los Angeles v. Lyons*, 461 U.S. at 109.  In the case at bar, plaintiff has not demonstrated the existence of a real and immediate threat of harm regarding his free exercise of religion, in particular, where plaintiff has not attended Wiccan meetings in nine months.  In the absence of a showing of a real and immediate threat of harm to plaintiff, the request for prospective relief should be denied.

## VIII.  DEFENDANTS WILL SUFFER THE GREATER HARM SHOULD PROSPECTIVE RELIEF BE GRANTED.

It is well established that prison administrators should be accorded wide latitude in making decisions regarding prison safety and the internal order and running of correctional facilities. *See Bell*, 441 U.S. at 547;  *Rhodes v. Chapman*, 452 U.S. 337, 349 n. 14 (1981).  As described above, there are compelling state interests in support of the challenged DOC policies. In order to provide for the safety of inmates, staff, and the public, it is imperative that prison administrators have the ability to make decisions that promote internal order, discipline, and safety.  Defendants will suffer the greater harm if the requested relief is granted.

## IX.  GRANTING THE REQUESTED RELIEF IS NOT IN THE PUBLIC'S INTEREST.

It is in the public's interest that prison administrators be permitted to address institutional safety and security concerns.  Such issues should remain in the hands of those with the expertise

and experience to handle them.  The management of secure facilities is an extremely difficult task and it is in the public's interest that qualified prison administrators be permitted to make decisions and establish procedures which provide for the safety and security of inmates and staff. The public benefits from having prisons that are safe for inmates, staff, and the public.

## CONCLUSION

For the foregoing reasons, defendants request that summary judgment be entered in their favor, pursuant to Fed. R. Civ. P. 56 (c).

Dated: August 30, 2006                              Respectfully submitted,

                                                    NANCY ANKERS WHITE
                                                    Special Assistant Attorney General


                                                    /s/ Richard C. McFarland
                                                    Richard C. McFarland,   BBO#  542278
                                                    Department of Correction
                                                    Legal Division
                                                    70 Franklin Street, Suite 600
                                                    Boston, MA 02110-1300
                                                    (617) 727-3300


## CERTIFICATE OF SERVICE

I, Richard C. McFarland, counsel for Defendants, hereby certify that on this 30th day of August, 2006, I served a copy of the Memorandum of Law in Support of Defendants' Cross-Motion For Summary Judgment upon *pro se* plaintiff, William Stevens, by first class mail, postage prepaid, to his address: Massachusetts Treatment Center, 30 Administration Rd., Bridgewater, MA  02324.

                                                    /s/ Richard C. McFarland
                                                    Richard C. McFarland