UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

WILLIAM G. STEVENS,
          PLAINTIFF,

CIVIL ACTION NO.
04-11938-JLT

v.

ROBERT HOWLAND, et al.,
          DEFENDANTS.

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGEMENT

### INTRODUCTION

Pro Se Plaintiff, William G. Stevens, submits this Memorandum of Law in Opposition to Defendants' Cross-Motion for Summary Judgement.  For the reasons set forth below, this Court should NOT allow Defendants' Motion for Summary Judgement.

### BACKGROUND

On September 3, 2004, Plaintiff, William G. Stevens, a temporarily detained resident of the Massachusetts Treatment Center ("MTC"), commenced this Pro Se action, alleging violations of his free exercise of religion and raising claims under 42 U.S.C. 2000cc; 42 U.S.C. 1983; 28 U.S.C. § 2201; M.G.L. c. 127, § 88; M.G.L. c. 231A, § 2; M.G.L. c. 127, § 38E and H; and Code of Massachusetts Regulations 103 CMR 471.00 et seq.  Specifically, Stevens alleges a violation of his rights where defendants (1) failed to provide him with ceremonial items necessary to his religious services on several occasions; (2) are denying him the same opportunities for group worship that are granted to adherents of mainstream religions; (3) are withholding many ceremonial items, significantly altar accuterements, that are substantially

2.

identical to those that the adherents of other faiths are provided;
(4) are failing to provide a chaplain trained in the Wiccan faith;
and (5) are failing to allow Stevens to practice his chosen
religion, Wicca.  The named defendants are: Kathleen Dennehy,
Commissioner of the Massachusetts Department of Correction ("DOC");
Robert Murphy, Superintendent of the Massachusetts Treatment
Center ("MTC"); Joseph Murphy, Deputy Superintendent of the MTC
(at the onset of this action Director of Programs and Treatment);
and Robert Howland, Recreation Officer of the MTC.

## ARGUMENT

### I.  STANDARD FOR SUMMARY JUDGEMENT

Pursuant to Rule 56 (c) of the Federal Rules of Civil
Procedure, summary judgement is properly granted only where (1)
there is "no genuine issue of material fact" in dispute and (2)
"that the moving party is entitled to judgement as a matter of
law."  Fed. R. Civ. P. 56 (c); Woodman v. Haemonetics Corp., 51 F.
3d 1087, 1091 (1st Cir. 1995).  A party moving for summary
judgement bears the burden of affirmatively demonstrating the
absence of a triable issue and that the moving party is entitled
to judgement as a matter of law.  See Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986).  The burden then shifts to the non-
moving party to "set forth specific facts showing that there is
a genuine issue of material facts as to each issue upon which he
would bear the ultimate burden of proof at trial."  Hodgens v. Gen.
Dynamics Corp., 144 F. 3d 151. 158 (1st. Cir. 1998).  In deciding
a motion for summary judgement the Court may consider the pleadings,
depositions, answers to interrogatories, admissions on file and

3.

affidavts.  Fed. R. Civ. P., 56 (c).

## 1.  **Defendant is not entitled to summary judgement because there is material fact in dispute.**

The Plaintiff disputes certain facts as alleged by the Defendants in Defendants' Cross-Motion for Summary Judgement — Statement of Undisputed  Facts — paragraphs 7, 8, 10, 11, 13, 14, 16. 17. 18, 21, 24, and 25.

¶¶ 7 and 8, Murphy Aff, ¶¶ 8 and 9 - Defendants claim MTC "residents engage in religious activities for... Jehovah
                                          asseverates
Witnesses..."  Plaintiff asseverates  that there are currently no "resident" Jehovah Witnesses at  the MTC.  Defendants further claim that "the religious groups meet in the facilitiy's chapel, on the 'D' corridor.  However, because of the need to provide seperate meeting space for SDP and the SPI residents, the Treatment Center also uses a room on the 'B' corridor to accommodate additional religious group meetings."  Plaintiff objects to this transparent fabrication that defendants appear to be employing to project the facade of a lack of space for religious worship.   The defendants currently utilize space in 'B' corridor therapy, 'D' corridor chapel, the inmate dining room, and some of the many, not fully utilized rooms in the inmate education corridor to accommodate Protestant worship services.  Civilly committed residents ("SDP's") and state prison inmates ("SPI's") are not kept seperate and apart by utilization of seperate spaces for worship, as claimed, but through scheduling of alternate access times.  Generally SDP's are scheduled to have access to the shared areas of the MTC 9:00 a.m. - 11:00 a.m. Tuesday, Thursday, and Saturday; 1:30 p.m. - 4:00 p.m. Monday, Wednesday, Friday,

and Sunday; and 7:00 p.m. - 8:45 p.m. Monday, Wednesday, Friday, and Sunday. SPI's are scheduled for access on the alternate days during these time periods. A facility schedual has been attached to this motion as Exhibit 1. Finally defendants claim that "the 'B' corridor room is more than sufficient to accommodate the four or five SDP's that generally attend the Wiccan meetings. Plaintiff argues that pursuant to commonly held Wiccan beliefs, all religious work is to be conducted within the confines of a protective circle. The minimum diameter of this circle, for group practice, is nine to twelve (9 to 12) feet in diameter in order to accommodate all of the various objects, tools, instruments, and people involved in the ritual or ceremonial rite, as well as the movement(s) necessary of the Wiccan practitioner during the ritual or ceremony. Response of William Stevens to Defendants First Set of Interrogatories, Interrogatory No. 10 has been attached as Exhibit 2 and Affidavit of William Stevens has been attached as Exhibit 3 to this motion; and the circle is further defined:

