UNTIED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM G. STEVENS,　　　　)
　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　)
　　　v.　　　　　　　　　　)　　　　CIVIL ACTION
　　　　　　　　　　　　　　)　　　　NO. 04-11938-JLT
ROBERT HOWLAND, et al.,　　　)
　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　)

# REPORT AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

March 29, 2007

DEIN, U.S.M.J.

## I.  INTRODUCTION

Pro se plaintiff William G. Stevens ("Stevens"), a practicing Wiccan, has been

civilly committed to the Massachusetts Treatment Center in Bridgewater, Massachusetts

(the "Treatment Center") pursuant to Mass. Gen. Laws ch. 123A ("Chapter 123A").  He

has brought this civil rights action against three officials at the Treatment Center and the

Commissioner of the Massachusetts Department of Corrections ("DOC"), in both their

individual and official capacities, claiming that the defendants violated his constitutional

and statutory rights, as well as DOC regulations, by denying the Wiccan religious group

adequate time, space and supplies for worship and failing to obtain a religious leader to

conduct Wiccan services, while providing these benefits to other, more mainstream religious groups.[1]

The matter is presently before the court on the parties' cross-motions for summary judgment. By his motion, Stevens is seeking summary judgment with respect to his federal civil rights claims asserted in Count I of his Complaint, and with respect to his claims under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc et seq. ("RLUIPA"), which are asserted in Count II. The defendants, by their motion, are seeking summary judgment with respect to these same claims as well as to all of Stevens' remaining claims for violations of his rights under the Massachusetts Constitution (Count I), violations of DOC regulations (Count III), violation of Mass. Gen. Laws ch. 127, § 88 (Count IV), review of grievances (Count V) and declaratory and injunctive relief (Count VI). For all of the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the "Plaintiff's Motion for Summary Judgment" (Docket No. 34) be DENIED and that the "Defendants' Cross-Motion for Summary Judgment" (Docket No. 36) be ALLOWED with respect to all of Stevens' federal law claims as alleged in Counts I, II and VI. Moreover, this court recommends that the federal court decline to exercise jurisdiction over the state law claims.

_____

[1]  The DOC also was named as a defendant in this action, but was dismissed from the case on October 12, 2004 on the grounds of sovereign immunity. (See Docket No. 4).

2

## II. **STATEMENT OF FACTS**[2]

The following facts are undisputed unless otherwise indicated.

### **The Parties**

Plaintiff William Stevens, a practitioner of Wicca, was civilly committed to the

Treatment Center on January 30, 2004.  (DF ¶¶ 1-2; Compl. (Docket No. 5) ¶ 14).  The

Treatment Center houses three populations of adult male sex offenders, including

(1) persons who have been committed as sexually dangerous persons ("SDPs") for an

indefinite period ranging from one day to life pursuant to Chapter 123A; (2) inmates

serving criminal sentences who are participating in the DOC's voluntary sex offender

treatment program ("SPIs"); and (3) persons awaiting adjudication as SDPs under Chapter

123A.  (DF ¶ 3; Def.'s Ex. 2 ¶ 4).  The DOC keeps SDPs and SPIs separate and apart at

all times as a result of a decision of the Massachusetts Superior Court. (DF ¶ 4).  Stevens

has been detained civilly as an SDP.

At all relevant times defendant Robert Howland was the Staff Program Director,

defendant Joseph Murphy was the Director of Programs and Treatment, and defendant

---

[2]  The facts are derived from the following: (1) the Statement of Undisputed Facts set forth on pages 2 through 8 of the Memorandum of Law in Support of Defendants' Cross-Motion for Summary Judgment (Docket No. 37) ("DF"); (2) the exhibits attached to the Memorandum of Law in Support of Defendants' Cross-Motion for Summary Judgment (Docket No. 37) ("Defs.' Ex. __"); (3) the plaintiff's responses to the defendants' Statement of Undisputed Facts, which are set forth on pages 3 through 8 of the Plaintiff's Memorandum of Law in Opposition to Defendants' Cross-Motion for Summary Judgment (Docket No. 41) ("PF"); (4) the exhibits attached to the plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (Docket No. 35) ("Pl.'s Ex. __"); and (5) the exhibits attached to the Plaintiff's Memorandum of Law in Opposition to Defendants' Cross-Motion for Summary Judgment (Docket No. 41) ("Pl.'s Supp. Ex. __").

Robert Murphy was the Superintendent at the Treatment Center. (Compl. ¶¶ 4-6; Answer (Docket No. 13) ¶¶ 4-6). Defendant Kathleen Dennehy was the DOC Commissioner. (Compl. ¶ 7; Answer ¶ 7).

### Stevens' Religious Practices

Wicca is a nature-based religion, which is recognized by the DOC and includes many different traditions and denominations. (Def.'s Ex. 2, Attach. B at 55). Within most Wiccan denominations there are both groups, known as covens, and individual practitioners. (Id.). Wiccan practices vary widely. (Id.). As the plaintiff described in his answers to interrogatories:

> My own experience has taught me that if you were to ask one dozen people who claim to be Wiccan exactly what the beliefs, tenets and practices of Wicca are, you would get at least a half-dozen different answers, and each answer could probably be tied to some acceptable reference source. There are many Traditions of the Old Religion and many Paths within each Tradition. That said the responses plaintiff provides to this interrogatory are his own and are based on the plaintiff's own research sour[c]es and the plaintiff's personal understanding of his chosen path and Tradition. There is no "one and only way" to work the Craft and worship our deities. We all have some differing understanding or interpretation of many aspects of the Old Religion, and each one of these interpretations is, by definition the correct one for those who embrace it.

(Pl.'s Ex. 1, Answer No. 4).

As a general statement, Wiccans seek to live in harmony with nature and they conduct celebrations that coincide with certain phases of the moon and with solstices and equinoxes, as well as midpoints between those events. (Def.'s Ex. 2, Attach. B at 55). The Wiccan New Year, known as Samhain, is typically celebrated on October 31. (Id.).

4

Certain ceremonial items, including a knife and chalice, are used in most Wiccan traditions.  (Id.).  Other items that may be used in connection with some, but not all, Wiccan traditions, include, but are not limited to, bells, brooms, candles, incense, jewelry, special plates, swords and wands.  (Id.).  Wiccan rituals usually involve the creation of sacred space, the invocation of divine power, dancing, singing, food or wine, a thankful farewell and a ceremonial closing.  (Id.).