> "... defining the outer shape of the circle
> (traditionally, a circle is nine feet in diameter...
> or you may have to make it larger to accommodate other
> people)."

Witch Crafting, by Phyllis Curott. Broadway Books, New York, N.Y. 2001. Page 100; and

> "Setting and Respecting Sacred Boundries. You should
> cleans the whole area that you will be working in.
> ... usually a nine-foot circle is big enough to work
> in. Or if you are working with a group, the space...
> may have to be very large...."

The Complete Idiot's Guide to Wicca and Witchcraft, by Denise Zimmermann and Katherine A. Gleason. Alpha Books, New York,

N.Y. 2003.   Page 134.

¶ 10 - Defendants blatantly misquote Plaintiff.  Defendants indicate they are citing Deposition of Plaintiff 20:17 to 21:02 which was attached to Defendants' Cross-Motion for Summary Judgemnt as Exhibit 4.  The deposition at 21:02 to 21:02 reads, subsequent to the quoted portion, "the hours are frequently shorter than that due to delayed movements."

¶ 11 - Plaintiff strenuously objects to Defendants' characterization that Plaintiff's ability "to educate other Wiccan members on the fundamentals of Wicca.", is in any possible way an acceptable substitute for the Wiccan corporate religious services, which have been banned by the defendants.

¶ 14 - Defendants have, yet again, through selective misquotation, made it appear in their motion that (1) previously allowed rituals performed by Plaintiff at N.C.C.I. Gardner; and (2) rituals generally performed by Wiccans outside of the DOC, are currently practiced by Plaintiff at the MTC.  A patently false insinuation.

¶¶ 16 and 21, Murphy Aff ¶¶ 15 and 19 - Defendants claim Wiccans at the MTC have access to a number of religious property items, including, "... a wand for use in corporate worship. However, due to security concerns, candles may only be used for corporate worship if a volunteer is present."  Plaintiff argues that although he has, on numerous occasions, requested candles and a wand neither has yet been made available to Plaintiff. Further, Plaintiff finds it difficult to give any credence to Defendants' "security concerns" when Native American groups — within this facility — are routinely given access — without DOC

6.

or outside supervision — to a cigarette lighter for their "Smudge" ceremonies, which entail the burning of various herbs, and for their "Pipe" ceremonies, which entail the smoking of various herbs.  See Affidavit of Joseph Gentle Moose Blake attached as Exhibit 4 to this motion.  Further, Plaintiff had unsupervised access to cigarette lighters, candles, and incense while incarcerated at N.C.C.I. Gardner.  See Affidavit of William Stevens attached as Exhibit 3 to this motion.  Defendants then proceed to provide, for the Court's entertainment, a whimsical tale regarding the request for "property not presently approved by the DOC", and the use of Inmate Religious Service Request Forms. Defendants' Cross-Motion, Statement of Undisputed Fcats, ¶¶ 21 and 22; and which can also be found at Ahmad v. Department of Correction, 845 N.E. 2d 289, 446 Mass. 479 (2006):

> "If an inmate has a request for an item that is not on the list of approved religious articles, the inmate should submit his or her request to the Superintendent. The Superintendent will forward the request with a recomendation to the Religious Services Review Committee through the Director of Program Services for review. The Religious Services Review Committee consists of three Assistant Deputy Commissioners, the Director of Offender Management and Placement and the Director of Program Services. This Committee shall meet on an as needed basis to review requests for religious articles that are not already approved for retention and shall forward their recomendations to the Commissioner for his approval."

Ahmad 845 N.E. 2d at 292, n 3.  However, the fifty-two (52) forms, unprocessed by the defendants which were attached as Exhibits 5 of Plaintiff's Complaint, as well as the five (5) additional unprocessed forms attached as Exhibit 5 of this motion taken in conjunction with letter attached as Exhibit 6 of this motion, disprove the validity of Defendants' claim.

¶ 17 - Defendants claim on November 11, 2005, was the last

7.

time Plaintiff attended a Wiccan service.  When, in fact, Plaintiff was ordered to stop leading worship services on several occasions on and after April 8, 2005, see Exhibit 7 attached to this motion.  This, coupled with the defendants' failure/refusal to provide a chaplain trained in the Wiccan faith, means Plaintiff has been denied the ability to practice his religion for some 17 months.  Plaintiff admits to discontinuing his practice of personnaly "teaching the fundamentals of Wiccan belief" some ten months ago — after placing these duties in capable hands.