Stevens asserts that he has been a follower of Wicca since 1983 and has practiced the faith in various forms since that time.  (Pl.'s Supp. Ex. 3 ¶ 3).  He describes the Wiccan religion as "more of a lifestyle than a religion[.]"  (Defs.' Ex. 4 at 10). According to Stevens, Wiccan tradition as he understands it includes daily individual prayers through meditation, the celebration of four major festivals and four minor festivals known as "Sabbats," and participation in group worship services called "Esbats." (Pl.'s Ex. 1, Answer No. 4).  When group worship is practiced, it takes place within the confines of a "protective circle," which needs to be at least nine feet in diameter to allow freedom of movement within the circle.  (Pl.'s Supp. Ex. 3 ¶ 12).  Stevens claims that the group members also should be able to circumnavigate the circle without breaching its boundary.  (Id.).  Additionally, according to Stevens, there are many different implements, books and other writings that are used by Wiccans to conduct their religious practices, but every Wiccan should have a Book of Shadows containing all ritual and spellcraft information and a Mirror Book documenting one's personal progress in the faith.  (Pl.'s Ex. 1, Answer No. 4).

5

While living on Cape Cod prior to his incarceration in 1999, Stevens did not attend any Sabbat ceremonies on the Cape. (DF ¶ 13). Instead, over a two-year period, he attended only two or three Sabbat ceremonies in Kentucky where he had lived previously. (Id.; Defs.' Ex. 4 at 12). Stevens engaged in daily meditations and personal observance of Wiccan rituals. (DF ¶ 13). When he did not attend group services on Sabbat, he "would try and do something personally showing [his] respect for that particular religious holiday," including an extended period of meditation and making a food offering to the gods and goddesses. (Defs.' Ex. 4 at 11-12). The plaintiff further claims that prior to his incarceration, he maintained a personal altar at or near his home at which he was able to conduct daily worship. (Pl.'s Supp. Ex. 3 ¶ 4). However, due to space considerations and DOC's policies regarding inmate property, Stevens has been unable to maintain an altar at the Treatment Center. (Id. ¶ 5).

## DOC Policies Regarding Religious Practice

The DOC has implemented regulations pertaining to religious programs and services at DOC facilities, including the Treatment Center. (See generally Def.'s Ex. 3; 103 C.M.R. §§ 471.00 et seq.). The regulations provide that "[t]he rights of inmates to practice their religious beliefs, or to confer with the clergy person of an accredited religious group shall not be abridged, provided that these activities do not threaten the safety, security and orderly running of the institution." (Id. § 471.07). To that end the regulations further provide in relevant part that personnel at DOC facilities "should make reasonable efforts" to create and maintain religious activities and services for inmates

6

affiliated with recognized religious groups and to insure that an accredited representative of an inmate's religious faith is available to provide services to those who so request. (Id. § 471.09(1)-(2)). They also encourage each religious group "to plan its own activities, using the appropriate community and institution resources[,]" require that "[a]dequate space and equipment" be provided in order to conduct and administer religious programs, and allow inmates access to "a reasonable number of religious publications." (Id. § 471.09(4), (6) & (9)). However, the regulations specify that no portion thereof "shall be interpreted or implemented in such a way as to threaten the security, safety or well-being of the institution, its visitors, inmates or staff[,]" and they grant authority to the superintendent to limit religious programs, practices or services if they pose such a threat. (Id. § 471.07(2)-(3)).

The DOC recognizes fifteen different religious groups, including Buddhists, Christian Scientists, Greek Orthodox, Hare Krishnas, Muslims, Jehovah's Witnesses, Jews, Mormons, Native Americans, Protestants, Rastafarians, Quakers, Roman Catholics, Scientologists and Wiccans. (DF ¶ 6). In order to assist personnel at its facilities in accommodating inmate requests regarding religious practices and property items, the DOC has developed a Religious Services Handbook ("Handbook"). (DF ¶ 19; Def.'s Ex. 2 ¶ 12). The Handbook provides information pertaining to the various faiths represented by persons in DOC custody, including Wicca, and describes approved practices for each religious group, as well as a list of approved property items that inmates may purchase from an approved vendor. (DF ¶ 20; Def.'s Ex. 2 ¶¶ 13, 14). The purpose of restricting

7

inmates to purchases from a single vendor is to ensure consistency in the religious items allowed into prisons, facilitate the screening of such items for security concerns, decrease the likelihood that contraband will be sent through incoming religious property, and reduce the burden on personnel responsible for processing and inspecting all incoming property. (DF ¶ 20).

As set forth in the Handbook, the DOC specifically allows for the celebration of holidays and festivals by the Wiccan population as follows:

> If requested, inmates who identify themselves as Wiccans should be allowed to celebrate the eight Sabbaths celebrated. The sabbats occur on the Solstices, the Equinoxes, and the cross quarter days. Samhain (Halloween) is also celebrated as the Wiccan New Year. If requested, Wiccans should be allowed to meet corporately and consume **cake and juice** to celebrate these holy days. _Please reference the Wiccan calendar in Section Four (IV)._

(Def.'s Ex. 2, Attach. B at 116) (emphasis in original). The Handbook also contains a list of approved items for use by Wiccans, including tarot cards, medallions or necklaces, prayer oil, alter bowls, alter cloths, runes with cloth bag, crow or raven feathers, the Book of Shadows, brass bells, worry stones, meditation tapes, candles and wands. (Id.). However, "[u]se of candles (three candles only) must be supervised by a volunteer during corporate worship only." (Id. at 117). Pursuant to the Handbook, inmates also are authorized to construct magic circles using sheets and markers, but only for purposes of corporate worship services. (Id. at 116).

## Implementation of Policies at the Treatment Center

8

The Treatment Center houses 626 men, approximately half of whom are SDPs and the other half of whom are SPIs. (DF ¶ 5). Current residents of the Treatment Center engage in religious activities for Catholics, Jews, Protestants, Muslims, Native Americans, Buddhists and Wiccans.[3] (DF ¶ 7; PF ¶¶ 7-8). Because the DOC keeps SDPs and SPIs separate, the Treatment Center must accommodate the needs of up to two populations within each religious group. (see DF ¶ 7). This is accomplished by giving SDP groups and SPI groups access to available space for religious worship on different days during the week. (DF ¶ 8; PF ¶¶ 7-8). SDP Wiccans are scheduled to meet weekly on Wednesday and Friday nights from 7:00 p.m. to 8:40 p.m., although these hours may be shorter due to delays in the movement of inmates. (DF ¶ 10; PF ¶ 10). Stevens contends that these meeting times are sometimes inadequate because they may not fall on the precise dates prescribed for the celebration of ceremonies and Sabbats, thereby precluding group, but not individual services. (See Pl.'s Opp. Mem. (Docket No. 41) at 11-12). As Stevens admits, however, celebrations of Sabbats may take place over a two to three day period surrounding the actual Sabbat. (Defs.' Ex. 4 at 12).