¶ 18 - Plaintiff finds numerous faults with this paragraph. (1) Plaintiff has, thus far, not requested any religious items for personal retention.  Complaint ¶¶ 22, 25, 42 and 43, Exhibit 5 and Exhibit 6 attached to this motion show all request forms submitted were for corporate worship items; and (2) the Massachusetts Supreme Judicial Court has noted "the fact that treatment for committed persons is provided under the auspices of the department of correction does not render the commitment penal in nature." Comm v. Bruno, 432 Mass. 489, 491-502, 735 N.E. 2d 1222 (2000). The SJC has interpreted authoritatively that Plaintiff is not "incarcerated in a correctional facility due to a felony conviction."  It should be further noted that involuntarily committed persons are entitled tomore considerate treatment than criminals whose conditions of confinement are designed to punish. Therefore, the Codes of Massachusetts Regulations which are applied to SPI's, as in Inmate Property 103 CMR 403.00 et seq. should not be applied to Plaintiff.

¶ 24 - Defendants refer to "volunteers from the community" who lead "additional groups".  A schedual of Protestant Services

has been attached as Exhibit 8 to this motion. If defendants'
allegations are to be taken as true, and the Court excludes the
Monday 7:00 p.m. to 8:45 p.m. Emmaus Bible Study, the Wednesday
7:00 p.m. to 8:45 p.m. Spanish Protestant Service, and the
Friday 7:00 p.m. to 8:45 p.m. Zion Bible Study as well as the,
presumed two, services led by the Protestant chaplain, there are
still four unaccounted for, inmate led, Protestant services weekly.

¶ 25 - Defendants offer the Court the fallacious claim that
"For security reasons, including concerns for escape, no Treatment
Center groups are permitted to meet outdoors." Currently both the
SDPs' and SPIs' Native American groups are forced to meet outside
three times per group per week. See Affidavit of Joseph Gentle
Moose Blake Exhibit 4 and Affidavit of William Stevens Exhibit 3
attached to this motion. The degree of speciousness of this claim
alone should lend a degree of doubtfullness to all of the
Defendants' claims, especially those of affiant Murphy.

## 2. Defendant is not entitled to judgement as a matter of law.

### A. RLUPA

Section 3 of RLUPA provides that "no government shall impose
a substantial burden on the religious exercise of a person
residing in or confined to an institution, ...unless the goverment
demonstrates that imposition of the burden on that person (1) is
in furtherance of a compelling governmental interest; and (2) is
the least restrictive means of furthering that compelling
governmental intrest. 42 U.S.C. 2000cc, § 3 (a)(1). Defendants'
failure to provide Plaintiff with ceremonial items necessary to

his religious services — which defendants have admitted are "common to almost every Wiccan tradition...." (Defendants' Cross-Motion, Exhibit 2, Attachment B), — the means for group worship, and the ability to practice the Wiccan religion most certainly amount to the imposition of a substantial burden upon Plaintiff's religious exercise. The Defendants have presented the preposterous claim that Plaintiff's actions - or lack there of - have somehow obviated the demonstration of substantial burden. This claim must fail under scrutiny.

Defendants routinely failed — after numerous complaints were lodged verbally (Complaint ¶ 20), in writing (Complaint ¶¶ 21, 30 and 54), and through utilization of the formal grievance process (Complaint ¶ 34) - to provide "cake and juice" for several Sabbat ceremonies. Though Defendants have attempted to deminish or marginalize the cake and juice as party favors they are, in the practice of Wicca, likened to the eucharist in the Christian faiths. Defendants only "resolved" their alleged "temporary miscommunication" after Plaintiff initiated this legal action. Despite claims otherwise this inaction by the Defendants has substantially burdened Plaintiff's religious practice.

"The 'exercise of religion' often involves not only belief and profession but the performance of... physical acts [such as] assembling with others for a worship services...." Empl. Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 877, 108 L. Ed. 2d 876. Defendants first deny Plaintiff the ability to personally conduct worship services for other inmates (Exhibit 7), then castigate Plaintiff for failing to contact religious groups, unknown to Plaintiff, to obtain professional Wiccan representation