Religious groups at the Treatment Center may be entitled to meet more than twice weekly if volunteers from the community are willing to lead additional groups. (DF ¶ 24). For example, there are three separate religious groups from the community that provide volunteers to lead Protestant groups of SDPs and SPIs at the Treatment Center.

---

[3] Stevens disputes the defendants' assertion that Jehovah Witnesses currently engage in religious activities at the Treatment Center. (PF ¶¶ 7-8).

(<u>Id.</u>).  These volunteers lead the Emmaus Bible Study groups, the Zion Bible Study groups and the Spanish-English services.  (<u>Id.</u>).

Religious programs take place in the Treatment Center's chapel on the "D" corridor and in a therapy room on the "B" corridor.  (DF ¶ 7).  According to the defendants, the "B" corridor room provides excellent visibility for the correctional staff monitoring activities inside the room.  (<u>Id.</u>).[4]

The parties dispute whether the space available for Wiccan worship is adequate in size.  The defendants contend that the "B" corridor room, which measures 16 feet, 9 inches by 10 feet, 4 inches, is more than sufficient for the four or five SDPs who usually attend the Wiccan meetings.  (DF ¶ 7).  Stevens contends that the room is inadequate to accommodate the 9 foot protective circle needed for Wiccan corporate worship, and asserts that there are other rooms available, including those on the inmate education corridor that are used for Protestant worship services.  (PF ¶¶ 7-8).  In particular, Stevens has requested that the Wiccans be allowed to use the "C" corridor meeting room, but that space, which is not substantially larger at 16 feet, 6 inches by 11 feet, 6 inches, is used only for behavior therapy and is not made available to any religious groups.  (Compl. ¶ 24 & Exs. 3-4 thereto; DF ¶ 9).

_____

[4]  The defendants claim that no religious groups are allowed to meet outside due to security concerns, but there is evidence that the Native American religious group is able to assemble outside in order to perform its "smudge ceremony."  (DF ¶ 25; PF ¶ 25; Pl.'s Supp. Exs. 3 ¶ 13 & 4 ¶ 5).  Since the plaintiff is not requesting outdoor worship, to the extent this fact is undisputed it is not material.

Also at issue in this case is whether the defendants have prevented the Wiccan group from engaging in corporate worship by failing to find a Wiccan chaplain to lead their worship services and by precluding the plaintiff from assuming a leadership role. The DOC employs a number of Catholic, Muslim, Protestant and Jewish chaplains who are assigned to many of its prisons, and the Treatment Center has part-time Catholic, Muslim and Protestant chaplains on site in addition to the Protestant volunteers from the community who lead Bible study groups and services.  (DF ¶ 6; Def.'s Ex. 2 ¶ 22). Furthermore, Treatment Center residents from any denomination may meet with and seek counseling from a DOC chaplain.  (DF ¶ 6).  However, there are no Wiccan volunteers at the Treatment Center or at any other DOC facility.  (DF ¶ 12).

The DOC has made efforts to locate Wiccan volunteers to conduct services at the Treatment Center.  (DF ¶ 12).  In particular, William Milhomme, the Director of Volunteer Services for the DOC's Program Services Division asserted in an affidavit that he has spent a considerable amount of time searching for volunteers from the Wicca community by contacting covens in three Massachusetts towns, as well as a coven in Connecticut. (Def.'s Ex. 5 ¶ 4).  Although he has not been successful, Mr. Milhomme has represented that he will continue his efforts to locate volunteers willing to work with Wiccan groups in DOC facilities, including the Treatment Center.  (Id. ¶ 5 (misnumbered)).

Stevens has presented evidence showing that he has been ordained as a Wiccan priest, is capable of leading group worship services and was allowed to lead Wiccan services when he was in state prison.  (Pl.'s Supp. Ex. 3 ¶¶ 6-7).  However, Stevens is not

11

permitted to lead religious services at the Treatment Center due to the DOC's current policy forbidding inmates from assuming positions of authority over other inmates. (DF ¶ 11; PF ¶ 11). According to the defendants, the purpose of this policy is to avoid situations where an inmate can use a superior position to take advantage of or exert undue influence over other inmates, which is especially problematic where religious activities are involved. (DF ¶ 23). Stevens contends that as a result of this policy, Wiccan corporate religious services have effectively been banned at the Treatment Center. (PF ¶ 11).

According to the plaintiff, during Wiccan group meetings at the Treatment Center, the members typically will talk, watch a Wicca videotape if a television is available, meditate, listen to Wiccan music and engage in certain rituals, including chanting and spells. (Def.'s Ex. 4 at 27-62). The Wiccans at the Treatment Center also are provided with cake and juice for their Sabbat celebrations. (DF ¶ 14). The defendants concede that during the time period from January 2004 to May 2004, when Joseph Murphy, the Director of Treatment, was temporarily reassigned to another location, there were several occasions when the Wiccan group did not receive cake and juice for their Sabbats. (DF ¶ 15). However, this problem was resolved upon Mr. Murphy's return to the Treatment Center. (Id.).

The Treatment Center has six posters and several sets of CDs, including meditation CDs, that Wiccans can use for corporate worship. (DF ¶ 16). Wiccans at the Treatment Center also have access to a variety of religious property items including Tarot cards, an altar cloth, altar bowls, runes with a cloth bag, brass bells, worry stones, magic

12

circle, meditation CDs, the Book of Shadows and black feathers.  (Id.).  Additionally,

inmates may purchase a medallion, prayer oil and books pertaining to Wiccan practices

from vendors approved by the DOC, and may request religious property that has not been

preapproved through a Religious Services Review process.  (Id.).

     The Religious Services Review process is set forth in the DOC Handbook, a copy

of which is available in the library at the Treatment Center.  (DF ¶ 21).  Pursuant to the

process, inmates seeking to obtain religious items or conduct religious practices that have

not been approved by the DOC must submit a request using an Inmate Religious Services

Request Form, along with supporting documentation, to the Superintendent of the

institution.  (Id.).  The Superintendent is responsible for forwarding the materials, along

with a recommendation, to a Religious Services Review Committee comprised of three

Assistant Deputy Commissioners and the DOC Director of Program Services.  (DF ¶ 22).