so the Plaintiff can assemble with others for worship service.
This, despite the fact that Plaintiff, on numerous occasions, in
writing and through the formal grievance process, provided
Defendants with contact telephone numbers for Nationally recognized
Wiccan religious organizations, Complaint ¶¶ 33,50, 51 and 52; and
Exhibit 9, which Plaintiff is unable to personally contact due to
the fact of his institutionalization.  This is a prime example of
an institutional resident's right to practice his religious faith
being at the mercy of those running the institution.  Section 3 of
RLUIPA was enacted for the protection of institutionalized persons,
such as Plaintiff, who are unable freely to attend to their
religious needs and are therefore dependant on the governments
permission and accommodation for exercise of their religion.  The
failure of the Defendants to provide even one Wiccan chaplain
anywhere in the state, despite the prevalence of Wiccan religious
groups, itself raises a serious question of discrimination.  See
Cruz v. Beto, 405 U.S. 319, 321 (1972).  "If [a Buddhist prisoner]
was denied a reasonable opportunity of pursuing his faith
comparable to the opportunity afforded fellow prisoners who adhere
to conventional religious precepts, then there was palpable
discrimination by the state against the Buddhist religion...."
See also Lemay v. Dubois, 1996 U.S. Dist. (D. Mass.) Lexis 11645,
1996 WL 463680.  Defendants go on to question the validity of
Plaintiff's need to assemble with others for group worship
services, citing Plaintiff's limited attendence at Sabbat
ceremonies during the several years prior to Plaintiff's
incarceration.  Defendants, however, omit Plaintiff's daily
worship at his personal home altar — a practice denied Plaintiff

by the Defendants' restrictive personal property regulations; Plaintiff's frequent telephone calls to fellow Wiccans as well as Wiccan religious leaders — a practice made impossible by the usurious telephone rates for service provided by the Defendants; and the fact that the years immediately preceeding Plaintiff's incarceration were monopolized by the care of a terminally ill mother. The death certificate has been attached as Exhibit 10 of this motion. Plaintiff's violation of Wiccan beliefs and practices does not make him insincere — merely a sinner. "Plaintiff could be sincere adherent... even though... he did not engage in formal observances." Cole v. Fulcomer, 588 F. Supp. 772, 774-75 (M.D. Pa. 1984); "the fact that a person does not adhere steadfastly to every tenet of his faith does not mark him as insincere." Reed v. Fulcomer, 842 F. 2d 960, 963 (7th Cir. 1988); Cf Luke 7:36-50; Matthew 7:1-14. Despite Defendants' claims to the contrary, failure to provide a chaplain trained in the Wiccan faith has substantially burdened Plaintiff's ability to engage in Wiccan practices.

As discussed infre at 1. Material Facts in Dispute, a Wiccan religious group "casts a circle of protection" an absolute minimum of nine feet in diameter which must be located so that it is possible to circumnavigate on the outside without breaching the integrity of the circle. Further, as adequately demonstarted in Defendant's Cross-Motion for Summary Judgement, Exhibit 2, Attachment B, page 55 and 116; and Plaintiff's Motion for Summary Judgement, Exhibit 1, practitioners of Wicca partake in "[c]eremonies held at the New and Full Moon times as well as attending seasonal festivals called Sabbats, spaced six to seven

weeks apart throughout the year and coinciding with the Solstices, Equinoxes and the midpoints between...." (Defendants' Cross-Motion, Exhibit 2, Attachment B). Therefore, additional access to meeting times would ensure Plaintiff the ability to assemble with others for group worship services on the dates and times proscribed for Wiccan worship. Defendants' failure to provide an area capable of accommodating the Wiccan group, as well as sufficient and correct times — despite the availability of the requested times and space, substantially burdens Plaintiff's religious exercise.

Defendants then proffer Plaintiff's ability to meditate in his cell as a reason why this Court should not find that a substantial burden has been placed on Plaintiff's religious exercise. Meditation, however, is the Wiccan method of prayer, not a substitute for group worship. Plaintiff's desire not to attend twice weekly meditation groups in a dirty and rarely cleaned room, under the constant supervision — and occasional harassment — of suspicious officers, and subjected to the constant interuption of other inmates passing by should hardly be used as the reason not to find substantial burden. Further, Defendants' refusal to allow Plaintiff access to materials which would facilitate the meditation process (see Affidavit of Andrew Hebert, attached as Exhibit 11 to this motion) has substantially burdened Plaintiff's ability to engage in Wiccan practices.

Any argument the Defendants have offered claiming compelling interest or least restrictive means must ultimately founder on the fact that the Defendants already facilitate religious services for mainstream faiths — including the provision of chaplains

trained in these faiths and ceremonial items for corporate worship which are substantially identical to those Plaintiff is requesting.

Under RLUPA, the actions of prison administrators that substantially burden religious belief are judged under a strict scrutiny standard, requiring the prison officials, rather than the inmate, to bear the burden of proof that the regulation furthers a compelling penological interest. As is well known from the history of constitutional law, the change that RLUPA imposes is revolutionary, switching from a scheme of deference to one of presumptive unconstitutionality. Instead of rational, the penological interest under RLUPA must be of the highest order; instead of focusing on the prison inmate's ability to find other avenues to exercise his belief, a court is required to focus on the prison administrator's choice among regulatory options; instead of placing the burden of proof on an inmate, RLUPA throws the burden on prison officials. Cutter v. Wilkinson, 349 F. 3d 257, 265 (2003) (quoting Madison v. Riter, 240 F. Supp. 2d 566, 575 (W.D. Va. 2003), judgement rev'd, 355 F. 3d 310 (4th Cir. 2003), cert. denied, 125 S. Ct. 2563, 162 L. Ed. 2d 274 (U.S. 2005)).