The Committee then makes a recommendation to the Commissioner based on its review

of the inmate's request and any additional information that it may have obtained from

sources such as DOC chaplains or outside religious groups, and the Commissioner is

responsible for rendering a final decision.  (Id.).

     Stevens claims that he submitted over 52 Inmate Religious Services Request Forms

in which he requested items for use during Wiccan corporate worship, including different

books, videos, magazines, posters and the like, but that the defendants have failed to

process his forms and have denied him adequate supplies.  (PF ¶¶ 16, 21; Compl. Ex. 5).

There is evidence that the Religious Services Review Committee did not receive all the

requests.  (Pl.'s Supp. Ex. 6).  Nevertheless, Stevens has presented correspondence demonstrating that approximately 20% of the items he requested ultimately were ordered for use at the Treatment Center and that at least some of the remaining items were not purchased due to budget constraints.  (See Pl.'s Supp. Exs. 6 & 9; Compl., Ex. 12).  The plaintiff has not submitted any evidence that the absence of any of the requested material impeded the participants' ability to engage in Wiccan services.

The parties dispute whether Stevens has had access to a wand and whether the defendants improperly have precluded the Wiccan group from lighting candles during corporate worship services.  The defendants claim that the Wiccan group has access to a wand and that due to security issues, candles may only be used for corporate worship if a volunteer is present.  (DF ¶ 16).  Stevens contends that no wand has been made available despite his numerous requests and he has presented evidence showing that the Native American group is routinely granted access to a cigarette lighter for use in their smudge and pipe ceremonies, even without oversight from DOC personnel or an outside volunteer.  (PF ¶¶ 16, 21; Pl.'s Supp. Ex. 4 ¶¶ 6, 8).  Furthermore, Stevens claims that during his incarceration in state prison, he was able to light candles and incense during group meditation and worship services without the need for supervision.  (Pl.'s Supp. Ex. 3 ¶ 8).

Treatment Center records reveal that the plaintiff has not attended a Wiccan service or meeting since November 11, 2005.  (DF ¶ 17).  Stevens contends that he stopped attending the meetings because there has been no one available to lead the group services.  (PF ¶ 17).  He further contends that he discontinued his practice of "teaching

14

the fundamentals of Wiccan belief" almost a year ago "after placing these duties in

capable hands."  (Id.).

Additional factual details relevant to the court's analysis are described below.

### III.  ANALYSIS

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be

decided at trial because the evidence, viewed in the light most flattering to the nonmovant

. . . would permit a rational fact finder to resolve the issue in favor of either party."

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal

citations omitted).  A material fact is one which has the "potential to affect the outcome

of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.

1996) (internal citations and quotation omitted).  In order to defeat the entry of summary

judgment, the nonmoving party must submit "sufficient evidence supporting the claimed

factual dispute to require a choice between the parties' differing versions of the truth at

trial." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (internal citations

and quotations omitted), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72

(1994).  In evaluating motions for summary judgment, however, the court will not

consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (internal citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991).

**B.    Count I: Federal Civil Rights Claims Under 42 U.S.C. § 1983**

In Count I of his Complaint, Stevens has asserted claims against the defendants pursuant to 42 U.S.C. § 1983 ("Section 1983") for alleged violations of his constitutional rights. Specifically, Stevens contends that the defendants' failure to provide the Wiccan group with adequate space and meeting times, necessary ceremonial items and a chaplain or leader, while at the same time providing those benefits to other, more mainstream religious groups, violated his rights to free exercise of religion and equal protection under the First and Fourteenth Amendments to the Constitution.[5] (Pl.'s Opp. Mem. at 14-18). Each of the parties has moved for summary judgment with respect to these claims.

---

[5] At oral argument, Stevens acknowledged that the defendants have been providing the Wiccan group with cake and juice for their corporate worship and agreed that their temporary failure to provide these items during the time period from January to May 2004 is not a basis for any of his claims.

16

1.    **Claims Under Section 1983 in General**

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quotations and citation omitted).  It states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.  "A claim under section 1983 has two essential elements.  First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law."  Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir.), cert. denied, 522 U.S. 819, 118 S. Ct. 71, 139 L. Ed. 2d 32 (1997).  In the instant case, there is no dispute that each of the defendants was acting in his or her official capacity at all relevant times and was therefore acting under color of state law.  However, the defendants dispute that any of their conduct deprived Stevens of his constitutional rights.  This court agrees and recommends that the defendants' motion for summary judgment on Stevens' federal civil rights claims be granted and that Stevens' motion be denied.

17

## 2.    **Free Exercise of Religion**

"The Free Exercise Clause of the First Amendment, which has been made applicable to the States by incorporation into the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof* . . . .'" Employment Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 876-77, 110 S. Ct. 1595, 1599, 108 L. Ed. 2d 876 (1990) (quoting U.S. Const., Amdt. 1) (internal citation omitted; emphasis in original). In this case, the parties agree that the free exercise rights of prisoners are governed by the Supreme Court's analysis in Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987) and O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987).[6] In Turner, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S. Ct. at 2261.[7] The Court emphasized that "such a

---

[6] Because the parties agree that this case is governed by the Supreme Court's analysis in Turner and O'Lone, this court will not address whether the Supreme Court's decision in Employment Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), arguably might require a different analysis in cases involving infringements on prisoners' constitutional right of free exercise. See Levitan v. Ashcroft, 281 F.3d 1313, 1318-19 (D.C. Cir. 2002) (while "[m]any courts have grappled with the question of how the Court's decision in *Smith* interacts with the prisoner-specific test set forth in *Turner* and *O'Lone*" most courts of appeal have continued to apply Turner and O'Lone in analyzing prisoners' constitutional rights).

[7] It is unclear whether a prisoner asserting a First Amendment free exercise claim is obligated to demonstrate that the burden on his religious exercise is substantial. See Ford v. McGinnis, 352 F.3d 582, 591-92 (2d Cir. 2003) (describing why Supreme Court cases have created ambiguity as to whether substantial burden test persists as a threshold requirement to a prisoner's free exercise claim and noting split in the circuits regarding the issue). This court finds

18

standard is necessary if 'prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" Id. (quoting Jones v. N.C. Prisoners' Union, 433 U.S. 119, 128, 97 S. Ct. 2532, 2539, 53 L. Ed. 2d 629 (1977)) (alteration and punctuation in original).  In O'Lone, the Court applied Turner to prisoners' free exercise claims.  O'Lone, 482 U.S. at 350-53, 107 S. Ct. at 2405-07. Therein, the Court reaffirmed its "refusal, even where claims are made under the First Amendment, to substitute [its] judgment on . . . difficult and sensitive matters of institutional administration, for the determinations of those charged with the formidable task of running a prison."  O'Lone, 482 U.S. at 353, 107 S. Ct. at 2407 (internal quotations and citation omitted).