A prison's interest in safety, security, and institutional integrity, without argument, constitute compelling interests. Prison administrators in particular, however, have long demonstrated a practiced gift of relaying folksy anecdotes in support of romanticized views of their jobs. These exercises could be inconsequential except for the fact that the inspired folklore disseminated by correctional officials can be accorded unmerited deference, premised on the relevance of administrative correctional experience and professional expertise. Hence, the

"compelling interest" test which requires prison administrators
to articulate security concerns with specificity.  Conclusory
statements regarding prison security do not establish "compelling
interests":

> "While recognizing that the courts may not substitute
> their judgements for those of prison administrators in
> matters of prison procedure and management, ...We are
> of the opinion that the state must do more than simply
> offer conclusory statements that a limitation on
> religious freedom is required for security, health or
> safety in order to establish that its interests are of
> the "highest order."

Weaver v. Jago, 675 F. 2d 116, 119 (6th Cir. 1982) (quoting

Kennedy v. Meacham, 540 F. 2d 1057, 1061 (10th Cir. 1976).)

Assertions of "potential security problems" are not sufficient

to sustain a denial of inmate free excercise of religion:

> "Prison administrators cannot merely brandish the words
> "safety" and "security" and expect that their actions
> will be deemed constitutionally permissible conduct.
> Indeed, "inadequately formulated prison regulations and
> policies grounded on mere speculation, exaggerated fears,
> or post-hac (sic) rationalizations will not suffice...."
> (citations omitted).

Campos v. Coughlin, 854 F. Supp. 194, 207 (S.D. NY 1994).  The
Defendants have failed to meet the burden to prove that their
actions were in furtherance of compelling penological interest or
the least restrictive means of furthering that interest.  As such
Defendant's Cross-Motion for Summary Judgement must fail.

## B.   42 U.S.C. § 1983

### 1.   FIRST AMENDMENT RIGHTS

As discussed infra at A, Plaintiff has made an adequate
showing that Defendants have substantially burdened Plaintiff's
ability to practice his religion.  Plaintiff's free exercise claim
under RLUPA entailed meeting a higher standard of review than that
which is applicable to constitutional free exercise claims.  Having

met the higher standard, Plaintiff is entitled to a favorable
judgement on his § 1983 claim.

Assuming arguendo, that the four prong test set out by the
Court, in Turner v. Safely, 482 U.S. 78, 89 (1987), is the
standard of review, the Defendants again failed to meet their
burden where (1) there is no "valid connection between the prison
regulation and the legitimate government interest put forward to
justify it." Id at 89; (2) there are no "alternate means of
exercising that right open to prison inmates." Id; (3) there is
no legitimate "impact of accommodation of the asserted right on
gaurds and other inmates, and on the allocation of prison resources
generally." Id; and (4) there are "ready alternatives" to the
regulation available to the Defendants.

Defendants have further argued some mythical ability to render
a detailed prognostication regarding the probable extent of future
catastrophe should the burden on Plaintiff's Constitutional Right
to religious exercise be lifted. Though the Courts have accorded
prison administrators wide-ranging deference in adaption and
implimentation of prison policies the Supreme Court has recognized
that prisoners do not forfeit their constitutional rights while
they are incarcerated, or, as is the case here, civilly committed.
Those in the custody of the state "do not forfeit all
constitutional protections by reason of their conviction and
confinement in prison." O'Lone v. Estate of Shabazz, 482 U.S.
342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987) (quoting Bell
v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447
(1979)). As Justice Brennan eloquently stated:

      "Prisoners are persons whom most of us would rather

> not think about.... [T]hey exist in a shadow world
> that only dimly enters our awareness. It is thus
> easy to think of prisoners as members of a seperate
> netherworld.... Nothing can change the fact, however,
> that the society that these prisoners inhabit is our
> own. When prisoners emerge from the shadows to press
> a constitutional claim, they invoke no alien set of
> principles drawn from a distant culture. Rather, they
> speak the language of the charter upon which all of
> us rely to hold official power accountable. They ask
> us to acknowledge that power exercised in the shadows
> must be restrained at least as diligently as power
> that acts in the sunlight."

O'Lone, 482 U.S. 354-55, 107 S. Ct. 2400 (Brennan, J. dissenting).

For more than a decade, the Federal Bureau of Prisons has
managed the largest correctional system in the Nation under the
higher scrutiny standard of RLUPA without compromising prison
security, public safety, or the constitutional rights of prisoners.
Therefore, Defendants' mere brandishment of the words "safety"
and "security" should not suffice to meet their burden.

In the case at bar, it is clear that the restrictions placed
on Plaintiff's religious exercise are not based on legitimate
penological goals and the Defendants are not entitled to judgement
on the First Amendment Claims.