## The Turner Factors

The Supreme Court has identified four factors that are relevant to the reasonableness determination.  See Turner, 482 U.S. at 89-91, 107 S. Ct. at 2262; O'Lone, 482 U.S. at 350-53, 107 S. Ct. at 2405-07.  They include: (1) whether the challenged policy has a rational connection to legitimate and neutral governmental interests; (2) whether there are alternative means that remain available for the exercise of the asserted right; (3) consideration of the impact that accommodation of the asserted right will have on guards, other inmates, and on the allocation of prison resources generally; and (4) whether there are

---

that it is unnecessary to resolve this issue at this time because even assuming the plaintiff could establish a substantial burden on his religious exercise, the record demonstrates that the policies and practices that allegedly have impinged upon his constitutional rights are reasonably related to legitimate penological interests.

obvious, easy alternatives to the policy at issue.  See Turner, 482 U.S. at 89-91, 107 S.

Ct. at 2262.  "At least one circuit has held that '[n]either *Turner* nor *O'Lone*, however,

*require* a court to weigh evenly, or even consider, each of these factors.'"  Shaheed-

Muhammad v. DiPaolo, 393 F. Supp. 2d 80, 98 (D. Mass. 2005) (quoting Scott v. Miss.

Dep't of Corrections, 961 F.2d 77, 80 (5th Cir. 1992)).  This court finds that when these

factors are applied to the evidence in this case, the policies and practices alleged to have

infringed Stevens' free exercise of religion are reasonably related to legitimate

penological interests.

**Application of the Turner Factors to the Record**

The record establishes that the policies in place at the Treatment Center are

logically connected to legitimate governmental interests.  In particular, the evidence

demonstrates that limitations on meeting times and space available for Wiccan group

worship are based on the need to keep SDPs and SPIs separate while at the same time

accommodating the needs of inmates from at least seven different religious backgrounds

and maintaining security.  (DF ¶¶ 7-8; PF ¶¶ 7-8).  In order to schedule at least two group

meetings per week for both SDPs and SPIs within each religious group, it is logical that

the defendants place restrictions on the availability of meeting times for Wiccans, just as

they do for the other religious populations.  Additionally, the defendants have shown that

religious activities inside the institution are legitimately limited to specific locales which

can by monitored by correctional staff.  In light of these legitimate administrative

concerns, the fact that Wiccan group worship may not be scheduled for each Wiccan

20

holiday does not state a constitutional claim.  See O'Lone, 482 U.S. at 350-51, 107 S. Ct. at 2405-06 (although prison regulations resulted in inmates being precluded from attending weekly Friday religious services, no violation of free exercise clause).

Similarly, the defendants have shown that the DOC policy prohibiting inmates from leading religious services also is intended to further the legitimate penological goals of maintaining order and security.  See id. at 350, 107 S. Ct. at 2405 (policies "justified by concerns of institutional order and security" satisfy reasonableness standard).  The policy, which is aimed at preventing inmates from assuming positions of authority over other inmates, seeks to avoid situations where an inmate uses a position of superiority to take advantage of other inmates or exert undue influence over them.  (DF ¶ 23; Defs. Ex. 2 ¶ 20).  Where, as here, it cannot be said that the logical connection between the policy at issue and the asserted goal of maintaining order among inmates "is so remote as to render the policy arbitrary or irrational[,]" the rational relationship factor is satisfied. Turner, 482 U.S. at 89-90, 107 S. Ct. at 2262.

The defendants also have demonstrated that the restrictions on Stevens' ability to obtain additional religious items for group worship were based on safety and security concerns or on limited institutional resources.  Significantly, Stevens does not argue that the absence of any specific item, as opposed to having a leader,[8] prevented him from

---

[8]  The defendants' failure to provide a Wiccan chaplain is unrelated to any policy or practice, but is a result of the inability to locate volunteers despite continuing efforts to do so.

engaging in group worship.[9]  Prison officials simply cannot be expected to satisfy all

inmate requests for religious property without regard to cost and overall institutional

budgetary considerations.  See Shaheed-Muhammad, 393 F. Supp. 2d at 99 (prison

officials' logistical and monetary concerns are relevant to reasonableness determination).

Accordingly, the record demonstrates that to the extent the defendants' policies and

practices infringed on the plaintiff's First Amendment rights, those policies and practices

had a rational relationship to the legitimate governmental interests set forth to justify

them.

Consideration of the second factor articulated by the Supreme Court in Turner

weighs heavily in favor of summary judgment for the defendants.  "[T]his prong is an

inquiry into 'whether an inmate has alternative means of expressing his religious beliefs

generally, not whether there is an alternative means of engaging in the particular religious

practice in issue.'"  Shaheed-Muhammad, 393 F. Supp. 2d at 98 (quoting Denson v.

Marshall, 230 F.3d 1347, 1347 n.1 (1st Cir. 2000)).  The evidence in the instant case

demonstrates that Stevens had alternative means of practicing his faith at the Treatment

---

[9]  Stevens challenges the failure to fill over 50 requests for items, without indicating why
the absence of these items interferes with his ability to practice his religion.  He also challenges the
DOC's policy of not allowing candles to be used without a volunteer.  Thus, he argues that any
safety concerns regarding the use of candles without a volunteer are undercut by evidence that the
Native Americans use a lighter to conduct their smudge and pipe ceremonies and by evidence that
he was able to light candles and incense while in state prison without the need for supervision.
(PF ¶¶ 16, 21; Pl.'s Supp. Ex. 3 ¶ 8).  The fact that other institutions might allow candles does not
render the DOC's policy for its institutions irrational.  Nor does the (disputed) fact that a lighter
may be used without supervision in an outdoor ceremony negate the need to limit the use of
burning candles indoors.  Deference to the DOC's policies is warranted in this case.