## 2. EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment to
the United States Constitution mandates that no state shall deny
any person within its jurisdiction equal protection of laws;  U.S.
Const. amend XIV, § 1, cl. 4 provides support for 42 U.S.C.S. §
2000cc, the Religious Land Use and Institutionalized Persons Act
by directing that all persons similarly situated should be treated
alike.   See Midrash Sephardi Inc. v. Town of Surfside, 366 F. 3d.
1214.

In the instant action, Plaintiff has demonstrated that he has

been treated unequally as compared to other Treatment Center
religious groups where the Defendants fail to provide the same
opportunities for group worship that are granted adherents of
mainstream religions; fail to provide ceremonial items and altar
accoutrements that are substantially identical to those that
adherents of mainstream religions are provided; fail to provide a
chaplain trained in Plaintiff's religion as are provided for
adherents of mainstream religions; and despite provision of a
time and space - inadequate as it may be - fail to allow Plaintiff
to engage in corporate worship as adherents of mainstream religions
are allowed.  Evidence that the ban on inmate-conducted services
was enforced unequally and that the Defendants delayed unreasonably
in arranging for outside ministers stated a constitutional claim.
Cf Johnson-Bey v. Lane, 863 F. 2d. 1308 (7th Cir. 1988).
Plaintiff has adequately demonstarted the ban on inmate-conducted
services (Exhibits 3, 7 and 8); as well as the unreasonable delay
in arranging for outside ministers (Complaint ¶¶ 33 and 50 and
Exhibits 8, 9 and 13 attached to Complaint).  Defendants profer
the Affidavit of William Milhomme as excuse for failure to provide
an outside Wiccan minister.  It should be noted that the
Defendants currently "provides chaplains who are Catholic, Muslim,
Protestant and Jewish for many of its prisons." (Affidavit of
William Milhomme, ¶ 3); and "presently, the Treatment Center has
part-time Catholic, Muslim, and Protestant chaplains on site."
(Affidavit of Joseph Murphy, ¶ 7).  In interrogatory responses
Defendant, Robert Murphy, has indicated that DOC employed chaplains
are recompensed at a rate of $1,521.05 - $2,077.48.

Mr. Milhomme (Aff. ¶ 3) indicates he has spent "a considerable

amount of time searching for volunteers from the Wiccan community to work with inmates in DOC facilities." Plaintiff would submit that this highly specious argument should be rejected by this Court as this agent for the Defendants has, by his own admission (id.), only managed to contact four (4) covens in the twenty-nine (29) months since Plaintiff's First Request to Defendants (Complaint ¶ 33, and Exhibit 9) or conversely the seventeen (17) months since Plaintiff was ordered to stop leading Wiccan worship services. This, despite access to direct dial phone access, unlimited postage, E-mail, and Internet access for research purposes. It could be argued that a chaplain trained in Plaintiff's religion would have been retained by this time had Defendants choosen to compensate a Wiccan chaplain in the same manner as clergy for mainstream religions. See Cochran v. Rowe, 438 F. Supp. 566 (N.D. Ill. 1977) (Muslim clergy should be compensated in the same manner as other clergy.)

Plaintiff has demonstrated that the differences that exist between Wiccans and other mainstream religious groups at the Treatment Center — whether from indifference, ignorance, or bigotry — are the result of discriminatory intent on the part of the Defendants. Accordingly Defendants are not entitled to judgement on this claim.

## C.  DECLARATORY JUDGEMENT ACT

Plaintiff has sought relief under 28 U.S.C. § 2201 The Declaratory Judgement Act. "The Declaratory Judgement Act is uncommon in that it neither imposes an unflagging duty upon the Courts to decide declaratory judgement actions nor grants an entitlement to litigants to demand declaratory remedies."

El Dia Inc. v. Hernandez-Colon, 963 F. 2d. 488, 493 (1st Cir.
1992), quoting Green v. Mansour, 474 U.S. 64, 72 (1985).  However,
a well reasoned declaratory judgement will focus the parties' dispute
and save judicial resources in the long run.

There are two basic requirements for pleading a declaratory
judgement claim: (1) an actual controversy must exist, and (2)
there must be a seperate basis for federal subject matter
jurisdiction.  The Act states that a declaratory judgement is
available "[i]n case of actual controversy...."  An actual
controversy occurs when there is a substantial controversy between
adverse legal interests "of sufficient immediacy and reality to
warrent issuance of a declaratory judgement."  Maryland Cas. Co.
v. Pacific Coal & Oil Co., 321 U.S. 270 (1941).  The dispute must
be real, not imaginary; concrete, not abstract; apparent, not
illusionary; and demonstrable, not speculative.  Orix Credit
Alliance, Inc. v. Wolfe, 212 F. 3d. 891 (5th Cir. 2000).  The
second requirement is that the district court have jurisdiction
of the subject matter, which this Court maintains in this action
under 28 U.S.C., §§ 1343, and 1367, including pendant and
supplemental jurisdiction over claims under the Massachusetts
General Laws where those claims are so related to the claims
under §§ 1343, and 1367 that they form part of the same case or
controversy.