Center notwithstanding any limitations on the extent to which he could engage in group worship activities.  It is undisputed that not only could he engage in private worship, but also the Wiccan group was provided with regular opportunities to meet and conduct group activities.  While these group sessions might not have had all the accoutrements Stevens desired, based on his own description of the fluidity of the rituals practiced in the Wiccan religion, it is clear that their absence did not preclude him from expressing his religious beliefs.  Stevens' ability to engage in other religious traditions and practices supports the conclusion that any restrictions on Wiccan group worship were reasonable.  See O'Lone, 482 U.S. at 352, 107 S. Ct. at 2406 ("ability on the part of respondents to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable").  See also Turner, 482 U.S. at 90, 107 S. Ct. at 2262 ("Where other avenues remain open for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.") (quotations and citations omitted).

The third Turner factor requires an assessment of the impact that accommodation of the asserted right will have on others .  The defendants argue that accommodating the plaintiff's requests for additional meeting times and larger space may require another religious group to give up some of its meeting time, and that lifting restrictions on access to religious property and books would increase burdens on correctional staff and increase opportunities for contraband to enter the facility.  (Defs.' Mem. at 16).  "When accommo-dation of an asserted right will have a significant 'ripple effect' on fellow inmates or on

prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Turner, 482 U.S. at 90, 107 S. Ct. at 2262. In light of the number of different religious groups whose needs must be met at the Treatment Center, this court concludes that the defendants' concerns about the impact of additional accommodations for the Wiccan group are reasonable. Accordingly, this court finds that consideration of the first three Turner factors supports the validity of the limitations on Wiccan group activities.

Finally, the defendants contend that "there are no 'ready alternatives' to the Treatment Center policies which allow for security concerns." (Defs.' Mem. at 16). Although the defendants have not described what if any alternatives they have considered and rejected, "prison officials do not have to set up and then shoot down every con- ceivable alternative method of accommodating the claimant's constitutional complaint." Turner, 482 U.S. at 90-91, 107 S. Ct. at 2262. Stevens has not shown what if any alter- natives would fully accommodate his rights without sacrificing order, safety or security, creating significant logistical difficulties or straining resources. See id. at 91, 107 S. Ct. at 2262 (where inmate "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."). Therefore, consideration of this final factor does not alter this court's conclusion that the defendants' policies and practices are reasonably related to legitimate penological interests and do not violate Steven's free exercise rights.

24

3.    **Equal Protection**

Stevens argues, in support of his equal protection claim, that the defendants

discriminated against him on the basis of his religion when they "fail[ed] to provide the

same opportunities for group worship that are granted adherents of mainstream religions;

fail[ed] to provide ceremonial items and altar accoutrements that are substantially

identical to those that adherents of mainstream religions are provided; fail[ed] to provide

a chaplain trained in [Wicca] as are provided for adherents of mainstream religions; and

. . . fail[ed] to allow [Stevens] to engage in corporate worship as adherents of mainstream

religions are allowed."  (Pl.'s Opp. Mem. at 17).  However, the record does not support

his claim that the defendants treated the Wiccan group any differently than they treated

other religious groups at the Treatment Center.  Accordingly, this court recommends that

the defendants' motion for summary judgment be allowed with respect to the plaintiff's

equal protection claim.

### Standard of Review of Equal Protection Claims

"The Equal Protection Clause of the Fourteenth Amendment commands that no

State shall 'deny to any person within its jurisdiction the equal protection of the laws,'

which is essentially a direction that all persons similarly situated should be treated alike."

City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254,

87 L. Ed. 2d 313 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216, 102 S. Ct. 2382,

2394, 72 L. Ed. 2d 786 (1982)).  "The essence of the Equal Protection Clause is that

government should treat similarly situated persons alike."  Street v. Maloney, 991 F.2d

786, 1993 WL 125396, at *4 (1st Cir. Apr. 23, 1993) (unpub. op.). "Prison administrators confronted with an equal protection claim 'need only demonstrate a rational basis for their distinctions between organization groups.' Courts must defer to such differentiation unless it is clear that 'the two groups are so similar that discretion has been abused.' Thus, so long as the prison officials' response is shown to be rationally supported, an equal protection claim must fail." Id. (internal citations omitted).

To prevail on his equal protection claim, Stevens must first establish that he was subjected to disparate treatment. See Rasheed v. Comm'r of Corr., 446 Mass. 463, 478, 845 N.E.2d 296, 310 (2006). Since he has failed to make this showing, his equal protection claim fails.[10]

### Stevens' Claims of Unequal Treatment

Stevens argues that the defendants have failed to make reasonable efforts to accommodate his requests for additional meeting times, alternative meeting space, adequate worship supplies, and a Wiccan chaplain, despite having provided these benefits to more mainstream religious groups at the Treatment Center. (See Pl.'s Opp. Mem. at 16-18). Fundamentally, the record demonstrates that the Wiccan population, like the other religious groups at the Treatment Center, has been afforded various opportunities to

---

[10] In light of this conclusion, this court will not address whether discriminatory intent must be proved, or if there is evidence of such intent in the record. See Rasheed, 446 Mass. at 478, 845 N.E.2d at 310 (equal protection claims fail as a matter of law where record was not sufficient to establish that plaintiff "was subject to disparate treatment, or that any differences in his treatment were the result of a discriminatory intent").

engage in private religious practices and to participate in group religious activities. This conclusion is bolstered by the fact that there are many different means of practicing Wicca and many different items that may be used to engage in religious practices. (Pl.'s Ex. 1, Answer No. 4). Moreover, with respect to the specific policies and practices at issue, the evidence shows that the Wiccan group has suffered no disparate treatment.

As detailed above, the Wiccans meet as frequently as other groups without community volunteers and use the same rooms as the other religious groups. Similarly, although Stevens contends that he has been denied supplies for corporate worship that are "substantially identical" to items provided to other more "mainstream" groups, he has not identified such items or explained their significance. It is undisputed that a number of items have been provided for Wiccan group worship and Stevens has not presented any evidence that Wiccans were treated differently with respect to either the type or number of items permitted to be used in group worship.