Finally, it should be noted that "Declaratory Judgement Act
should be liberally construed to accomplish its purpose of
providing speedy and inexpensive method of adjudicating legal
disputes... and is not to be interpreted in any narrow or
technical sense."  Sherwood Medical Industries, Inc. v. Deknatel,

Inc., 512 F. 2d 724 (8th Cir. 1975).

In the instant case, relief under the federal Declaratory Judgement Act is warrented where Plaintiff has met the basic requirements for pleadings under the Act.

## D.   CLAIMS UNDER STATE LAW   .

### 1.   State Constitutional Claims

Lest he be accused of putting forth allegations in a conclusory fashion - Plaintiff listed numerous instances (Complaint ¶¶ 12-54) where Defendants actions violated Plaintiff's rights under the Declaration of Rights of the Massachusetts Constitution. The Massachusetts Supreme Judicial Court has held that the compelling interests standard set out in Attorney General v. Desilets, 418 Mass. 316, 319-20 (1994) is applicable to free exercise of religion claims brought by inmates under the State Constitution.  Accordingly, the analysis of Plaintiff's claims under RLUIPA, discussed infra at **A**, is applicable here, and Defendants are not entitled to Judgement.

### 2.   M.G.L. c. 127, § 88 Claim

M.G.L. c. 127, § 88, titled "imate religious services," provides that inmates are entitled to the free exercise of religion which does not "imair the disciplince of any such institution so far as may be needful for the good government and safe custody of its inmates...."  As discussed infra at **A**, Plaintiff has successfully demonstrated that the Defendants have substantially burdened his ability to practice his religion and, further, that under the "strict scrutiny standard" of RLUIPA the challanged actions do not further a compelling penological interest. Accordingly, Defendants are not entitled to judgement on this claim.

## 3.  D.O.C. REGULATIONS

The Courts have consistantly found "in granting D.O.C. authority to promulgate regulations, Legislature did not empower Department to create possible civil liability against Department Officials...." Martino v. Hogan, 37 Mass. App. Ct. 710 (1994) rev. de. 419 Mass. 1106 (1995). Thus, Plaintiff has not taken issue with the promulgated regulations, just the Defendants implementation of these regulations or more percisely the failure to implement those regulations. It has been clearly established that the courts permit prison administrators considerable discretion in the adoption and implementation of prison policies. However, the limits of such discretion are established by the rules and regulations promulgated by the Department of Correction. Once an agency has seen fit to promulgate regulations, it must comply with those regulations. Agency regulations have the force of law. See Royce v. Commissioner of Corrections, 456 N.E. 2d 1127 (1983); and "Regulations of the D.O.C. have the force of law and must be followed by correctional officials." Stokes v. Commissioner of Correction, 26 Mass. App.Ct. 585 (1988), rev. den. 403 Mass. 1106 (1989).

Here, where Defendants have failed to comply with the rules and regulations promulgated by the D.O.C., Plaintiff is entitled to raise a claim regarding D.O.C. Religious Services Regulations.

## 4.  M.G.L. c. 231A.

Plaintiff is entitled to declaratory relief under M.G.L. c. 231A where his claims question the constitutional validity of the Defendants' failure to implement the Departments' policies. The expressed intent of the Legislature in the clear language of

the Act provides that declaratory judgement may be sought:

> "to obtain a determination of the legality of the
> administrative practices and procedures of any...
> state agency or official which practices or
> procedures are alleged to be in violation of the
> Constitution of the United States or the
> constitution or laws of the commonwealth, or are
> in violation of rules or regulations promulgated
> under the authority of such laws, which violation
> has been consistantly repeated.... For the purpose
> of this section practices or procedures mean the
> customary and usual method of conducting... state
> agency or official business."

M.G.L. c. 231A, § 2. In the case at bar, Plaintiff has adequately
demonstrated that the Defendants' have violated his rights as
protected by both the Constitution of the United States as well
as the constitution and laws of the Commonwealth.

To secure declaratory relief in a case involving
administrative action, Plaintiff must show that (1) there is
actual controversy, (2) he has standing, (3) necessary parties
have been joined, and (4) available administrative remedies have
been exhausted. See Villages Dev. Co. v. Secretary of Executive
Office of Environmental Affairs, 410 Mass. 100, 571 N.E. 2d 361.
Plaintiff has successfully met these four burdens leaving it to
the Court's discretion to decide whether this action is
appropriate for declaratory relief. Boston v. Keene Corp., 406
Mass. 301, 547 N.E. 2d 328 (1989); Pazolt v. Director of Div. of
Marine Fisheries, 417 Mass. 565, 631 N.E. 2d 547 (1994).
Plaintiff is entitled to relief.