With respect to the absence of a Wiccan chaplain, it is undisputed that the DOC has no chaplains available on its staff for numerous religious groups including, among others, Christian Scientists, Greek Orthodox, Hare Krishnas, Jehovah's Witnesses, Native Americans, and Rastafarians. (DF ¶ 6). Additionally, there are no paid chaplains for Jews, Native Americans or Buddhists at the Treatment Center, and the defendants' failure to provide a Wiccan chaplain has been due to their inability to locate a volunteer to come to the Treatment Center notwithstanding their reasonable efforts to do so. (DF ¶¶ 6, 12). The defendants have represented their intention to keep looking for volunteers and have

27

invited Stevens to participate in the search.  This court has no reason to doubt these

representations.  Thus, the record illustrates that the defendants' actions with respect to a

Wiccan chaplain are consistent with DOC regulations providing that personnel "make

reasonable efforts to insure that an accredited representative of an inmate's religious faith

is available to provide formal or informal services to inmates who so request," and

Stevens has not shown that he has suffered disparate treatment under this policy.  (See

Def.'s Ex. 3 § 471.09(2)).

Finally, Stevens argues that the defendants have treated him unconstitutionally by

applying the prohibition on inmate-led activities unequally to different religious groups.

(Pl.'s Opp. Mem. at 17).  Specifically, he claims that he has been barred from leading

Wiccan group activities, but that some Protestant group meetings are led by inmates.  (PF

¶ 24).  However, nothing in the schedule of Protestant services on which Stevens relies in

support of this claim indicates that inmates are assuming leadership positions or that a

leader is even necessary.  (See Pl.'s Supp. Ex. 8).  Therefore, Stevens has not presented

evidence to support his claim.

Because the plaintiff cannot demonstrate that he was treated differently than other

similarly situated inmates, his equal protection claims  must fail.  Accordingly, this court

recommends that the plaintiff's motion for summary judgment on the equal protection

claim be denied and that the defendants' motion for summary judgment on that claim be granted.[11]

C.    **Count II: Claims Under the Religious Land Use and Institutionalized Persons Act of 2000**

The parties have cross-moved for summary judgment on Stevens' claim, alleged in Count II of his Complaint, that the defendants' actions have imposed a substantial burden on his religious practice in violation of RLUIPA.  Stevens contends that the defendants violated his rights under the statute by withholding ceremonial and other items necessary for the conduct of Wiccan group worship, failing to provide adequate space for the Wiccan group to cast an appropriately sized circle, failing to provide a chaplain trained in his faith or to allow the plaintiff to lead group services, and failing to provide the Wiccan group with meeting times that coincide with the dates prescribed by the Wiccan religion for the celebration of ceremonies and Sabbats.  (Pl.'s Mem. (Docket No. 35) at 5; Pl.'s Opp. Mem. at 8-13).  As detailed below, this court finds that the defendants are entitled to summary judgment on the RLUIPA claim because the undisputed facts set forth in the record demonstrate that their actions did not impose a substantial burden on Stevens' religious exercise.

1.    **Burden of Proof Under RLUIPA**

_____

[11]  This court, having determined that the plaintiff cannot support his claims for violation of his constitutional rights, declines at this time to address the defendants' argument that they are entitled to qualified immunity.

Section 3 of RLUIPA, which protects the religious practices of institutionalized

persons, provides in relevant part:

> (a)  General rule
>
> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —
>
> (1)  is in furtherance of a compelling governmental interest; and
> (2)  is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The statute defines the term "government" to include any

official of "a State, county, municipality or other governmental entity created under the

authority of a State" as well as "any other person acting under color of State law."  Id.

§ 2000cc-5(4)(A).  In the instant case, the defendants are not disputing that they were

acting under color of State law at all relevant times.

To prevail on a claim under Section 3 of RLUIPA, the plaintiff must establish that

"the government practice complained of imposes a substantial burden on his religious

exercise."  Adkins v. Kaspar, 393 F.3d 559, 567 (5th Cir. 2004); see also 42 U.S.C.

§ 2000cc-2(b).  Once the plaintiff makes this showing, the burden shifts to the defendants

to demonstrate that their "burdensome practice is in furtherance of a compelling govern-

mental interest and is the least restrictive means of furthering that interest."  Adkins, 393

F.3d at 567 n. 32; see also 42 U.S.C. § 2000cc-2(b).  The statute defines "religious

exercise" to include "any exercise of religion, whether or not compelled by, or central to,

a system of religious belief." Id. § 2000cc-5(7)(A). For purposes of summary judgment, the defendants do not dispute that the group worship activities alleged by Stevens to have been burdened constitute "religious exercise" within the meaning of RLUIPA. At issue is whether the defendants' conduct substantially burdened those activities.

RLUIPA does not specifically define what is meant by a "substantial burden" and neither the Supreme Court nor the First Circuit has had occasion to interpret the term under the statute. See 42 U.S.C. § 2000cc-5 (defining terms); Farrow v. Stanley, No. Civ. 02-567-PB, 2005 WL 2671541, at *3 (D.N.H. Oct. 20, 2005). Moreover, the circuit courts that have addressed the question are in disagreement. Farrow, 2005 WL 2671541, at *3. For example, the Eighth Circuit has adopted a definition that requires the government action to significantly infringe upon a "central tenet" or "fundamental" aspect of the plaintiff's religious practice. See Murphy v. Missouri Dep't of Corr., 372 F.3d 979, 988 (8th Cir. 2004). At least five other circuits, however, have rejected this standard, and focused instead on the effect on the practitioner. These courts find that "a substantial burden on religious exercise occurs when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (internal quotation and citation omitted). See also id. (citing cases from the Fifth, Eleventh, Ninth and Seventh Circuits adopting similar standard).[12]

---

[12] This latter standard is similar to the standard used by the Supreme Court in cases addressing the Free Exercise Clause in the non-prisoner context. See Thomas v. Review Bd. of

This court finds this latter standard to be appropriate.  Since the statute defines religious exercise "as 'any exercise of religion, *whether or not compelled by, or central to*, a system of religious belief,'" this court should not focus on whether the allegedly burdened religious exercise was central to the plaintiff's religious belief.  See 42 U.S.C. § 2000cc-5(7)(A) (emphasis added).  Moreover, the Supreme Court has expressed "disapproval of any test that would require a court to divine the centrality of a religious belief."  Adkins, 393 F.3d at 570 & n.51, and cases cited.  See also Hernandez v. Comm'r, 490 U.S. 680, 699, 109 S. Ct. 2136, 2148, 104 L. Ed. 2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretation of those creeds.").  Therefore, this court will follow those courts which conclude that "the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs."  Adkins, 393 F.3d at 570.  Applying this standard, summary judgment should enter in favor of the defendants.