## E. QUALIFIED IMMUNITY CLAIMS

The Court is required to utilize a three-part test to
determine the validity of the Defendants' claims of qualified
immunity: (1) whether Plaintiff's allegations establish a

constitutional violation; (2) whether the right was clearly established at the time of the violation; and (3) whether a reasonable actor, similarly situated would have understood that his conduct violated that clearly established right. Saucier v. Katz, 533 U.S. 194, 201 (2001); Hope v. Pelzer, 536 U.S. 730, 740 (2002); Subdh v. District Attorney Office of Suffolk District, 298 F. 3d 81, 89-90 (1st Cir. 2002). As discussed infra at **A**, the Defendants have clearly violated Plaintiff's constitutional right to free exercise of his religion; second, Plaintiff initiated this action in September 3, 2004 — four years after Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000; and finally the Defendants clearly understood that thier conduct violated that clearly established right.

The Defendants are not entitled to qualified immunity in this case because:

1. As discussed infra at **A**, the Defendants have clearly violated Plaintiff's constitutional right to free exercise of his religion;

2. The constitutional rights asserted were clearly established at the time of the alleged violations. Plaintiff intiated this action September 3, 2004 — four years after Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000; and

3. A reasonable official situated in the same circumstances would have understood that the challanged conduct violated the established right. St. Hillire v. City of Laconia, 71 F. 3d 20, 24 (1st Cir. 1995), cert denied, 518 U.S. 1017 (1996). Qualified immunity does not turn on a government official's state of mind,

rather, it turns on the "objective reasonableness" of the official's action, in light of legal rules that were "clearly established" at the time the action was taken. Anderson v. Creighton, 483 U.S. 635, 639 (1987). For the purpose of this determination, the actions of the Defendants, as alleged by the Plaintiff, are taken as true to determine whether those actions violated clearly established law. Accord, Michael v. Forsyth, 472 U.S. 511, 526 (1985).

None of the Defendants have acted as reasonable officials situated in the same circumstances would have, in light of clearly established law. This case does not involve a guard working alone in a cell block at three o'clock in the morning faced with a spur of the moment decision, but an ongoing systematic violation of Plaintiff's rights. The Defendants have a full time legal division of lawyers at their disposal, in addition to the four full time lawyers who have offices at the Massachusetts Treatment Center. The violations have occured as a direct result of the decisions made by the Defendants and involve the implementation of long term policies and procedures meant to deny followers of non-mainstream religion. The Defendants have persisted in these violations, even when the clearly established law has been called to their attention in correspondence, grievances, appeals, as well as in numerous legal actions in which one or more of the Defendants have been named. Under all of these circumstances a reasonable official would not have violated the Plaintiff's clearly established rights. The Defendants are not entitled to qualified immunity.

## F. PLAINTIFF FACES A REAL AND IMMEDIATE THREAT OF HARM.

Plaintiff has clearly shown a "real and immediate threat" of ongoing harm inflicted by Defendants, as is necessary to support a claim for injunctive relief. City of Los Angeles v. Lyons, 461 U.S. 95, 109, 75 L. Ed. 2d 675 (1983). Additionally, Plaintiff has standing because he has alleged a persistant pattern of [violations] from which future threat can be inferred. See Smith v. City of Fantana, 818 F. 2d 1411 (9th Cir. 1987). As such Plaintiff requests prospective relief should be granted.

## G. PLAINTIFF WILL SUFFER THE GREATER HARM SHOULD PROSPECTIVE RELIEF BE DENIED.

The Constitution protects each individual's religious beliefs. You need not belong to an established church or sect, Frazee v. Illinoise Dept. of Employment Security, 489 U.S. 829, 833, 109 S. Ct. 1514 (1989), though Plaintiff does, and your beliefs need not be shared by all of its members, or be part of any orthodox or official interpretation of church doctrine, Thomas v. Review Board, Indiana Employment Security Division, 450 U.S. 707, 715-16, 101 S. Ct. 1425 (1981), though Plaintiff's are. Your beliefs are protected even if you are "struggling" with your position or your beliefs "are not articulated with the clarity and precision that a more sophisticated person might employ." Thomas at 715. Further, it has been clearly established that group worship services — not group educational classes — are an essential part of the free exercise of religion. Where Plaintiff has shown real and ongoing harm regarding the denial of his right to free exercise of religion, Defendants have merely alleged, in a conclusory fashion, that the violations of Plaintiff's rights are necessary to provide for the safety of inmates, staff,

26.

and the public.   Clearly, Plaintiff will suffer the greater

harm if the requested relief is not granted.

## CONCLUSION

For the foregoing reasons, Defendants request for Summary

Judgement should be DENIED.

DATED:  /0-25-06

Respectfully Submitted,
William Stevens, Plaintiff

William G. Stevens, Pro Se
30 Administration Road
Bridgewater, MA 02324

## CERTIFICATE OF SERVICE

I hereby certift that I caused a copy of the foregoing
Motion to be served upon counsel for the defendants by Intra-
Institutional mail.

October 26, 2006

William G. Stevens