### 2.    Application of RLUIPA to the Record

Nothing in the record would support a finding that the defendants' acts or omissions placed substantial pressure on Stevens to modify his behavior and to violate his

_____

the Ind. Employment Sec. Div., 450 U.S. 707, 718, 101 S. Ct. 1425, 1432, 67 L. Ed. 2d 624 (1981).

religious beliefs.  With respect to Stevens' claim that the defendants have withheld items

that are needed for group worship and meditation, it is undisputed, as detailed more fully

above, that Wiccans at the Treatment Center have been able to engage in group activities

and proceed with their worship services even absent the additional materials they have

not received.  Moreover, the undisputed facts establish that Stevens, himself, has

practiced his religion in many ways over the years.  Stevens cannot establish that the

defendants' actions forced him to violate his religious beliefs or to depart significantly

from his religious traditions.

Similarly, the record does not establish that the defendants' refusal to provide the

Wiccan group with a larger meeting space has interfered with Stevens' religious

practices.  Stevens argues that the room on "B" corridor is insufficient to allow the

Wiccan group to cast a 9 foot circle of protection, while leaving room for the group

members to circumnavigate the circle without breaching its boundaries.  (Pl.'s Opp.

Mem. at 11).  Even assuming that the service requires a 9 foot circle, the evidence shows

that the "B" corridor room, which measures 16 feet, 9 inches by 10 feet, 4 inches, is big

enough to accommodate the circle.  Moreover, the "C" corridor room, which Stevens has

requested for Wiccan use, measures 16 feet, 6 inches by 11 feet, 6 inches, and is only

slightly larger.  (DF ¶¶ 7, 9).  While restricting the Wiccan group to the "B" corridor

room may make it more difficult for Stevens to engage in certain of his religious

traditions, nothing in the record indicates that the restriction has a "tendency to coerce

individuals into acting contrary to their religious beliefs[.]"  Lyng, 485 U.S. at 450, 108

S. Ct. at 1326.  Consequently, Stevens cannot establish that the defendants' refusal to

provide more space for Wiccan group worship places a substantial burden on the

plaintiff's religious exercise.

The defendants' failure to provide a Wiccan chaplain, combined with the DOC

policy precluding inmates from assuming positions of authority over other inmates,

supports a conclusion that the defendants' conduct has interfered with the Wiccan

group's ability to engage in religious services.  Nevertheless, the undisputed facts do not

support an inference that any such interference constitutes a substantial burden on the

plaintiff's religious exercise.  Not only do the Wiccans have the ability to engage in group

services absent a formal leader, there is no evidence that a formal leader is needed for

such group services.  Moreover, nothing in the record shows that formal group services

are a necessary part of Stevens' religious exercise.  On the contrary, the evidence shows

that there are many different ways to practice Wicca and that when the plaintiff lived on

Cape Cod in 1999, he only attended two or three Sabbat ceremonies and practiced his

religion by engaging in daily meditations and personal observance of Wiccan rituals.

(Def.'s Ex. 2, Attach. B at 55; Pl.'s Ex. 1, Answer No. 4; DF ¶ 13).  Accordingly, this

court cannot conclude that the absence of a chaplain or leader has forced Stevens to

modify his religious practice significantly or to violate his religious beliefs.  See Adkins,

393 F.3d at 571 (no substantial burden on religious exercise under RLUIPA based on

inmate's inability to congregate with other members of his faith to celebrate Sabbath and

holy days due to absence of outside volunteer).

34

Stevens' argument regarding the inadequacy of meeting times is also insufficient to withstand summary judgment in the defendants' favor.  It is undisputed that the Wiccan group is allowed to partake in Sabbat celebrations and that it is provided with cake and juice for those occasions.  (DF ¶ 14).  Even if, as Stevens contends, the meeting times for Wiccan group activities do not coincide with the prescribed dates for the celebration of Wiccan Sabbats and ceremonies, Stevens has not presented evidence describing why the inability to meet on those dates constitutes a significant departure from his religious practices.  Again, the evidence showing that Stevens attended only a few Sabbat ceremonies when he lived on Cape Cod and that there are various ways in which to practice Wicca belies Stevens' claim that the restrictions on meeting times substantially burden his religious exercise.

Based on the undisputed facts set forth in the record, this court concludes that the defendants' acts or omissions did not substantially burden the plaintiff's religious exercise within the meaning of RLUIPA.[13]  Accordingly, this court recommends that the defendants' motion for summary judgment be allowed with respect to Count II of the Complaint.

### D.    Stevens' Remaining Claims

---

[13]  Because Stevens is unable to establish that the defendants' conduct imposed a substantial burden on his religious exercise, this court declines at this time to address the parties' arguments regarding whether the defendants are able to demonstrate that the imposition of any such burden was in furtherance of a compelling governmental interest and used the least restrictive means of furthering that interest.

In Count VI of his Complaint, Stevens is seeking an injunction and a judgment, pursuant to 28 U.S.C. § 2201 and Mass. Gen. Laws ch. 231A, declaring that he is entitled to adequate space and equipment for the conduct and administration of religious programs, that he be entitled to equal access to such space, equipment and services as the Treatment Center ordinarily provides under the DOC regulations, and that "such equal access include, at minimum, sufficient time to engage in religious activities which include but are not limited to worship services, religious instruction, reading and study, religious discussion groups and pastoral counciling." (Compl. ¶ 81). The defendants have moved for summary judgment on these claims, as well as on Stevens' state law claims for violation of his state civil rights (Count I), for judicial review of the denials of his grievances pursuant to Mass. Gen. Laws ch. 30A (Count III), for violations of his right to the free exercise of religion pursuant to Mass. Gen. Laws ch. 127, § 88 (Count IV), and for judicial review and enforcement of his grievances pursuant to Mass. Gen. Laws ch. 127, § 38H (Count V). In light of this court's recommendation that the defendants be awarded summary judgment on Stevens' federal civil rights and RLUIPA claims, this court recommends that the defendants' motion for summary judgment be granted with respect to Stevens' claim in Count VI for a declaratory judgment and injunctive relief relating to his federal claims. Furthermore, because the dismissal of the plaintiff's federal claims will deprive the court of its original jurisdiction, this court recommends that the state law claims be dismissed pursuant to 28 U.S.C. § 1367(c).

36

## IV.  CONCLUSION

For all of the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the "Plaintiff's Motion for Summary Judgment" (Docket No. 34) be DENIED and that the "Defendants' Cross-Motion for Summary Judgment" (Docket No. 36) be ALLOWED with respect to Stevens' federal law claims as alleged in Counts I, II and VI.[14]

                              / s / Judith Gail Dein
                              Judith Gail Dein
                              United States Magistrate Judge

---

[14]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).